# EXHIBIT 2

# Exhibit A

TO ORDER COPIES OF ANY DOCUMENTS LISTED
BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 05/10/2023**

Today's Date: 5/10/2023
Source: Superior Court, Santa Clara COUNTY, CALIFORNIA

**DISCLAIMER**

This Data is provided for informational purposes only and it is not the official record.
For copies of the official record (of an incarceration, conviction or court filing record)
contact the source agency or court. In addition to any obligations under your Subscriber
Agreement, your use of this data may be governed by the Supplier Additional Terms (see
Footer).

**CASE INFORMATION**

| | |
|---|---|
| **Case Title:** | Stevenson, Et Al. v. Becker, Et Al. (Class Action) |
| **Court:** | Superior Court, Santa Clara COUNTY |
| **Case Number:** | 23CV413949 |
| **Case Type:** | Civil |
| **Case Subtype:** | Civil Limited And Unlimited Jurisdiction |
| **Description:** | Securities Litigation Unlimited (28) |
| **Date Filed:** | 04/10/2023 |
| **Location:** | Civil |
| **Case Status:** | Active |

**PARTICIPANT INFORMATION**

### Howard Tarlow

| | |
|---|---|
| **Type:** | Plaintiff |
| **Attorney:** | Adam E Polk |
| **Attorney Status:** | Lead Attorney |
| **Bar Number:** | 273000 |
| **Attorney:** | Daniel Charles Girard |
| **Bar Number:** | 114826 |
| **Attorney:** | Jordan S Elias |
| **Bar Number:** | 228731 |
| **Attorney:** | Namita Dhawan |
| **Bar Number:** | 326639 |

### Kim Stevenson

| | |
|---|---|
| **Type:** | Plaintiff |
| **Attorney:** | Daniel Charles Girard |
| **Bar Number:** | 114826 |
| **Attorney:** | Jordan S Elias |

| | |
|---|---|
| **Bar Number:** | 228731 |
| **Attorney:** | Adam E Polk |
| **Attorney Status:** | Lead Attorney |
| **Bar Number:** | 273000 |
| **Attorney:** | Namita Dhawan |
| **Bar Number:** | 326639 |

## Greg W. Becker

| | |
|---|---|
| **Type:** | Defendant |

## Daniel J. Beck

| | |
|---|---|
| **Type:** | Defendant |
| **Attorney:** | Kristopher Benjamin Kastens |
| **Bar Number:** | 254797 |
| **Attorney:** | Kristopher Benjamin Kastens |
| **Attorney Status:** | Lead Attorney |
| **Bar Number:** | 254797 |

## Roger F. Dunbar

| | |
|---|---|
| **Type:** | Defendant |

## Hon. Karen

| | |
|---|---|
| **Type:** | Defendant |

## Eric A. Benhamou

| | |
|---|---|
| **Type:** | Defendant |

## John S. Clendening

| | |
|---|---|
| **Type:** | Defendant |

## Richard D. Daniels

| | |
|---|---|
| **Type:** | Defendant |

## Alison Davis

**Type:** Defendant

## Joel L. Friedman

**Type:** Defendant

## Jeffrey N. Maggioncalda

**Type:** Defendant

## Beverly Kay Matthews

**Type:** Defendant

## Mary J. Miller

**Type:** Defendant

## Kate D. Mitchell

**Type:** Defendant

## John F. Robinson

**Type:** Defendant

## Garen K. Staglin

**Type:** Defendant

## Kpmg LLP

**Type:** Defendant
**Attorney:** Lisa R Bugni
**Attorney Status:** Lead Attorney

**Bar Number:**                         323962

---

## Superior Court Of California

---

**Type:**                                      Notice
**Attorney Status:**                  Lead Attorney
**Firm Name:**                          Superior Court Of Ca, County Of Santa Clara

### CALENDAR INFORMATION (1)

| Date/Time: | Description: | Location: | Judge: |
|---|---|---|---|
| 08/10/2023 2:30 PM | **Event:** Conference: Case Management | **Department:** Department 1 | |

### DOCKET PROCEEDINGS (32)

| Date: | Entry #: | Description: | Date Docketed: | Party: | |
|---|---|---|---|---|---|
| 05/04/2023 | | **Document Description:** Order Granting The Verified Applications For Admission Pro Hac Vice Of Jennifer S. Windom, Barry H. Berke, Darren A. Laverne, And Daniel M. Ketani - Signed By Judge Kulkarni. **Docket Entry:** Order | | Filed By: Daniel Beck | Send Runner to Court |
| 05/03/2023 | | **Document Description:** Verified Application Of Barry H. Berke To Appear As Counsel Pro Hac Vice **Docket Entry:** Application: Pro Hac Vice Renewal | | Filed By: Daniel Beck | Send Runner to Court |
| 05/03/2023 | | **Document Description:** Verified Application Of Daniel M. Ketani To Appear As Counsel Pro Hac Vice **Docket Entry:** Application: Pro Hac Vice Renewal | | Filed By: Daniel Beck | Send Runner to Court |
| 05/03/2023 | | **Document Description:** Verified Application Of Darren A. Laverne To Appear As Counsel Pro Hac Vice **Docket Entry:** Application: Pro Hac Vice Renewal | | Filed By: Daniel Beck | Send Runner to Court |
| 05/03/2023 | | **Document Description:** Verified Application Of Jennifer S. Windom To Appear As Counsel Pro Hac Vice **Docket Entry:** Application: Pro Hac Vice Renewal | | Filed By: Daniel Beck | Send Runner to Court |
| 05/03/2023 | | **Document Description:** Declaration Of Kristopher Kastens In Support Of The | | Filed By: Daniel Beck | Send Runner to Court |

|  |  |  |  |
|---|---|---|---|
|  | Verified Applications For Admission Pro Hac Vice Of Jennifer S. Windom, Barry H. Berke, Darren A. Laverne, And Daniel M. Ketani **Docket Entry:** Declaration: In Support |  |  |
| 05/03/2023 | **Document Description:** Notice Of Appearance Of Kristopher Kastens **Docket Entry:** Notice | Filed By: Daniel Beck | Send Runner to Court |
| 05/03/2023 | **Document Description:** Notice Of Verified Applications Of Jennifer S. Windom, Barry H. Berke, Darren A. Laverne, And Daniel M. Ketaini To Appear As Counsel Pro Hac Vice **Docket Entry:** Notice | Filed By: Daniel Beck | Send Runner to Court |
| 05/03/2023 | **Document Description:** Proof Of Service **Docket Entry:** Proof Of Service | Filed By: Daniel Beck | Send Runner to Court |
| 04/25/2023 | **Document Description:** Affidavit Of Service Of Civil Lawsuit Notice, And Order Deeming Case Complex **Docket Entry:** Affidavit | Filed By: Howard Tarlow, Kim Stevenson | Send Runner to Court |
| 04/25/2023 | **Document Description:** Unopposed Phv Application By Kevin J. O'Brien (Kpmg LLP) **Docket Entry:** Application: Pro Hac Vice | Filed By: Kpmg LLP | Send Runner to Court |
| 04/25/2023 | **Document Description:** Lisa Bugni Declaration Iso Unopposed Phv Application By Kevin J. O'Brien (Kpmg LLP) **Docket Entry:** Declaration: In Support | Filed By: Kpmg LLP | Send Runner to Court |
| 04/25/2023 | **Document Description:** Memo Of P&A Iso Unopposed Phv Application By Kevin J. O'Brien (Kpmg LLP) **Docket Entry:** Memorandum: Points And Authorities | Filed By: Kpmg LLP | Send Runner to Court |
| 04/25/2023 | **Document Description:** Notice Of Unopposed Phv Application By Kevin J. O'Brien (Kpmg LLP) **Docket Entry:** Notice | Filed By: Kpmg LLP | Send Runner to Court |
| 04/25/2023 | **Document Description:** Order Granting Unopposed Phv Application By Kevin J. O'Brien (Kpmg LLP) - | Filed By: Kpmg LLP | Send Runner to Court |

| | | | |
|---|---|---|---|
| | Signed/Srk. **Docket Entry:** Order | | |
| 04/25/2023 | **Document Description:** Proof Of Service **Docket Entry:** Proof Of Service | Filed By: Kpmg LLP | Send Runner to Court |
| 04/24/2023 | **Document Description:** Unopposed Phv Application By Richard T. Marooney (Kpmg LLP) **Docket Entry:** Application: Pro Hac Vice | Filed By: Kpmg LLP | Send Runner to Court |
| 04/24/2023 | **Document Description:** Lisa Bugni Declaration Iso Unopposed Phv Application By Richard T. Marooney (Kpmg LLP) **Docket Entry:** Declaration: In Support | Filed By: Kpmg LLP | Send Runner to Court |
| 04/24/2023 | **Document Description:** Memo Of P&A Iso Unopposed Phv Application By Richard T. Marooney (Kpmg LLP) **Docket Entry:** Memorandum: Points And Authorities | Filed By: Kpmg LLP | Send Runner to Court |
| 04/24/2023 | **Document Description:** Notice Of Unopposed Phv Application By Richard T. Marooney (Kpmg LLP) **Docket Entry:** Notice | Filed By: Kpmg LLP | Send Runner to Court |
| 04/24/2023 | **Document Description:** Order Granting Unopposed Phv Application By Richard T. Marooney (Kpmg LLP) - Signed/Srk. **Docket Entry:** Order | Filed By: Kpmg LLP | Send Runner to Court |
| 04/24/2023 | **Document Description:** Proof Of Service **Docket Entry:** Proof Of Service | Filed By: Kpmg LLP | Send Runner to Court |
| 04/20/2023 | **Document Description:** Notice Of Appearance By Atty Lisa Bugni (Kpmg LLP) + 1st App Fee + Complex Fee **Docket Entry:** Notice | Filed By: Kpmg LLP | Send Runner to Court |
| 04/18/2023 | **Document Description:** Corrected Civil Lawsuit Notice - 1st Cmc Set For 8/10/23 At 2:30pm In D1 **Docket Entry:** Civil Lawsuit Notice | | Send Runner to Court |
| 04/18/2023 | **Document Description:** Order Deeming Case Complex And Staying Discovery And Responsive Pleading Deadline - Signed/Srk. **Docket Entry:** | | Send Runner to Court |

|  | Order: Deeming Case Complex |  |  |
|---|---|---|---|
| 04/10/2023 | **Docket Entry:** Civil Case Cover Sheet | Filed By: Howard Tarlow, Kim Stevenson | Send Runner to Court |
| 04/10/2023 | **Docket Entry:** Civil Case Cover Sheet | Filed By: Howard Tarlow, Kim Stevenson | Send Runner to Court |
| 04/10/2023 | **Document Description:** *complex* Complaint For Violations Of The Securities Act Of 1933 **Docket Entry:** Complaint (Unlimited) (Fee Applies) | Filed By: Howard Tarlow, Kim Stevenson | Send Runner to Court |
| 04/10/2023 | **Document Description:** *complex* Complaint For Violations Of The Securities Act Of 1933 **Docket Entry:** Complaint (Unlimited) (Fee Applies) | Filed By: Howard Tarlow, Kim Stevenson | Send Runner to Court |
| 04/10/2023 | **Docket Entry:** New Filed Case |  | Send Runner to Court |
| 04/10/2023 | **Docket Entry:** Summons: Issued/Filed | Filed By: Howard Tarlow, Kim Stevenson | Send Runner to Court |
| 04/10/2023 | **Docket Entry:** Summons: Issued/Filed | Filed By: Howard Tarlow, Kim Stevenson | Send Runner to Court |

## TO ORDER COPIES OF ANY DOCUMENTS LISTED ABOVE, CALL WESTLAW COURTEXPRESS 1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

GREG W. BECKER, et al. (Additional Parties Attachment Form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Plaintiffs Kim Stevenson and Howard Tarlow

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

E-FILED
4/10/2023 6:43 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
23CV413949
Reviewed By: Y. Chavez
Envelope: 11670801

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Santa Clara County Superior Court<br><br>191 North First Street, San Jose, CA 95113 | **CASE NUMBER:**<br>*(Número del Caso):*  **23CV413949** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Adam E. Polk, Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, CA 94108

| DATE:<br>*(Fecha)* 4/10/2023 6:43 PM   Clerk of Court | Clerk, by<br>*(Secretario)* Y. Chavez | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUM-200(A)**

| SHORT TITLE:<br>Stevenson, et al v. Becker, et al. | CASE NUMBER: |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVIS, JOEL P. FRIEDMAN, JEFFREY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**<br>**Attachment to Summons**

# Exhibit C

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<div style="text-align:right">

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

E-FILED
4/10/2023 6:43 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
23CV413949
Reviewed By: Y. Chavez
Envelope: 11670801

</div>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

GREG W. BECKER, et al. (Additional Parties Attachment Form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Plaintiffs Kim Stevenson and Howard Tarlow

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Santa Clara County Superior Court<br><br>191 North First Street, San Jose, CA 95113 | CASE NUMBER:<br>*(Número del Caso):*   **23CV413949** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Adam E. Polk, Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, CA 94108

| DATE:<br>*(Fecha)* 4/10/2023 6:43 PM | Clerk of Court | Clerk, by<br>*(Secretario)* Y. Chavez | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |

**SUM-200(A)**

| SHORT TITLE:<br><br>Stevenson, et al v. Becker, et al. | CASE NUMBER: |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVIS, JOEL P. FRIEDMAN, JEFFREY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP

Page _____ of _____

**Page 1 of 1**

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

# Exhibit D

**ATTACHMENT CV-5012**

## CIVIL LAWSUIT NOTICE

*Superior Court of California, County of Santa Clara*
*191 North First St., San José, CA 95113*

**23CV413949**

CASE NUMBER: _____

<div align="center">

### ☐ PLEASE READ THIS ENTIRE FORM

</div>

*PLAINTIFF* (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint*, *Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

*DEFENDANT* (The person sued):  **You must do each of the following to protect your rights:**

1.  You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint*;
2.  You must serve by mail  a copy of your written response on the  Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3.  You must attend the first Case Management Conference.

   **Warning:  If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

*RULES AND FORMS:*  You must follow the California Rules of Court and the Superior Court of California, County of <_CountyName_> Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms:  www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms:  http://www.sccsuperiorcourt.org/civil/rule1toc.htm

*CASE MANAGEMENT CONFERENCE (CMC):*  You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

   ***You or your attorney must appear at the CMC.*** *You may ask to appear by telephone – see Local Civil Rule 8.*

Your Case Management Judge is: __Hon. Sunil R. Kulkarni__   **Department:** __1__

The 1st CMC is scheduled for: (Completed by Clerk of Court)

   **Date:** __08/10/23__  **Time:** __2:30pm__  in **Department:** __1__

The next CMC is scheduled for: (Completed by party if the 1st CMC was continued or has passed)

   **Date:** _____  **Time:** _____  in **Department:** _____

---

*ALTERNATIVE DISPUTE RESOLUTION (ADR):*  If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

*WARNING:* Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

<div align="right">

**Reset Form**

</div>

---

# Exhibit E

E-FILED
4/10/2023 6:43 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
23CV413949
Reviewed By: Y. Chavez

Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
Jordan Elias (SBN 228731)
jelias@girardsharp.com
Namita Dhawan (SBN 326639)
ndhawan@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846

*Attorneys for Plaintiffs and the Proposed Class*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| KIM STEVENSON and HOWARD TARLOW, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GREG W. BECKER, DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVIS, JOEL P. FRIEDMAN, JEFFREY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP,<br><br>Defendants. | Case No.  23CV413949<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs, individually and on behalf of a class of all other similarly situated investors, allege the following based upon personal knowledge as to Plaintiffs and their own acts, and otherwise based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by SVB Financial Group (the "Company" or "SVB") and Boston Private Bank & Trust Company ("Boston Private"), as well as media, testimony, and analyst reports concerning the Company and its public statements. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein.

## **SUMMARY OF THE ACTION**

1.      This is a securities class action on behalf of all persons who acquired SVB common stock pursuant to the S-4 registration statement, 424B3 prospectus (collectively, with materials incorporated by reference therein, the "Offering Materials") issued in connection with the July 2021 transaction through which SVB acquired and merged with Boston Private (the "Merger"). Plaintiffs assert strict liability claims for relief under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act") against certain SVB directors and officers and against KPMG, LLP ("KPMG"), SVB's independent auditor.

2.      At the time of the Merger, SVB operated as a financial services company, a bank holding company, and a financial holding company, offering banking and financial products and services to domestic and international clients. It offered its banking services through its primary subsidiary, Silicon Valley Bank, which operated as a California state-chartered bank.

3.      Under the Merger, each share of Boston Private stock was converted into the right to receive $2.10 in cash and 0.0228 shares of SVB common stock. Through this cash-and-stock exchange, in connection with the Merger, Defendants solicited and sold to former Boston Private shareholders approximately 1.9 million shares of SVB common stock. All of these new shares of SVB common stock were registered, issued, and solicited pursuant to the Offering Materials.

4.      The Offering Materials contained untrue statements of material fact and materially incomplete statements, and omitted material facts that were both required by governing regulations and necessary to make the statements not misleading. Leading up to the Merger, in an environment

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

of historically low interest rates, SVB concentrated a substantial portion of its investment portfolio to longer-term, fixed-rate securities. In doing so, because a rise in interest rates reduces the market value of fixed-rate securities, SVB exposed itself to significant interest rate risk that was not disclosed in the Offering Materials.

5.      As shown in greater detail below, the Offering Materials were rife with materially false and misleading statements and omissions as to the significant, undisclosed market risks, including severe interest rate risk, uninsured depositor risk and liquidity risk, that SVB faced.  Among other matters, the Offering Materials failed to disclose that:

(a)      Higher interest rates were already jeopardizing the bank's financial future, and worse, instead of mitigating such risks, SVB exacerbated them by, among other things, overconcentrating its investments in long-term investments to deliver short-term profits;

(b)      As more deposits flowed in, SVB's executives had disregarded internal assessments, including recommendations to purchase shorter-term bonds and implement other strategies to mitigate the risks to SVB's portfolio of a rise in interest rates, and instead continued investing in long-term bonds in order to drive short-term profits;

(c)      SVB had ignored internal risk management alarms, had failed to reasonably address and comply with key risk metrics, and had altered assumptions underlying internal models that showed higher interest rates would sharply reduce the value of SVB's investment portfolio, using unreasonable and improper adjustments to those models to mask the undisclosed risks and facilitate SVB's strategy of prioritizing short-term profits over sound investment strategy;

(d)      SVB lacked effective internal controls, had deficient risk management systems, its holding Company had been rated as deficient under the CAMELS (acronym for Capital adequacy, Assets, Management capability, Earnings, Liquidity, Sensitivity) rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was already facing various operational and technological problems, impairing the Company's ability to track risks, including interest rate risks, among other matters;

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

(e)     SVB lacked a diversified customer base, and was over-reliant on large depositors whose accounts exceeded the $250,000 Federal Deposit Insurance Corporation maximum, making SVB particularly vulnerable to a bank run if doubts arose as to its solvency; and

(f)     SVB's liquidity was less than disclosed by Defendants and, in truth, inadequate in view of its customers' business and their collective deposits.

6.     Moreover, with respect to interest rate risk, SVB failed to disclose the foreseeable risk that an increase in interest rates would impair the value of its long term fixed rate investment portfolio, creating catastrophic risks to SVB's balance sheet.  The Offering Materials' risk factor disclosures were materially incomplete and misleading, framing potential interest rate increases as an entirely *positive* development for SVB, without disclosing the risks of an increase in interest rates to SVB's investment portfolio. According to the Offering Materials, such increases would increase its interest rate spread, allowing SVB to charge more for its loans and buy higher yielding securities at a rate that would outpace the increased interest it would be obligated to pay on its customer deposits. But that same risk factor disclosure omitted that higher rates would reduce the market value of SVB's marketable securities, resulting in material unrealized losses from their decline in market value and realized losses if they had to be liquidated.

7.     On March 9, 2023, the Company announced in a mid-quarter update that it had sold "substantially all of our Available for Sale (AFS) securities portfolio" resulting in an estimated realized post-tax loss of $1.8 billion. SVB's stock plummeted more than 60% the next day.

8.     Since March 8, 2023, the stock has lost substantially all of its value. SVB terminated its previously announced equity offerings; Silicon Valley Bank was shut down by the California Department of Financial Protection and Innovation; and on March 17, 2023, SVB announced it had filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

9.     The Federal Reserve System has since undertaken a review of the SVB failure. According to prepared testimony given by Michael Barr, the Fed's Vice Chair for Supervision, to the Senate Committee on Banking, Housing, and Urban Affairs, "[t]he picture that has emerged thus far shows SVB had inadequate risk management and internal controls . . . ." In fact, as reported in

the *New York Times*, at around the time of the Merger the Fed alerted SVB that it "was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble." And the *Washington Post* reported in April 2023 that an internal model at SVB "showed that higher interest rates could have a devastating impact on the bank's future earnings" but that, "[i]nstead of heeding that warning—and over the concerns of some staffers—SVB executives simply changed the model's assumptions . . . ."

10.     Plaintiffs Kim Stevenson and Howard Tarlow owned Boston Private stock before the Merger and acquired SVB stock pursuant to the Offering Materials in the Merger.  Plaintiffs assert causes of action under §§ 11, 12, and 15 of the Securities Act against Defendants: the directors and officers who signed the Offering Materials, and KPMG, SVB's independent auditor.

**JURISDICTION AND VENUE**

11.     This Court has original subject matter jurisdiction under the California Constitution, Article VI, Section 10.  Removal is barred by Section 22 of the 1933 Act.

12.     This Court has personal jurisdiction and venue is proper under California Code of Civil Procedure § 410.10. Certain Defendants and their agents reside in California. Further, certain Defendants drafted and signed the Offering Materials, and controlled SVB's operations, within California and this county. KPMG signed the "Consent of Independent Registered Public Accounting Firm" authorizing use of its reports concerning SVB's consolidated balance sheets, and vouched for the effectiveness of internal controls over financial reporting in the Offering Materials and the "Report of Independent Registered Public Accounting Firm," in California. Certain Defendants and their agents also affirmatively solicited the subject securities and disseminated the false and misleading statements and omissions to investors in California and this county. Individually and collectively, these contacts with California are substantially connected to the claims set forth in this complaint.

13.     This Court is a proper venue under California Code of Civil Procedure § 395.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

**PARTIES**

14.     Plaintiff Kim Stevenson is a citizen and resident of Woolford, Maryland. Ms. Stevenson acquired SVB common stock via the Merger, in exchange for Boston Private shares, pursuant to the Offering Materials and was damaged thereby.

15.     Plaintiff Howard Tarlow is a citizen and resident of Lexington, Massachusetts. Mr. Tarlow acquired SVB common stock via the Merger, in exchange for Boston Private shares, pursuant to the Offering Materials and was damaged thereby.

16.     Defendant Greg W. Becker was, at all relevant times, President, Chief Executive Officer, and a Director of SVB. Defendant Becker reviewed, contributed to, and signed the Offering Materials.

17.     Defendant Daniel J. Beck was, at all relevant times, the Chief Financial Officer of SVB. Defendant Beck reviewed, contributed to, and signed the Offering Materials.

18.     Defendant Roger F. Dunbar was, at all relevant times Chairman of the Board of Directors of SVB. Defendant Dunbar was the chairperson of the Risk Committee at the time of the Merger. Defendant Dunbar reviewed, contributed to, and signed the Offering Materials.

19.     Defendant Karen Hon was, at all relevant times, the Chief Accounting Officer of SVB. Defendant Hon reviewed, contributed to, and signed the Offering Materials.

20.     Defendant Eric A. Benhamou was, at all relevant times, a Director of SVB. Defendant Benhamou was a member of the Risk Committee at the time of the Merger. Defendant Benhamou reviewed, contributed to, and signed the Offering Materials.

21.     Defendant John S. Clendening was, at all relevant times, a Director of SVB. Defendant Clendening reviewed, contributed to, and signed the Offering Materials.

22.     Defendant Richard D. Daniels was, at all relevant times, a Director of SVB. Defendant Daniels reviewed, contributed to, and signed the Offering Materials.

23.     Defendant Allison Davis was, at all relevant times, a Director of SVB. Defendant Davis reviewed, contributed to, and signed the Offering Materials.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

24.     Defendant Joel L. Friedman was, at all relevant times, a Director of SVB. Defendant Friedman was a member of the Risk Committee at the time of the Merger. Defendant Friedman reviewed, contributed to, and signed the Offering Materials.

25.     Defendant Jeffrey N. Maggioncalda was, at all relevant times, a Director of SVB. Defendant Maggioncalda reviewed, contributed to, and signed the Offering Materials.

26.     Defendant Beverly Kay Matthews was, at all relevant times, a Director of SVB. Defendant Matthews reviewed, contributed to, and signed the Offering Materials.

27.     Defendant Mary J. Miller was, at all relevant times, a Director of SVB. Defendant Miller was a member of the Risk Committee at the time of the Merger. Defendant Miller reviewed, contributed to, and signed the Offering Materials.

28.     Defendant Kate D. Mitchell was, at all relevant times, a Director of SVB. Defendant Mitchell was a member of the Risk Committee at the time of the Merger. Defendant Mitchell reviewed, contributed to, and signed the Offering Materials.

29.     Defendant John F. Robinson was, at all relevant times, a Director of SVB. Defendant Robinson was a member of the Risk Committee at the time of the Merger. Defendant Robinson reviewed, contributed to, and signed the Offering Materials.

30.     Defendant Garen K. Staglin was, at all relevant times, a Director of SVB. Defendant Staglin was a member of the Risk Committee at the time of the Merger. Defendant Staglin reviewed, contributed to, and signed the Offering Materials.

31.     The Defendants named in ¶¶ 16-30 are referred to herein as the "Individual Defendants."  Each of them signed and/or was identified as an incoming officer or director in the Offering Materials, solicited the securities issued pursuant thereto, and planned and contributed to the Merger and Offering Materials.

32.     Defendant KPMG LLP ("KPMG") is a New York Registered Foreign Limited Liability Partnership headquartered in New York, New York.  KPMG was the auditor for SVB from 1994 to 2023, including for the calendar year ended December 31, 2020.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

# FACTUAL BACKGROUND

## Relevant Banking Background

33.     A commercial bank is licensed to accept deposits and originate loans. Banks contract with customers to repay to the customer the amount deposited, with any interest provided for under the deposit agreement, upon the customer's demand.  For this reason, banks account for deposits as balance sheet liabilities.

34.     Commercial banks seek to profit from the funds on deposit by originating commercial loans. Banks require cash to fund operations and meet customer requests for cash withdrawals. Banks may also accumulate cash if the flow of deposits exceeds available lending opportunities.  To promote sound banking practice, regulations limit the types of investments banks are permitted to make with customer deposits. Banks account for commercial loans and investment securities as balance sheet assets.  Banks seek to profit on the difference between the interest that its assets earn and the interest that it must pay on its liabilities. This difference is called the "interest rate spread."

35.     Low interest rates generally correspond to a low interest rate spread. And because a bank makes its profit off the interest rate spread, low interest rates can result in lower bank profits than a higher interest rate environment.

36.     The securities that banks purchase generally fall into two categories: (1) "available-for-sale," or "AFS," and (2) "hold-to-maturity," or "HTM." AFS securities are those that might be sold to raise revenue, so their book value—their value on a balance sheet—is adjusted periodically to reflect changes in their market value, such as due to interest rate fluctuations. HTM securities are intended to be held to maturity, so their book value is kept fixed throughout their life. Selling HTM securities prior to their date of maturity results in the portfolio being immediately "marked to market" (valued at current market value versus value at maturity). Sales at a loss of a bank's investment securities reduce stockholder's equity.  If the loss is sufficient, the bank may need to raise new capital to avoid insolvency.

## SVB's Origins and Development to 2021

37.     SVB was founded in Santa Clara County in 1983 and has been headquartered in the same county ever since. Until its bankruptcy, SVB (through its primary subsidiary, Silicon Valley

- 7 -

Bank) specialized in accepting deposits from and lending to startup companies, particularly ones based in the Silicon Valley region of the San Francisco Bay Area.

38.     Throughout the 2010s, interest rates were low by historical standards, resulting in lower-than-desired profits at SVB. The concerns about profitability became more acute by the late 2010s, as SVB's assets approached $50 billion. The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 subjected all bank holding companies with $50 billion or more in assets to enhanced regulation due to their presumed systemic importance.

39.     In 2017, there was a change in leadership within SVB's key finance functions, and in 2018, the new financial leadership at SVB sought greater returns on the bank's assets. To that end, SVB shifted a greater portion of its investment portfolio from short-term bonds to long-term bonds. The latter pay higher interest rates but require a longer-term capital commitment by the bank.

40.     From the fourth quarter of 2019 through 2021, in part because the COVID-19 pandemic led to an increase in the use of the Internet for most activities and the federal government injected money into the economy to prevent a recession, SVB experienced massive growth in deposits. In 2018, SVB's deposits were just under $50 billion. In 2020, its deposits had grown to $102 billion. By 2021, its deposits were approaching $190 billion.

41.     More deposits came in than SVB could lend out. Loans to startups were a relatively small part of SVB's business in the early 2020s, both because startups were primarily funded through equity investments and because the typical startup lacked sufficient creditworthiness. SVB made home loans and performed other kinds of business lending, such as vineyard finance, but in accordance with the strategy it had adopted a few years earlier, much of the inflow of deposits to SVB in 2020 and 2021 went to purchasing long-term securities, such as U.S. Treasury bonds.

42.     SVB classified its investments as HTM securities (as opposed to AFS securities) for regulatory and accounting purposes. (*See supra* ¶ 36.)

43.     As a consequence of these developments, SVB's balance sheet in 2021 had the following essential characteristics:

- First, SVB's liabilities consisted primarily of recent deposits, often from startups and/or venture capital firms. These deposits brought significant risk. Venture capital

firms invest in startups to earn returns, but as interest rates rise, safer alternatives to investing in startups become more viable by paying a higher return. When interest rates rise, therefore, fewer startups receive funding, startups have less cash to deposit in a bank, and some may need to withdraw funds.

- Second, a substantial proportion of SVB's assets were long-term U.S. Treasury notes and bonds and other government-affiliated debt securities.

44.     U.S. Treasury notes and bonds are sometimes described as "safe" investments. But, while U.S. Treasury bonds are safe from *credit* risk (*i.e.*, the U.S. Treasury has never failed to repay creditors), all fixed-interest bonds are subject to significant interest rate risk. A U.S. Treasury bond or note provides payments at a fixed interest rate for a set number of years, but when interest rates rise, a bond at the older, lower rate *loses* value because investors can buy bonds at a new, higher rate.

45.     Long-term bonds pose additional risks. By definition, the holder must commit capital for a longer period. Hence, if there is an unexpected need for liquidity, bonds must be sold. If interest rates have risen, bonds must be sold at a loss.

46.     In the 2010s, interest rates had been low for years. The Federal Funds Rate, a key benchmark, dropped close to zero during the financial crisis in 2007 and 2008, and remained close to zero thereafter, except for a few small increases between 2017 and 2020, which were quickly reversed.

47.     By early 2021, market conditions had changed enough that SVB's exposure to rising interest rates was no longer a potential future risk: It presented a near-term crisis. Typically, the Federal Reserve raises interest rates to fight inflation. Accordingly, by early 2021, with interest rates at near historic lows, and increasing risks of inflation, a rise in interest rates was increasingly foreseeable.[1] Before 2022, interest rates were historically low: from the end of 2008 to early 2022, rates were lower than they had ever been in any previous time period of comparable length.

---

[1] The Federal Reserve announced seven rate increases in 2022, beginning in March, amounting to a total of four percentage points. Another rate hike followed in early 2023.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Historically, though, the Federal Reserve has lowered ***and raised*** interest rates to respond to macroeconomic conditions. Near-zero rates could not persist indefinitely.

## DEFENDANTS' FALSE AND MISLEADING OFFERING MATERIALS

48.   On January 4, 2021, SVB announced that it had entered into a definitive merger agreement pursuant to which it would acquire Boston Private Bank & Trust Company. Under the terms of the merger agreement, Boston Private shareholders would receive 0.0228 shares of SVB common stock and $2.10 of cash for each Boston Private share they owned.

### The Offering Materials

49.   On February 11, 2021, SVB filed with the SEC on Form S-4 a draft registration statement to register the SVB shares to be issued and exchanged in the Merger under the federal securities laws.

50.   On March 16, 2021, SVB filed with the SEC a final amendment to the registration statement. As amended, the registration statement incorporated by reference previous SVB SEC filings, namely:

- Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed with the SEC on March 1, 2021;

- Definitive Proxy Statement on Schedule 14A for the 2021 annual meeting of stockholders, filed with the SEC on March 4, 2021;

- Current Reports on Form 8-K filed with the SEC on January 4, 2021, January 8, 2021, January 21, 2021 (only with respect to Item 8.01) and February 2, 2021; and

- Description of SVB common stock, par value $0.001 per share, contained in the registration statement on Form 8-A filed with the SEC on April 23, 1987, including any amendment or report filed for the purposes of updating such description.

51.   The SEC declared the amended registration statement effective on March 17, 2021.

52.   On March 18, 2021, SVB filed a prospectus on Form 424B3 for the SVB shares issued and exchanged in the Merger.

53.   On July 1, 2021, the Merger closed. On that date, Boston Private shareholders received 0.0228 shares of SVB common stock and $2.10 of cash for each Boston Private share they

owned. The final closing price of Boston Private stock was $14.75. Before then, Boston Private shareholders could sell their shares on the open market if they did not want to receive SVB stock in the Merger.

### The Offering Materials' False and Misleading Statements and Omissions Regarding Interest Rate and Deposit Risk

54.     The Offering Materials contained untrue statements of material fact and omitted material facts that were both required by governing regulations and necessary to make the statements made not misleading.

55.     The Offering Materials failed to disclose that SVB faced significant interest rate risk, including on both the asset and liability sides of its balance sheet from its concentrations of long-term, fixed-rate, government-backed debt securities.  On the asset side of SVB's balance sheet, higher interest rates risked decreasing the value of SVB's long-term debt securities. On the liability side, higher interest rates meant increased risk that investors would allocate less capital to venture capital investments, which would serve to reduce SVB's deposits.

56.     The Offering Materials failed to disclose the interest rate risk associated with SVB's deposit base and longer-term fixed income securities, including the risk that if interest rates increased significantly, SVB would need to sell its longer term assets at market in a higher interest rate environment, such that SVB would realize losses on its investment portfolio. As detailed below, this relationship between the interest rate risk in SVB's deposits and its assets—which was an existing material risk by early 2021—materialized in March 2023 and precipitated the bank run that caused SVB's collapse.

57.     The Risk Factors section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, failed to disclose the grave interest rate risk that SVB faced.

58.     The Risk Factors section stated the following:

**Our interest rate spread has declined, and may continue to decline in the future. Any material reduction in our interest rate spread could have a material adverse effect on our business, results of operations or financial condition.[2]**

---

[2] Bolding in original.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

A significant portion of our net income comes from our interest rate spread, which is the difference between the interest rates paid by us on interest-bearing liabilities, such as deposits and internal borrowings, and the interest rates and fees we receive on our interest-earning assets, such as loans extended to our clients, securities held in our investment portfolio and excess cash held to manage short-term liquidity. Our interest rate spread can be affected by the mix of loans, investment securities, deposits and other liabilities on our balance sheet, as well as a variety of external factors beyond our control that affect interest rate levels, such as competition, inflation, recession, global economic disruptions, unemployment and the fiscal and monetary policies of various governmental bodies. For example, changes in key variable market interest rates, such as the Federal Funds, National Prime ("Prime"), LIBOR or Treasury rates, generally impact our interest rate spread. While changes in interest rates do not generally produce equivalent changes in the revenues earned from our interest-earning assets and the expenses associated with our interest-bearing liabilities, increases in market interest rates are nevertheless *likely to cause our interest rate spread to increase. Conversely, if interest rates decline, our interest rate spread will likely decline. In the first quarter of 2020, the Federal Reserve lowered the target Federal Funds rate to between zero and 0.25%, which contributed to the decline of our interest rate spread, and also led to a decrease in the rates and yields on U.S. Treasury securities. If interest rates do not rise, or if the Federal Reserve lowers the target Federal Funds rate to below 0%, these low rates could continue to constrain our interest rate spread and may adversely affect our business forecasts*. On the other hand, increases in interest rates may result in a change in the mix of non-interest and interest-bearing accounts, and the level of off-balance sheet market-based investment preferred by our clients, which may also impact our interest rate spread.

(emphasis added).

59.     This paragraph incorporated into the Offering Materials was materially misleading because, among other matters, it portrays an increase in interest rates as "likely to cause [SVB's] interest rate spread to increase," which would increase the Company's net income from the spread. In other words, SVB could charge more for its loans and buy higher yielding securities. This statement was materially incomplete because SVB failed to disclose that an increase in interest rates also would sharply reduce the value of SVB's long-term debt securities and create the added risk of a sharp reduction in deposits as investors allocated less capital to venture capital investments.

60.     SVB's omissions regarding its interest rate risk rendered the Offering Materials false and misleading. Specifically, the Offering Materials failed to disclose the substantial risk that higher interest rates posed to SVB, including that higher interest rates would lower the market value of SVB's long-term debt securities, resulting in material unrealized losses from their declining market

value and realized losses if the securities were liquidated. Instead of informing investors of this risk, the Offering Materials presented future rate increases as a purely positive development for SVB.

61.     In late 2020, as SVB's deposits increased, Company executives rejected an internal recommendation to purchase shorter-term bonds to reduce the risk of material losses from interest rate increases.  As Bloomberg reported on March 13, 2023:

> In late 2020, the firm's asset-liability committee received an internal recommendation to buy shorter-term bonds as more deposits flowed in, according to documents viewed by Bloomberg. That shift would reduce the risk of sizable losses if interest rates quickly rose. But it would have a cost: an estimated $18 million reduction in earnings, with a $36 million hit going forward from there.
>
> Executives balked. Instead, the company continued to plow cash into higher-yielding assets. That helped profit jump 52% to a record in 2021 and helped the firm's valuation soar past $40 billion. But as rates soared in 2022, the firm racked up more than $16 billion of unrealized losses on its bond holdings.
>
> Throughout last year, some employees pleaded to reposition the company's balance sheet into shorter duration bonds. The asks were repeatedly rejected, according to a person familiar with the conversations. The firm did start to put on some hedges and sell assets late last year, but the moves proved too late.[3]

62.     Nor did the Offering Materials disclose that, to drive short-term profits, the Company ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that (correctly) showed that higher interest rates could force SVB into realizing devastating losses.  As reported by the Washington Post in an article titled, "*Silicon Valley Bank's risk model flashed red. So its executives changed it*":

> Flush with cash from a booming tech industry, ***Silicon Valley Bank executives embarked on a strategy in 2020 to juice profits that quickly triggered an internal alarm. In buying longer-term investments that paid more interest, SVB had fallen out of compliance with a key risk metric. An internal model showed that higher interest rates could have a devastating impact on the bank's future earnings, according to two former employees familiar with the modeling who spoke on the condition of anonymity to describe confidential deliberations.***
>
> ***Instead of heeding that warning — and over the concerns of some staffers — SVB executives simply changed the model's assumptions, according to the former***

---

[3]https://www.bloomberg.com/news/articles/2023-03-13/svb-failure-sparks-blame-game-over-trump-era-regulatory-rollback#xj4y7vzkg.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*employees and securities filings.* The tweaks, which have not been previously reported, initially predicted that rising interest rates would have minimal impact.

The new assumptions validated SVB's profit-driven strategy, but they were profoundly misplaced. Over the past year, interest rates have climbed nearly five percentage points, the fastest pace since the 1980s. Meanwhile, the tech industry has entered a post-pandemic swoon, causing SVB's elite clientele to withdraw cash far faster than bank executives had expected.

On March 8, the bank was forced to raise additional cash by selling securities at a $1.8 billion loss. That touched off panic among SVB clients, who staged one of the biggest bank runs in U.S. history. Fanned by social media, depositors tried to withdraw $42 billion in a single day. The next morning, the bank collapsed and federal regulators took control.

***The episode shows that executives knew early on that higher interest rates could jeopardize the bank's future earnings. Instead of shifting course to mitigate that risk, they doubled down on a strategy to deliver near-term profits, displaying an appetite for risk that set the stage for SVB's stunning meltdown.***

\*     \*     \*

"They thought they could never go wrong," said a former bank official who spoke on the condition of anonymity to discuss internal business practices, recalling an internal stress test in late 2018 or 2019 that showed SVB could lose at least a third of its deposits over two years. Executives directed that that model also be reworked. "If they see a model they don't like," the official said, "they scrap it."

Kate Mitchell, a venture capitalist and chair of the SVB board's risk committee, didn't respond to a request for comment.

The behavior of customers depositing money is a key variable that banks use in developing risk models. One metric, closely tracked by banks and their examiners, estimates future cash flows and how sensitive they are to changes in interest rates. It was this metric, called the economic value of equity, that triggered a warning in mid-2020, according to the former employees.[4]

63.     The Offering Materials failed to disclose the risks from SVB's comparatively narrow and impulsive base of clients which rendered SVB's deposit base particularly at risk.  As Bloomberg reported on April 1, 2023: "There's all these venture-capital funded companies that have $5, $10, $20, $25, sometimes hundreds of millions of dollars parked with this little bank," he said. "And you

---

[4] "Silicon Valley Bank's risk model flashed red. So its executives changed it," *Washington Post* (Apr. 2, 2023), https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

can move money with the click of a mouse now. And then they're all talking to one another. So in retrospect, it's like yeah, should have seen that one coming more easily."[5]

64.    The Offering Materials failed to disclose that the deposit risk the Company faced because it lacked a diversified customer base was amplified by the large percentage of uninsured deposits at SVB.[6]

65.    Because depositors with uninsured deposits are exposed to the danger that they will lose their deposit if a bank fails, they are much more likely to withdraw their money if the bank reports adverse financial results, triggering a self-fulfilling cycle in which customers withdraw cash, forcing the bank into a fire sale of assets that further drives down their value.  The Offering Materials did not disclose the uninsured depositor risk that SVB faced.

66.    Further, there are several additional false, misleading, and incomplete disclosures in the Offering Materials. As set forth more fully below, none of the statements discloses SVB's failure to mitigate its interest rate and deposit risk, including through ignoring internal recommendations and alarms.

67.    The Risk Factors section of SVB's 2020 10-K stated:

**Liquidity risk could impair our ability to fund operations and jeopardize our financial condition.[7]**

Liquidity is essential to our business, both at the SVB Financial and the Bank level. We require sufficient liquidity to meet our expected financial obligations, as well as unexpected requirements stemming from client activity and market changes, such as the unexpected cash outflows that occurred at the onset of the COVID-19 pandemic when certain clients increased utilization of their credit lines. . . . ***The primary source of liquidity for the Bank is client deposits***. When needed, our liquidity is supplemented by wholesale borrowing capacity in the form of short- and long-term borrowings secured by our portfolio of high-quality investment securities, long-term capital market debt issuances and unsecured overnight funding channels available to us in the Federal Funds market. An inability to maintain or raise funds through these

---

[5] https://www.bloomberg.com/news/articles/2023-04-01/svb-s-fall-stunned-even-the-one-stock-analyst-who-said-to-sell.

[6] While the Federal Deposit Insurance Corporation (FDIC) insures bank deposits up to $250,000, the great majority of deposits in SVB (by value) were above $250,000.

[7] Bolding in original.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

sources could have a substantial negative effect, individually or collectively, on SVB Financial and the Bank's liquidity. Our access to funding sources in amounts adequate to finance our activities, or on terms attractive to us, could be impaired by factors that affect us specifically or the financial services industry in general. For example, *factors that could detrimentally impact our access to liquidity sources include a decrease in the level of our business activity due to a market downturn or adverse regulatory action against us, a downturn in asset markets such that the collateral we hold cannot be realized or is liquidated at prices not sufficient to recover the full amount of our secured obligations, a reduction in our credit rating, any damage to our reputation or any other decrease in depositor or investor confidence in our creditworthiness and business. Our access to liquidity could also be impaired by factors that are not specific to us, such as laws and regulations that limit the amount of intercompany dividends that bank subsidiaries may pay, severe volatility or disruption of the financial markets or negative views and expectations about prospects for the financial services industry as a whole.* Any such event or failure to manage our liquidity effectively could affect our competitive position, increase our borrowing costs and the interest rates we pay on deposits, limit our access to the capital markets and have a material adverse effect on our financial condition.

(emphasis added).

68.     The MD&A section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, stated:

Net gains on investment securities include gains and losses from our non-marketable and other equity securities, which include public equity securities held as a result of exercised equity warrant assets, as well as gains and losses from sales of our AFS debt securities portfolio, when applicable.

Our non-marketable and other equity securities portfolio primarily represents investments in venture capital and private equity funds, including a joint venture bank in China, debt funds, the newly acquired managed credit platform, private and public portfolio companies and qualified affordable housing projects. We experience variability in the performance of our non-marketable and other equity securities from period to period, which results in net gains or losses on investment securities (both realized and unrealized). This variability is due to a number of factors, including unrealized changes in the values of our investments, changes in the amount of realized gains and losses from distributions, changes in liquidity events and general economic and market conditions. Unrealized gains or losses from non-marketable and other equity securities for any single period are typically driven by valuation changes, and are therefore subject to potential increases or decreases in future periods. Such variability may lead to volatility in the gains or losses from investment securities. As such, our results for a particular period are not necessarily indicative of our expected performance in a future period.

The extent to which any unrealized gains or losses will become realized is subject to a variety of factors, including, among other things, the expiration of certain sales

restrictions to which these equity securities may be subject to (e.g. lock-up agreements), changes in prevailing market prices, market conditions, the actual sales or distributions of securities and the timing of such actual sales or distributions, which, to the extent such securities are managed by our managed funds, are subject to our funds' separate discretionary sales/distributions and governance processes.

Our AFS securities portfolio is a fixed income investment portfolio that is managed with the objective of earning an appropriate portfolio yield over the long-term while maintaining sufficient liquidity and credit diversification as well as addressing our asset/liability management objectives. ***Though infrequent, sales of debt securities in our AFS securities portfolio may result in net gains or losses and are conducted pursuant to the guidelines of our investment policy related to the management of our liquidity position and interest rate risk***.

(emphasis added).

69.     With respect to interest rate derivatives and swaps, the MD&A section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, also stated:

*Client Interest Rate Derivatives*

We sell interest rate contracts to clients who wish to mitigate their interest rate exposure. ***We economically reduce the interest rate risk from this business by entering into opposite way contracts with correspondent banks***. . . .

*Interest Rate Swaps*

***To manage interest rate risk on our variable-interest rate loan portfolio, we enter into interest rate swap contracts to hedge against future changes in interest rates*** by using hedging instruments to lock in future cash inflows that would otherwise be impacted by movements in the market interest rates.

(emphasis added; italics in original).

70.     With respect to interest rate risk management, SVB's 2020 10-K, incorporated by reference into the Offering Materials, stated:

**Interest Rate Risk Management[8]**

Market risk is defined as the risk of adverse fluctuations in the market value of financial instruments due to changes in market interest rates. ***Interest rate risk is our primary market risk and can result from timing and volume differences in the repricing of our rate-sensitive assets and liabilities, widening or tightening of credit spreads, changes in the general level of market interest rates and changes in the***

---

[8] Bolding in original.

*shape and level of the benchmark interest rates. **Additionally, changes in interest rates can influence the rate of principal prepayments on mortgage securities, which affects the rate of amortization of purchase premiums and discounts*. Other market risks include foreign currency exchange risk and equity price risk (including the effect of competition on product pricing). These risks and related impacts are important market considerations but are inherently difficult to assess through simulation results. Consequently, simulations used to analyze the sensitivity of net interest income to changes in interest rates will differ from actual results due to differences in the timing and frequency of rate resets, the magnitude of changes in market rates, the impact of competition, fluctuating business conditions and the impact of strategies taken by management to mitigate these risks.

. . .

*Interest rate risk is managed primarily through strategies involving our fixed income securities portfolio, available funding channels and capital market activities. In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk.*

(emphasis added).

71.     Each of the statements excerpted in paragraphs 67-70 above, was incomplete and misleading for numerous reasons.  The Offering Materials failed to disclose that higher interest rates jeopardized the bank's financial future but that instead of mitigating such risks, the bank doubled down on a strategy of investing in long-term investments to deliver short-term profits.  Moreover, the Offering Materials failed to disclose that despite internal recommendations at the bank to purchase shorter-term bonds as it took in more deposits, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits and disregarded duration risks despite pleas from employees to hedge SVB's balance sheet with shorter duration bonds. Additionally, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, using unreasonable and improper adjustments to the model to validate SVB's strategy of maximizing near term profits at the expense of assuming risks to the bank's solvency over the longer term.  The Offering Materials also failed to disclose that SVB lacked effective internal controls, had poor risk management, its holding Company was rated as deficient under the CAMELS rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

riddled with many serious operational and technological problems that impeded Defendants' ability to track risks, including interest rate risks, among other matters. Further still, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits—the primary source of the Company's liquidity—were particularly sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore reduced deposits at Silicon Valley Bank. Altogether, then, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including the interest rate risk, uninsured depositor risk and liquidity risk that SVB faced.

72.     SVB's 2020 10-K, incorporated by reference into the Offering Materials, also discussed a model for the effect of interest rate changes of 1 and 2 percentage points (100 and 200 basis points). In pertinent part, SVB's 2020 10-K stated:

> **Rapid deposit growth has exceeded the pace of our loan growth**, and as a result, a significant amount of excess deposits not used to fund loan growth have contributed to the growth of our cash and investments balances. Much of the investment portfolio is held in fixed rate MBS and CMOs which generally have a higher market value sensitivity than variable rate loans or cash. Thus, **under an upward rate shock scenario, the market value of investments changes more than the market value of deposits resulting in a negative EVE [economic value of equity, defined as the market value of assets, less the market value of liabilities] sensitivity in those scenarios**.

(emphasis added).

73.     These generalized cautionary statements were devoid of the context investors needed to evaluate them. They were, accordingly, incomplete and misleading for several reasons. First, SVB's deposit growth had not merely exceeded the pace of its loan growth. The Company's loans, which paid higher interest rates and were more profitable than its long-term debt security assets, were highly dependent on the performance of the technology market in Silicon Valley, which had been performing as well as it ever had in 2020, and hence it was unlikely that SVB would be able to substantially increase its loan portfolio without changing its lending model.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

74.     For example, more than half of SVB's loans were capital call loans, which are short-term loans to bridge the time between a call for capital from an investment firm's partners to fund an investment and the actual receipt of the funds. Demand for capital call loans from SVB depended on the frequency of capital calls among venture capital firms investing in technology companies. That frequency was very high by historical standards in 2020 and was unlikely to continue at the same level indefinitely, much less increase.

75.     The Offering Materials failed to disclose that SVB could not substantially grow its loan business from its size in 2020.

76.     Second, an upward rate shock would not simply result in a negative economic value of equity, as SVB suggested. It would also decrease liquidity. Hence, just as SVB's assets were decreasing in value, SVB would also need to sell assets to raise cash, creating the risk of catastrophic losses.

77.     Third, the effect of an upward rate shock was nonlinear. SVB's simulation—which only tested up to 2 percentage points—showed that an increase of 1 percentage point in interest rates would result in a 5.9% decrease in economic value of equity, and a 2 percentage point increase would result in a 15.4% decrease in economic value of equity. But SVB did not disclose that as interest rates continued to increase (a highly probable outcome), they would exert an *exponential* effect on SVB's economic value of equity, resulting in complete collapse of the Company at around 4-5 percentage points.

**The Offering Materials' False and Misleading Statements and Omissions Regarding Compliance with Generally Accepted Accounting Principles**

78.     Despite the Offering Materials' representations to the contrary, SVB violated Generally Accepted Accounting Principles ("GAAP").

**GAAP Overview**

79.     SEC Regulation S-X, 17 C.F.R. § 210.4 01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

80.     GAAP reflects those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB") and the American Institute of Certified Public Accountants ("AICPA").  SEC Regulation S-X, Rule 4-01, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

81.     GAAP consists of a hierarchy of authoritative literature. The highest authority is the Accounting Standards Codification, or ASC, formerly the FASB Statements of Financial Accounting Standards (FAS), followed by FASB Interpretations (FIN), FASB Staff Positions (FSP), Accounting Principles Board Opinions (APB), AICPA Accounting Research Bulletins (ARB), AICPA Statements of Position (SOP), and AICPA Industry Audit and Accounting Guides (AAG). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements (FASCON).

82.     As set forth in ASC 105-10-05-1, the Financial Accounting Standards Board (FASB) Accounting Standards Codification is the source of authoritative GAAP:

> This Topic establishes the Financial Accounting Standards Board (FASB) Accounting Standards Codification® (Codification) as the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to the SEC's rules and interpretive releases, the SEC staff issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and it utilizes SEC Staff Announcements and Observer comments made at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants.

83.     Additionally, under ASC 105-10-05-3, the following non-authoritative sources of accounting guidance may be relevant depending on circumstances, including the specificity of the guidance, the general recognition of the issuer or author as an authority, and the extent of its use in practice:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Accounting and financial reporting practices not included in the Codification are nonauthoritative. Sources of nonauthoritative accounting guidance and literature include, for example, the following:

a. Practices that are widely recognized and prevalent either generally or in the industry
b. FASB Concepts Statements (FASCON)
c. American Institute of Certified Public Accountants (AICPA) Issues Papers
d. International Financial Reporting Standards of the International Accounting Standards Board
e. Pronouncements of professional associations or regulatory agencies
f. Technical Information Service Inquiries and Replies included in AICPA Technical Practice Aids
g. Accounting textbooks, handbooks, and articles.

The appropriateness of other sources of accounting guidance depends on its relevance to particular circumstances, the specificity of the guidance, the general recognition of the issuer or author as an authority, and the extent of its use in practice.

84.     SVB was also expected to adhere to fundamental accounting principles that require that a Company's financial statements should be presented in a manner which, among other things, should:

(a) Provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASCON 1 ¶ 34);

(b) Provide information about an enterprise's economic resources, obligations, and owners' equity. That information helps investors, creditors, and others identify the enterprise's financial strengths and weaknesses and assess its liquidity and solvency. (FASCON 1 ¶ 40);

(c) Provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶ 42);

(d) Include explanations and interpretations to help users understand financial information because management knows more about the enterprise and its affairs than investors, creditors, or other "outsiders" and can often increase the usefulness of financial information by identifying certain transactions, other events, and circumstances that affect the enterprise and explaining their financial impact on it. (FASCON 1 ¶ 54);

(e) Be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. (FASCON 2 ¶¶ 58-59);

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

(f) Be complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASCON 2 ¶ 79);

(g) Be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent. (FASCON 2 ¶ 81); and

(h) Reflect that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶ 95, 97).

85.     SVB was subject to risks associated with depository and lending institutions. One such risk factor identified by the AICPA in the applicable AAG was "significant declines in customer demand and increasing business failures in either the industry or overall economy," including "deteriorating economic conditions . . . within industries or geographic regions in which the institution has significant credit concentrations." (Ch. 5, Audit Considerations and Certain Financial Reporting Matters, Ex. 5-1, Fraud Risk Factors).

86.     The AAG identifies another risk factor for lenders as occurring when "[v]acant staff positions remain unfulfilled for extended periods, thereby preventing the proper segregation of duties," and when there exists an "[u]nderstaffed accounting or information technology department, inexperienced or ineffective accounting or information technology personnel, or high turnover."

87.     Among the risk factors the AICPA identifies are "concentration in a particular type of financial instrument" and "a failure by management and those charged with governance to set parameters (for example, trading limits, credit limits, and aggregate market risk limits) and to continuously monitor trading activities against those parameters."

88.     ASC 450 (formerly Statement of Financial Accounting Standards No. 5, Accounting for Contingencies) defines a loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to [a] possible . . . loss to an enterprise that will ***ultimately be resolved when one or more future events occur or fail to occur***." Under ASC 450, a charge to income should be taken if "(1) Information (before financial statements are issued) indicates that it is probable that an asset has been impaired or a liability incurred at the date of the financial statement; and (2) Amount of loss is reasonably estimable. Further, ASC 450 requires disclosure in the

- 23 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

footnotes to the financial statements for material loss contingencies and/or significant risks and uncertainties. The occurrence, or non-occurrence, of a future event meets the definition of a loss contingency under GAAP.  Under ASC 450, disclosing a loss contingency in the notes to the financial statements  is ***required*** when there is more than a remote chance that a loss will be incurred (even in the event that a reliable estimate of eventual losses cannot be made at the time). The threshold for disclosure of a loss contingency (as opposed to a higher threshold for the ***accrual*** of a loss contingency) is very low—GAAP requires disclosure if, "***[t]he chance of the future event or events occurring is more than remote but less than likely***."  Under ASC 450: "***The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made***." Defendants failed to account for or disclose the loss contingencies SVB faced, including from material market risks such as interest rate risk, uninsured depositor risk and liquidity risks.

89.     Contrary to Defendants' representations in the Offering Materials, SVB's incorporated financial statements and other disclosures were not in compliance with GAAP. In numerous respects, SVB violated GAAP, including the standards detailed above, including by failing to properly account for the following matters.  The Offering Materials failed to disclose that higher interest rates jeopardized the bank's financial future but that instead of mitigating such risks, the bank doubled down on a strategy of investing in long-term investments to deliver short-term profits. Moreover, the Offering Materials failed to disclose that despite internal recommendations at the bank to purchase shorter-term bonds as it took in more deposits, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits and disregarded duration risks despite pleas from employees to hedge SVB's balance sheet with shorter duration bonds. Additionally, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, using unreasonable and improper tweaks to the model to validate SVB's profit-driven strategy.  Further, the Offering Materials failed to provide requisite quantitative disclosures to reflect reasonably possible near term changes to interest rates, thereby misrepresenting and failing to disclose the critical change in the Company's market

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

risk exposure, including interest rate risk, as well as how it would manage such risk. The Offering Materials also failed to disclose that SVB lacked effective internal controls, had poor risk management, its holding Company was rated as deficient under the CAMELS rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was riddled with many serious operational and technological problems that impeded Defendants' ability to track risks, including interest rate risks, among other matters. Further still, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits—the primary source of the Company's liquidity—were particularly sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank. Accordingly, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including interest rate risk, uninsured depositor risk and liquidity risk, that SVB faced.

### The Offering Materials Falsely Represented that SVB's Internal Controls Over Financial Reporting Were Effective Despite Pervasive Operational and Technological Issues, Including Critical Problems Tracking Interest Rate Risk

90.     SVB falsely asserted in its Offering Materials that it maintained effective internal controls over financial reporting. In fact, SVB lacked effective internal controls and the absence of such controls facilitated SVB misrepresenting, among other matters, that:

(a)     It was exposed to significantly less risk, including market risk such as interest rate risk, liquidity risk, and uninsured depositor risk, than was inherent in the assets it held;

(b)     Its risk management personnel and procedures were effective and reliable, when they were not;

(c)     It was able to make reasonable estimates of the fair value of its financial instruments; and

(d)     The fair value of the Company's financial instruments and other assets was reasonable.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

91.     COSO defines "internal controls" in Chapter 1 of its Framework as follows:

Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) Reliability of financial reporting; (iii) Compliance with applicable laws and regulations.

92.     COSO emphasizes the importance of a strong control environment, which sets a positive "tone at the top" and then flows down through the Company. The COSO Framework Executive Summary identifies the pervasive influence that the control environment has on the Company, as follows:

The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.

93.     In addition, the COSO Framework, Ch. 2, establishes that management's philosophy and operating style directly affect how the company is managed, the amount of risk that the company accepts, and ultimately its success. Chapter 2 of the COSO Framework states:

Management's philosophy and operating style affect the way the enterprise is managed, including the kinds of business risks accepted . . . . Other elements of management's philosophy and operating style include attitudes toward financial reporting, conservative or aggressive selection from available alternative accounting principles, conscientiousness and conservatism with which accounting estimates are developed, and attitudes toward data processing and accounting functions and personnel. . . . The impact of an ineffective control environment could be far reaching, possibly resulting in a financial loss, a tarnished public image or a business failure.

94.     Section 404 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley Act") requires management to assess the effectiveness of the internal control structure and the financial reporting for procedures. Management is responsible for performing this assessment in the context of a top-down risk assessment, which requires management to base both the scope of its assessment and the evidence gathered on risk. Management's conclusion of its assessment of the effectiveness of the Company's internal control must be included in the Company's annual report. Moreover, it was crucial for SVB to regularly monitor those controls to verify their operating effectiveness.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

95.     Further, SEC rules require management to report publicly all material weaknesses in the Company's internal controls.

96.     Defendants Becker and Beck were required under Rule 302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's "internal control over financial reporting." Rule 302 states as follows:

> [E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting.

97.     In connection with the Offering Materials, Defendants Becker and Beck executed the applicable Rule 302 certification on March 1, 2021.

98.     As explained above and in the Company's regulatory filings, in doing so Defendants Becker and Beck represented to the marketplace that their assessment of internal controls over financial reporting was reliable and based upon the framework established by COSO. Also, Defendants Becker and Beck stated in the Company's Form 10-K filings that "management concluded that the Company's internal control over financial reporting was effective as of" the year ended 2020. These statements were false because: SVB lacked effective internal controls, including over market rate risk, interest rate risk, uninsured deposit liability risk and liquidity risk; engaged in poor risk management; its holding Company was rated as deficient under the CAMELS rating system; federal regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations; SVB was riddled with many serious operational and technological problems, impairing Defendants' ability to track risks, including interest rate risks, among other matters; and Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered new assumptions to internal models that showed that higher interest rates could impair SVB's capital base, to facilitate SVB's profit-driven strategy.  Thus, because SVB's internal controls were ineffective, management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes-Oxley Act, were materially false and misleading. Defendants Becker's and Beck's statements were false and misleading because SVB's internal controls were significantly

- 27 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

deficient and ineffective to prevent or detect errors or misstatements in its financial and operations reporting.

99.     Management's assessment of internal control over financial reporting was a significant matter for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws. However, SVB did not properly assess its internal controls over financial reporting; it consequently violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and Sarbanes-Oxley Act.

100.     The Offering Materials failed to disclose that in January 2019, regulators warned SVB that its risk management systems were inadequate, and also warned SVB in 2020 that its risk management systems were below the Federal Reserve's expectations.  As reported by the Wall Street Journal on March 19, 2023:

> The Federal Reserve raised concerns about risk management at Silicon Valley Bank starting at least four years before its failure earlier this month, documents show.
>
> In January 2019, the Fed issued a warning to SVB over its risk-management systems, according to a presentation circulated last year to employees of SVB's venture-capital arm, which was viewed by The Wall Street Journal.
>
> The Fed issued what it calls a Matter Requiring Attention, a type of citation that is less severe than an enforcement action. Regulators are supposed to make sure the problem is addressed, but it couldn't be learned if the Fed held SVB to that standard in 2019.
>
> *       *       *
>
> Following the 2019 warning, the Fed informed SVB in 2020 that its system to control risk didn't meet the expectations for a large financial institution, or a bank holding company with more than $100 billion in assets, the presentation to employees at SVB's venture-capital arm said.
>
> Large banks that don't meet the Fed's expectations are supposed to take corrective action to fix the problems or potentially face enforcement actions.
>
> At that time, the bank was growing quickly as deposits poured in during the early months of the pandemic. The average level of interest-earning assets grew 76% in the first quarter of 2021, compared with the same period one year earlier, the presentation said.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

> The bank's assets rose to $114 billon at the end of 2020, from about $70 billion in 2019, the year the Fed voiced its concerns. They nearly doubled from 2020 to the end of 2021 to about $209 billion, according to Federal Deposit Insurance Corp. data.
>
> The Fed's criticism of SVB's risk-management systems raises the question of "why were they allowed to double their size after that," said Keith Noreika, an executive vice president at Patomak Global Partners who served as acting Comptroller of the Currency in 2017.[9]

101.    The Offering Materials failed to disclose that SVB lacked effective internal controls to reduce the risk of material losses from quickly rising interest rates:

> In late 2020, the firm's asset-liability committee received an internal recommendation to buy shorter-term bonds as more deposits flowed in, according to documents viewed by Bloomberg. That shift would reduce the risk of sizable losses if interest rates quickly rose. But it would have a cost: an estimated $18 million reduction in earnings, with a $36 million hit going forward from there.
>
> Executives balked. Instead, the company continued to plow cash into higher-yielding assets. That helped profit jump 52% to a record in 2021 and helped the firm's valuation soar past $40 billion. But as rates soared in 2022, the firm racked up more than $16 billion of unrealized losses on its bond holdings.
>
> Throughout last year, some employees pleaded to reposition the company's balance sheet into shorter duration bonds. The asks were repeatedly rejected, according to a person familiar with the conversations. The firm did start to put on some hedges and sell assets late last year, but the moves proved too late.[10]

102.    The Offering Materials also failed to disclose that SVB had many serious operational and technological problems and weaknesses that examiners appointed by the Federal Reserve Bank of San Francisco identified, and that triggered formal warnings to SVB's executives.  As reported by Bloomberg on March 17, 2023:

> Just over a year before Silicon Valley Bank's collapse threatened a generation of technology startups and their backers, the Federal Reserve Bank of San Francisco appointed a more senior team of examiners to assess the firm. They started calling out problem after problem.

---

[9]https://www.wsj.com/articles/fed-raised-concerns-about-svbs-risk-management-in-2019-4a1d802c.

[10]https://www.bloomberg.com/news/articles/2023-03-13/svb-failure-sparks-blame-game-over-trump-era-regulatory-rollback#xj4y7vzkg.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

> As the upgraded crew took over, it fired off a series of formal warnings to the bank's leaders, pressing them to fix serious weaknesses in operations and technology, according to people with knowledge of the matter.
>
> Then late last year they flagged a critical problem: The bank needed to improve how it tracked interest-rate risks, one of the people said, an issue at the heart of its abrupt downfall this month.[11]

103.    The Offering Materials also failed to disclose that SVB had critical problems in tracking interest rate risk including billions of dollars in unrealized losses. As Bloomberg reported on March 31, 2023, Federal Reserve examiners identified this "critical problem" at SVB in late 2022:

> Late last year, Fed examiners identified a critical problem: the bank needed to improve how it tracked interest-rate risks. The firm had about $15 billion in unrealized losses at year-end on mortgage-backed securities that it loaded up when rates were lower.[12]

104.    By 2021, as well, SVB's liquidity problems were clear to insiders. According to the *New York Times*, in 2021, "[s]upervisors at the Federal Reserve Bank of San Francisco, which oversaw Silicon Valley Bank, issued six citations" designated as "matters requiring attention" (MRAs) or "matters requiring immediate attention" (MRIAs). The warnings "flagged that the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble."  The article stated in part:

> Silicon Valley Bank's risky practices were on the Federal Reserve's radar for more than a year — an awareness that proved insufficient to stop the bank's demise.
>
> The Fed repeatedly warned the bank that it had problems, according to a person familiar with the matter.
>
> In 2021, a Fed review of the growing bank found serious weaknesses in how it was handling key risks. Supervisors at the Federal Reserve Bank of San Francisco, which oversaw Silicon Valley Bank, issued six citations. Those warnings, known as "matters requiring attention" and "matters requiring immediate attention," flagged that the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble.

---

[11]https://www.bloomberg.com/news/articles/2023-03-17/fed-alarms-at-svb-began-more-than-year-ago-as-examiners-changed.

[12]https://www.bloomberg.com/news/articles/2023-03-21/svb-s-loans-to-insiders-tripled-to-219-million-before-it-failed?re_source=boa_related.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

But the bank did not fix its vulnerabilities. By July 2022, Silicon Valley Bank was in a full supervisory review — getting a more careful look — and was ultimately rated deficient for governance and controls. It was placed under a set of restrictions that prevented it from growing through acquisitions. Last autumn, staff members from the San Francisco Fed met with senior leaders at the firm to talk about their ability to gain access to enough cash in a crisis and possible exposure to losses as interest rates rose.

It became clear to the Fed that the firm was using bad models to determine how its business would fare as the central bank raised rates: Its leaders were assuming that higher interest revenue would substantially help their financial situation as rates went up, but that was out of step with reality.

*       *       *

The picture that is emerging is one of a bank whose leaders failed to plan for a realistic future and neglected looming financial and operational problems, even as they were raised by Fed supervisors. For instance, according to a person familiar with the matter, executives at the firm were told of cybersecurity problems both by internal employees and by the Fed — but ignored the concerns.[13]

105.    The Federal Reserve describes MRAs as "a call for action to address weaknesses that could lead to deterioration in a banking organization's soundness. MRAs are confidential and not publicly issued."

106.    The Federal Reserve describes MRIAs as "a call for more immediate action to address acute or protracted weaknesses that could lead to further deterioration in a banking organization's soundness, may result in harm to consumers, or have caused, or could lead to, noncompliance with laws and regulations. MRIAs are confidential and not publicly issued."

107.    Although the MRAs and MRIAs issued by SVB's primary regulator—as well as the risk management failings that led to them—were known to SVB, investors remained in the dark.

**The Offering Materials Violated Affirmative Disclosure Obligations Under SEC Regulation S-K**

108.    Regulation S-K, Item 305, sets forth quantitative and qualitative disclosure requirements regarding market risk, including interest rate risk.

---

[13]https://www.nytimes.com/2023/03/19/business/economy/fed-silicon-valley-bank.html.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

109.    As to quantitative disclosures about market risk, Item 305(a) provides registrants three disclosure alternatives: (1) tabular presentation of fair values of the market risk sensitive instruments and contract terms sufficient to determine future cash flows from those instruments, categorized by expected maturity dates; (2) sensitivity analysis disclosures that express the potential loss in future earnings, fair values, or cash flows of market risk sensitive instruments resulting from one or more selected hypothetical changes in interest rates, foreign currency exchange rates, commodity prices, and other relevant market rates or prices over a selected period of time: or (3) value at risk disclosures that express the potential loss in future earnings, fair values, or cash flows of market risk sensitive instruments over a selected period of time, with a selected likelihood of occurrence, from changes in interest rates, foreign currency exchange rates, commodity prices, and other relevant market rates or prices.  17 C.F.R. § 229.305(a)(1)(i)-(iii).

110.    For sensitivity analysis disclosures, Item 305(a)(1)(ii) requires registrants to describe the model, assumptions and parameters necessary to understand the sensitivity analysis disclosures. The instructions to sensitivity analysis disclosures under paragraph 305(a)(1)(ii) make clear that "Registrants should select *hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices*. In this regard, absent economic justification for the selection of a different amount, registrants should use changes that are not less than 10 percent of end of period market rates or prices."  The same instructions state that "the term reasonably possible has the same meaning as defined by generally accepted accounting principles (*see, e.g.*, FASB ASC Master Glossary). The FASB ASC Master Glossary defines "reasonably possible" as "[t]he chance of the future event or events occurring is more than remote but less than likely."  Moreover, the same instructions state: "For purposes of instruction 3.A. of the Instructions to Paragraph 305(a), the term near term means a period of time going forward up to one year from the date of the financial statements (*see* FASB ASC Master Glossary)."

111.    The instructions to Item 305(a)(1)(ii) also set forth the following requirements:

Model, assumptions, and parameters that should be described include, but are not limited to, how *loss* is defined by the model (*e.g.*, loss in earnings, fair values, or cash flows), a general description of the modeling technique (*e.g.*, duration modeling, modeling that measures the change in net present values arising from selected

- 32 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

hypothetical changes in market rates or prices, and a description as to how optionality is addressed by the model), the types of instruments covered by the model (*e.g.*, derivative financial instruments, other financial instruments, derivative commodity instruments, and whether other instruments are included voluntarily, such as certain commodity instruments and positions, cash flows from anticipated transactions, and certain financial instruments excluded under instruction 3.C.ii. of the General Instructions to Paragraphs 305(a) and 305(b), and other relevant information about the model's assumptions and parameters, (*e.g.*, the magnitude and timing of selected hypothetical changes in market rates or prices used, the method by which discount rates are determined, and key prepayment or reinvestment assumptions).

112.    Contrary to these requirements, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates likely would devastate SVB's financial future, making unreasonable and improper tweaks to the model to validate and advance SVB's profit-driven strategy.

113.    As to qualitative disclosures about market risk, Item 305(b) requires registrants to describe, to the extent material, market risks including interest rate risk:

(i) The registrant's primary market risk exposures;

(ii) How those exposures are managed. Such descriptions shall include, but not be limited to, a discussion of the objectives, general strategies, and instruments, if any, used to manage those exposures; and

(iii) Changes in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods.

114.    The instructions accompanying Item 305(b) make clear that "primary market risk exposure" includes "interest rate risk," stating:

1. For purposes of disclosure under paragraph 305(b), primary market risk exposures means:

A. The following categories of market risk: interest rate risk, foreign currency exchange rate risk, commodity price risk, and other relevant market rate or price risks (e.g., equity price risk); and

B.  Within each of these categories, the particular markets that present the primary risk of loss to the registrant. For example, if a registrant has a material exposure to foreign currency exchange rate risk and, within this category of

- 33 -
COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

market risk, is most vulnerable to changes in dollar/yen, dollar/pound, and dollar/peso exchange rates, the registrant should disclose those exposures. Similarly, *if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure.*

2. For purposes of disclosure under paragraph 305(b), registrants should describe primary market risk exposures that exist as of the end of the latest fiscal year, and how those exposures are managed.

115.    As to the materiality assessment required under Item 305, the accompanying instructions make clear that registrants should evaluate:

i. The materiality of the fair values of derivative financial instruments, other financial instruments, and derivative commodity instruments outstanding as of the end of the latest fiscal year; and

ii. The materiality of potential, near-term losses in future earnings, fair values, and/or cash flows from reasonably possible near-term changes in market rates or prices.

iii. If either paragraphs B.i. or B.ii. in this instruction of the General Instructions to Paragraphs 305(a) and 305(b) are material, the registrant should disclose quantitative and qualitative information about market risk, if such market risk for the particular market risk exposure category is material.

116.    In conducting the materiality assessment, moreover, "registrants generally should not net fair values, except to the extent allowed under generally accepted accounting principles," and "registrants should consider, among other things, the magnitude of:

i. Past market movements;

ii. Reasonably possible, near-term market movements; and

iii. Potential losses that may arise from leverage, option, and multiplier features."

117.    The SEC's Office of the Chief Accountant and the Division of Corporation Finance have provided the following guidance on determining whether its market risk exposures are material enough to require the quantitative and qualitative disclosures under Item 305:

To determine if the quantitative and qualitative disclosures must be furnished, a company must perform the following procedure:

- 34 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Step 1: Categorize its market risk sensitive instruments into two portfolios: instruments entered into for trading purposes, and all other instruments.

Step 2: further categorize instruments within the two portfolios by type of market risk exposure category (interest rate risk, foreign currency exchange rate risk, commodity price risk, etc.).

Step 3: the company must assess the materiality of the market risk exposure for each category within each portfolio. ***This assessment must evaluate both (1) the materiality of the fair values of market sensitive instruments as of the end of the latest fiscal year, and (2) the materiality of potential, near-term losses in future earnings, fair values and cash flows from reasonably possible near-term changes in market rates or prices. If either is material, then the company should disclose the quantitative and qualitative information for that particular market risk exposure***. For these tests, registrants should not net favorable and unfavorable fair values, except where allowed under generally accepted accounting principles.

For example, assume a company has both a trading and non-trading portfolio. Each portfolio contains instruments that expose the company to changes in interest rates, foreign currency exchange rates, and commodity prices.

The company initially determines whether the fair values of market risk sensitive instruments were material at period end. If they were material, disclosure is material. If the fair values at period end were not material, the company would assess whether the interest rate sensitive instruments in its trading portfolio create a material exposure to changes in interest rates. That assessment should be made based on of [sic] fair values, cash flows, or earnings. If any of those measures is material, the company would provide quantitative information regarding its interest rate sensitive trading portfolio. Similar assessments are necessary for interest rate sensitive instruments in its non-trading portfolio, and all other exposures.

Quantitative disclosures are required only for material exposures. Thus, if the company's only material exposure is to changes in interest rates in its trading portfolio, it must present quantitative information only for that specific exposure. Quantitative disclosures about other, immaterial exposures are elective.[14]

118.   With respect to sensitivity analysis disclosures, the SEC's Office of the Chief Accountant and the Division of Corporation Finance further directed that:

Companies using sensitivity analysis should select hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices. Companies should use changes not less than 10% of end-of-period market rates or prices unless there is economic justification for a different

---

[14] https://www.sec.gov/divisions/corpfin/guidance/derivfaq.htm

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

amount. The rule provides that the magnitude of selected hypothetical changes in rates or prices may differ among and within market risk exposure categories.[15]

\*      \*      \*

Companies must select hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices. The rules specified the use of a change that is not less than 10%, unless there is justification for using another amount. If a company has sufficient historical data indicating that a reasonably possible near-term change will be an amount less than 10%, it may use that amount. The Company should disclose why it chose a hypothetical change less than 10%.

119.    The SEC's Office of the Chief Accountant and the Division of Corporation Finance also made clear that Item 305 requires the following qualitative disclosures about market risks:

Qualitative disclosure about interest rate risk in a non-trading portfolio would include:

1) the nature of the interest rate exposure,

2) how interest rate risks are managed,

3) changes in interest rate exposures or how the interest rate exposures were managed when compared to the conditions that existed during the most recently completed fiscal year, and

4) known trends in interest rates, or anticipated rates in future reporting periods.

120.    The Offering Materials failed to provide the required disclosures under Item 305.  The quantitative disclosures violated Item 305 because they failed to reflect "reasonably possible near term changes."  Instead, SVB used only a maximum 200 bps rate increase.  It was reasonably possible at the time of the Offering Materials that the Federal Reserve would (as it ultimately did) raise interest rates to a greater degree.

121.    The Offering Materials qualitative disclosures also violated Item 305, as they misrepresented and failed to disclose the critical change in the Company's market risk exposure, including from interest rate risk, as well as how it would manage such risk.  Further, the Offering

---

[15] https://www.sec.gov/divisions/corpfin/guidance/derivfaq.htm

- 36 -

Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, making unreasonable and improper adjustments to the model to validate and advance SVB's profit-driven strategy.

122.    SEC Regulation S-K, Item 105, requires disclosure of "material" risk factors. As detailed therein, the "Risk Factor" section of the Offering Materials must "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.[16]  Item 105 requires disclosure of the risks to which reasonable investors would attach importance in making investment or voting decisions. Contrary to Item 105's requirements, the Offering Materials failed to disclose that higher interest rates would jeopardize the bank's financial future but that, instead of mitigating such risks, the Company had doubled down on a strategy to deliver short-term profits.  Further, the Offering Materials failed to disclose that despite internal recommendations to purchase shorter-term bonds as more deposits flowed in, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits, and disregarded duration risks despite strong recommendations from employees to prudently hedge SVB's balance sheet with shorter duration bonds.  Further still, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, using unreasonable and improper tweaks to the model to validate SVB's profit-driven strategy.  Additionally, the Offering Materials failed to disclose that SVB lacked effective internal controls and was riddled with many serious operational and technological problems, plaguing Defendants' ability to track risks, including interest rate risks.  Moreover, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits, the primary source of the Company's liquidity, were especially

[16] Before April 2, 2019, current Item 105 was Item 503(c).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank. Additionally, SVB never disclosed the relationship between the interest rate risk in the Company's deposits and its long-term debt security assets. Moreover, SVB also failed to disclose that it largely did *not* manage its interest rate risk in its fixed income securities portfolio—in fact, it faced enormous interest rate risk from that portfolio. And it made grossly inadequate use of derivatives or other hedging strategies, such as interest rate swaps, to mitigate interest rate risk. While the Offering Materials' discussion of risk factors listed market and liquidity risks in vague and generic terms, it did not even mention the actual material risks posed by the foregoing, much less adequately describe those risks as required by Item 105.

123.     SEC Regulation S-K, Item 303, requires that management's discussion and analysis (MD&A) "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way" and "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303. Contrary to Item 303's requirements, the Offering Materials failed to disclose the material market risks, including the interest rate risk, uninsured depositor risk and liquidity risk that SVB faced, and which resulted in, and were reasonably likely to result in, SVB's liquidity materially decreasing and having a materially unfavorable impact on SVB's revenues and income. As detailed herein, the Offering Materials failed to disclose that higher interest rates jeopardized the bank's financial future but that, instead of mitigating such risks, the bank had doubled down on a strategy to deliver short-term profits. Further, the Offering Materials failed to disclose that despite internal recommendations to purchase shorter-term bonds as more deposits flowed in to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits, disregarding duration risks despite pleas from employees to hedge SVB's balance sheet with shorter duration bonds. Further still, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, using unreasonable and improper tweaks to the model to validate

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

SVB's profit-driven strategy.  Additionally, the Offering Materials failed to disclose that SVB lacked effective internal controls and was riddled with many serious operational and technological problems, plaguing Defendants' ability to track risks, including interest rate risks.  Moreover, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to seek to withdraw their money *en masse*. Indeed, SVB failed to disclose that its startup clients' deposits, the primary source of the Company's liquidity, were especially sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank.  Additionally, SVB never disclosed the relationship between the interest rate risk in the Company's deposits and its long-term debt security assets. SVB also failed to disclose that SVB largely did *not* manage its interest rate risk in its fixed income securities portfolio; instead, it faced enormous interest rate risk from that portfolio. And it made grossly inadequate use of derivatives or other hedging strategies, such as interest rate swaps, to mitigate interest rate risk. Accordingly, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including interest rate risk, uninsured depositor risk and liquidity risk that SVB faced.  These undisclosed trends, events, and their likely consequences, were known at the time and thus Item 303 required disclosure.

### KPMG's Liability

**Overview of Allegations Against KPMG**

124.    KPMG began auditing SVB in 1994, and audited SVB's financial statements and its system of internal controls over financial reporting for the year ended December 31, 2020.  KPMG also issued and signed audit opinions in which it certified that KPMG's internal controls were adequate and that the Company's financial statements were free of material misstatements and fairly presented SVB's financial position.

125.    The 2020 10-K includes as Item 8 a "Report of Independent Registered Public Accounting Firm," signed by KPMG. The KPMG Report states in relevant part:

> *Opinions on the Consolidated Financial Statements and Internal Control Over Financial Reporting*

1

2   We have audited the accompanying consolidated balance sheets of SVB Financial
Group and subsidiaries (the Company) as of December 31, 2020 and 2019, the
3   related consolidated statements of income, comprehensive income, stockholders'
equity, and cash flows for each of the years in the three-year period ended
4   December 31, 2020, and the related notes (collectively, the consolidated financial
statements). We also have audited the Company's internal control over financial
5   reporting as of December 31, 2020, based on criteria established in *Internal Control
– Integrated Framework (2013)* issued by the Committee of Sponsoring
6   Organizations of the Treadway Commission.

7
In our opinion, the consolidated financial statements referred to above present
8   fairly, in all material respects, the financial position of the Company as of
December 31, 2020 and 2019, and the results of its operations and its cash flows
9   for each of the years in the three-year period ended December 31, 2020, in
conformity with U.S. generally accepted accounting principles. **Also in our
10   opinion, the Company maintained, in all material respects, effective internal
control over financial reporting as of December 31, 2020 based on criteria
11   established in *Internal Control – Integrated Framework (2013)* issued by the
Committee of Sponsoring Organizations of the Treadway Commission**.
12

13   (bolding added; italics in original).

14         126.    KPMG consented to the incorporation by reference of its above-described report

15   concerning the effectiveness of SVB's internal controls into the Offering Materials. Specifically, the

16   Offering Materials included as an exhibit a "Consent of Independent Registered Public Accounting

17   Firm" that provides in relevant part:

18   We consent to the use of our report dated March 1, 2021, with respect to the
consolidated balance sheets of SVB Financial Group as of December 31, 2020 and
19   2019, the related consolidated statements of income, comprehensive income,
stockholders' equity, and cash flows for each of the years in the three-year period
20   ended December 31, 2020, and the related notes, and the effectiveness of internal
control over financial reporting as of December 31, 2020, incorporated herein by
21   reference and to the reference to our firm under the heading "Experts" in this
prospectus.
22

23         127.    KPMG's unqualified opinions on SVB's financial statements, incorporated by

24   reference into the Offering Materials, were materially false and misleading.   Contrary to its

25   representations, KPMG's audits of those financial statements were not conducted in accordance with

26   Generally Accepted Auditing Standards ("GAAS") or Public Company Accounting Oversight Board

27   ("PCAOB") standards, and SVB's financial condition and results of operations were not presented

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

in conformity with GAAP.   In issuing unqualified audit opinions and consenting to their incorporation in SVB's SEC filings, KPMG made false and misleading statements in violation of Section 11 of the Securities Act.

**Overview of GAAS**

128.   As SVB's external auditor, KPMG was required to audit the Company's financial statements and the effectiveness of SVB's internal controls over financial reporting in accordance with GAAS.

129.   The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, Generally Accepted Auditing Standards, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. For simplicity, all references to GAAS hereinafter include the standards of the PCAOB. The standards adopted by PCAOB that also have been approved by the SEC are designated with the prefix "AS."  Preexisting interim standards that have been adopted by the PCAOB are designated by the prefix "AU."

130.   GAAS is comprised of ten standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. Auditors are required to follow those standards in each and every audit they conduct.

131.   The GAAS standards fall into three categories: General Standards; Fieldwork Standards; and Reporting Standards. The General Standards require, among other things, that the auditor exercise professional skepticism. The General Standards provide guidance to an auditor on the exercise of due professional care in the performance of the audit.  The Field Work Standards require, among other things, that an auditor obtain a sufficient understanding of the entity's business and operating environment to properly plan an audit in accordance with GAAS. Finally, the Reporting Standards require that an auditor express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed.

132.    An audit is a risk-based process during which the auditor should exercise due care. An auditor should be always aware of the risk of misstatements due to fraud or error.  As those risks increase or materialize, auditors are obligated by GAAS and PCAOB standards to alter their audit procedures accordingly.  KPMG failed to recognize glaring risks, and consequently, failed to adjust its audit procedures, leading to an unqualified audit report that was materially false and misleading.

133.    KPMG failed to exercise sufficient professional care in its audits of SVB's financial statements, and thus violated GAAS General Standard No. 3, which requires due professional care to be exercised in the performance of the audit and the preparation of the report, and AU § 230, Due Professional Care in the Performance of Work, which states that "[d]ue professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting."  AU § 230.02.  The duty to exercise due care required KPMG to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.  AU § 230.10.  KPMG did not obtain such assurances.

134.    KPMG also failed to exercise sufficient professional skepticism in violation of AU § 316:

> Due professional care requires the auditor to exercise professional skepticism. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks.  Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity.  Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU § 316.13 (internal citations omitted).

135.    AU § 316 therefore required KPMG to be continually alert for indications of misstatements of SVB's financial statements, whether due to error or fraud.  The PCAOB standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present."  AU § 316.13.  As detailed above, due to the presence

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

of multiple red flags, KPMG knew or should have known that there was a strong possibility of material misstatements in connection with SVB's financial statements for the 2020 fiscal year.

136.    KPMG should have been aware that there was a heightened risk associated with the market risks, including the interest rate risk, uninsured depositor risk and liquidity risk, that SVB faced.   That heightened risk obligated KPMG to perform more stringent and rigorous audit procedures compared to those it otherwise performed.  For example paragraphs 6 and 9 of AS No. 13, The Auditor's Responses to the Risk of Material Misstatements, state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement.   Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment.
>
> *          *          *
>
> In designing the audit procedures to be performed, the auditor should . . . obtain more persuasive audit evidence the higher the auditor's assessment of risk.

137.    AS No. 13.14 provides specific examples of how KPMG should have modified its audit procedures to address its assessed risks.  In that regard, KPMG should have:

> (a) Chang[ed] the nature of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information;
> (b) Chang[ed] the timing of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and
> (c) Chang[ed] the extent of the procedures applied to obtain more evidence, *e.g.*, by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

138.    In failing to modify its audit procedures, KPMG failed to comply with AS No. 13. Had KPMG appropriately modified its audit procedures to be responsive to the risk of material misstatement of the Company's financial statements and carried out those procedures with the appropriate degree of professional skepticism, it would have discovered that the Company's financial statements failed to account for material market risks, including interest rate risk, uninsured depositor risk and liquidity risk.

139.   KPMG failed to obtain sufficient appropriate evidentiary matter regarding the market risks that SVB faced, including the interest rate risk, uninsured depositor risk and liquidity risk. KPMG also did not comply with PCAOB auditing standards.  For example, KPMG violated GAAS Standard of Fieldwork No. 3, which requires sufficient appropriate evidentiary matter to afford a reasonable basis for: (1) the opinion regarding the financial statements and (2) the opinion regarding internal control over financial reporting.  KPMG likewise violated AS No. 15: Audit Evidence, which states that "as the risk increases, the amount of evidence that the auditor should obtain also increases. . . . [O]rdinarily more evidence is needed to respond to significant risks."  Despite ample indicators of increased market risks faced by SVB, including interest rate risk, uninsured depositor risk and liquidity risk, KPMG failed to obtain more evidence than it typically would in the absence of increased risk.

140.   KPMG also violated GAAS Standards of Reporting Nos. 1 and 4 by falsely representing that SVB's financial statements were presented in conformity with GAAP when they were not and by improperly providing unqualified opinions on SVB's financial statements for the year ended December 31, 2020, even though its audits were not conducted in accordance with PCAOB auditing standards and the financial statements were not prepared in accordance with GAAP.

141.   Under AS No. 5, KPMG was required to complete a careful examination regarding SVB's effective controls over financial reporting.  PCAOB's rulemaking in connection with AS No. 5 makes clear that KPMG could not simply rely on the assessment of internal controls reached and communicated to it by SVB's management or third parties but was instead required to independently assess the internal controls before it could issue a "clean" opinion.  According to AS No. 5: "The auditor is required to provide an independent opinion on the effectiveness of the company's internal control over financial reporting. . . . The auditor cannot obtain sufficient evidence to support an opinion on the effectiveness of internal controls based solely on observation of or interaction with the company's controls.  Rather, the auditor needs to perform procedures such as inquiry, observation, and inspection of documents, or walkthroughs, which consist of a combination of these procedures, in order to fully understand and identify the likely sources of potential misstatements[.]"

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

After performing an independent analysis, an independent auditor is not permitted to issue a clean opinion if any "material weaknesses" exist.

142.     KPMG's certifications and representations were incomplete and misleading. The above-described misrepresentations and omissions, SVB's failure to adequately manage interest rate risk, and its attendant collapse demonstrate significant deficiencies in its internal controls. In his prepared Senate testimony, Michael S. Barr, the Vice Chair for Supervision of the Board of Governors of the Federal Reserve System, attributed SVB's failure to "inadequate risk management and internal controls that struggled to keep pace with the growth of the bank." These risk management and internal control failures prompted six "supervisory findings" by the Fed in 2021 which included the MRAs and MRIAs described above (*supra* ¶¶ 104-107).

143.     KPMG, moreover, erroneously did not identify SVB's interest rate and deposit risk as "Critical Audit Matters."  According to AS No. 3101.11:

> The auditor must determine whether there are any critical audit matters in the audit of the current period's financial statements. A critical audit matter is any matter arising from the audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved especially challenging, subjective, or complex auditor judgment.

144.     According to AS No. 3101.12:

> In determining whether a matter involved especially challenging, subjective, or complex auditor judgment, the auditor should take into account, alone or in combination, the following factors, as well as other factors specific to the audit:
>
> a.   The auditor's assessment of the risks of material misstatement, including significant risks;
>
> b.   The degree of auditor judgment related to areas in the financial statements that involved the application of significant judgment or estimation by management, including estimates with significant measurement uncertainty;
>
> c.   The nature and timing of significant unusual transactions and the extent of audit effort and judgment related to these transactions;
>
> d.   The degree of auditor subjectivity in applying audit procedures to address the matter or in evaluating the results of those procedures;

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

e.  The nature and extent of audit effort required to address the matter, including the extent of specialized skill or knowledge needed or the nature of consultations outside the engagement team regarding the matter; and

f.  The nature of audit evidence obtained regarding the matter.

145.    SVB's interest rate risk and deposit risk qualified as Critical Audit Matters, but were unidentified as such by KPMG.

146.    With the foregoing misrepresentations and omissions in the Offering Materials, Defendants were able to complete the Merger.  But in 2023, the price of SVB shares plunged, and the stock ultimately lost all value.

## **DEFENDANTS' MISSTATEMENTS AND OMISSIONS WERE MATERIAL**

147.    In April 2022, SVB terminated its Chief Risk Officer Laura Izurieta, paying her severance of over $7.1 million. SVB did not fill the position of Chief Risk Officer until Kim Olson "succeeded to the role of Chief Risk Officer on December 27, 2022."

148.    SVB's deficient risk management protocols and internal controls led to its March 2023 failure.

149.    Throughout 2022, and continuing in the first three months of 2023, as interest rates rose, depositors withdrew substantial funds from SVB, exhausting the cash that the Company kept on hand to manage day-to-day deposits and withdrawals. Deposits fell from $198 billion at the end of March 2022 to $173 billion at the end of 2022 and to $165 billion at the end of February 2023.

150.    Much of the rest of the Company's funds were tied up in long-term HTM securities. Many of those investments were purchased when the Company's deposits skyrocketed in 2020 and 2021 and thus would not mature—and return the principal invested in them—until several years in the future.

151.    To raise cash, SVB decided to sell its entire portfolio of AFS securities.

152.    According to SVB's 2022 disclosure on Form 10-K, as of December 31, 2022, SVB held roughly $26 billion in AFS securities. By March 8, 2023, the Company had sold substantially all of these securities.

153.    Due to the rise in interest rates, however, SVB sold these securities at a $1.8 billion loss.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

154.    According to Axios, early in the week of February 27, 2023, SVB was informed that the credit rating agency Moody's was considering a double downgrade of SVB's debt. SVB asked Moody's to postpone the downgrade, and Moody's agreed.

155.    By the middle of the week, SVB was speaking with Goldman Sachs and private equity firms about raising capital. The next week, in early March, SVB decided to sell $2.25 billion in shares to raise revenue, including $500 million to private equity firm General Atlantic.

156.    On March 8, 2023, Moody's downgraded SVB's debt. On the same day, SVB announced its $1.8 billion loss and its plan to sell $2.25 billion in shares to raise revenue (though the Company had not found investors to purchase all the shares it intended to sell).

157.    SVB stated in a March 8 letter to investors:

> The sale of substantially all of our AFS securities will enable us to increase our asset sensitivity, particularly lock in funding costs, better insulate net interest income (NII) and net interest margin (NIM) from the impact of higher interest rates, and enhance profitability.
> . . .
>
> While ***we will realize a one-time, post tax earnings loss of approximately $1.8 billion*** in connection with the sale, we expect the reinvestment of the proceeds to be immediately accretive to net interest income (NII) and net interest margin (NIM), resulting in a short payback period of approximately three years.

(emphasis added).

158.    The market immediately reacted, with the price of SVB's shares dropping more than 60% the next day.

159.    On March 9, 2023, Peter Thiel's Founders Fund, which invests in and advises many startups and is closely watched by other market participants, began advising startups to withdraw their money from SVB.

160.    Depositors, including from SVB's startup-heavy depositor base, began to rapidly withdraw their deposits, a sequence of events partially driven by the fact that the bulk of SVB's deposits were not FDIC insured.  By the end of 2022, over 95% of the value of the deposits held at SVB was not backed by FDIC insurance.

161.     Because the great majority of deposits at SVB were not FDIC insured, when news of trouble at SVB began to spread, depositors feared they might lose their deposited funds. These fears sparked a bank run. On March 9, 2023, depositors attempted to withdraw $42 billion from their accounts at Silicon Valley Bank.

162.     On March 10, the California Department of Financial Protection and Innovation took possession of Silicon Valley Bank, ordered that it be liquidated, and named the FDIC as the receiver. On March 13, the FDIC transferred all deposits to a new FDIC-operated bank, Silicon Valley Bridge Bank, N.A.

163.     On March 17, SVB announced it had filed for bankruptcy. Its stock has since lost substantially all of its value.

164.     Thus, while depositors are being made whole, SVB stockholders have been wiped out. They have received nothing, and their shares are now virtually worthless.

## CLASS ACTION ALLEGATIONS

165.     Plaintiffs bring this action as a class action on behalf of all persons who acquired SVB common stock in the Merger exchange pursuant to the Offering Materials (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

166.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by SVB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

167.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of law that is complained of herein.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

168.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

169.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Securities Act;

(b)    whether the Offering Materials were negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

170.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of § 11 of the Securities Act
### Against All Defendants

171.    Plaintiffs incorporate all the foregoing by reference.

172.    This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

173.    This Count alleges and sounds in strict liability. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or scienter, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

174.    The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

175.    Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

176.    The Individual Defendants each signed or were named as Directors in the Offering Materials. As such, each is strictly liable for the material misrepresentations in the Offering Materials and the failure of the Offering Materials to be complete and accurate. Each Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials  and ensure that the representations in the Offering Materials were true and accurate, that there were no omissions of material facts that would render the Offering Materials misleading, and that the Offering Materials contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misrepresentations and omissions contained in the Offering Materials and should have known of the omissions of material facts necessary to make the statements made therein not misleading or otherwise required to be stated therein.  Accordingly, the Individual Defendants are liable to Plaintiffs and the Class under Section 11 for the material misrepresentations and omissions in the Offering Materials, and the failure of the Offering Materials to be complete and accurate.

177.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true and without omissions of any material facts and were not misleading.

178.    By reason of the conduct herein alleged, each Defendant violated, or controlled an employee or other person who violated, § 11 of the Securities Act.

179.    Plaintiffs acquired SVB shares pursuant to the Offering Materials.

180.    Plaintiffs and the Class have sustained damage.  The value of SVB common stock has declined substantially subsequent to and due to defendants' violations.

181.    At the time of their acquisition of SVB shares, Plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### Against All Defendants

182.    Plaintiffs incorporate all the foregoing by reference.

183.    This Count is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class against the Individual Defendants.

184.    This Count alleges and sounds in strict liability. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or scienter, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

185.    The prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiffs and the other members of the Class who purchased SVB shares pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no failure to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

186.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the prospectus at the time Plaintiffs acquired SVB shares.

187.    By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class, who purchased SVB shares pursuant to the prospectus, sustained substantial damages in connection with their purchases of the stock.  Accordingly, Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to Defendants

sued herein.  Class members who have sold their common stock seek damages to the extent permitted by law.

### THIRD CAUSE OF ACTION

**For Violation of § 15 of the Securities Act**
**Against the Individual Defendants**

188.    Plaintiffs incorporate all the foregoing by reference.

189.    This Cause of Action is brought pursuant to § 15 of the Securities Act against the Individual Defendants.

190.    The Individual Defendants were controlling persons of SVB by virtue of their positions as directors or senior officers of SVB.  The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of SVB.

191.    By reason of the wrongful conduct set forth above, each Individual Defendant was a culpable participant in the violations of §§ 11 and 12(a)(2) of the Securities Act alleged above, and thus also liable pursuant to § 15 of the Securities Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Certifying this class action, appointing Plaintiffs as Class representatives, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

DATED:  April 10, 2023

Respectfully submitted

/s/ *Adam E. Polk*

Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
Jordan Elias (SBN 228731)
jelias@girardsharp.com
Namita Dhawan (SBN 326639)
ndhawan@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846

*Attorneys for Plaintiffs and the Proposed Class*

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

# Exhibit F

E-FILED
4/10/2023 6:43 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
23CV413949
Reviewed By: Y. Chavez

Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
Jordan Elias (SBN 228731)
jelias@girardsharp.com
Namita Dhawan (SBN 326639)
ndhawan@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846

*Attorneys for Plaintiffs and the Proposed Class*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| KIM STEVENSON and HOWARD TARLOW, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br> vs.<br><br>GREG W. BECKER, DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVIS, JOEL P. FRIEDMAN, JEFFREY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP,<br><br>      Defendants. | Case No.   23CV413949<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs, individually and on behalf of a class of all other similarly situated investors, allege the following based upon personal knowledge as to Plaintiffs and their own acts, and otherwise based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by SVB Financial Group (the "Company" or "SVB") and Boston Private Bank & Trust Company ("Boston Private"), as well as media, testimony, and analyst reports concerning the Company and its public statements. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein.

## SUMMARY OF THE ACTION

1.     This is a securities class action on behalf of all persons who acquired SVB common stock pursuant to the S-4 registration statement, 424B3 prospectus (collectively, with materials incorporated by reference therein, the "Offering Materials") issued in connection with the July 2021 transaction through which SVB acquired and merged with Boston Private (the "Merger"). Plaintiffs assert strict liability claims for relief under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act") against certain SVB directors and officers and against KPMG, LLP ("KPMG"), SVB's independent auditor.

2.     At the time of the Merger, SVB operated as a financial services company, a bank holding company, and a financial holding company, offering banking and financial products and services to domestic and international clients. It offered its banking services through its primary subsidiary, Silicon Valley Bank, which operated as a California state-chartered bank.

3.     Under the Merger, each share of Boston Private stock was converted into the right to receive $2.10 in cash and 0.0228 shares of SVB common stock. Through this cash-and-stock exchange, in connection with the Merger, Defendants solicited and sold to former Boston Private shareholders approximately 1.9 million shares of SVB common stock. All of these new shares of SVB common stock were registered, issued, and solicited pursuant to the Offering Materials.

4.     The Offering Materials contained untrue statements of material fact and materially incomplete statements, and omitted material facts that were both required by governing regulations and necessary to make the statements not misleading. Leading up to the Merger, in an environment

of historically low interest rates, SVB concentrated a substantial portion of its investment portfolio to longer-term, fixed-rate securities. In doing so, because a rise in interest rates reduces the market value of fixed-rate securities, SVB exposed itself to significant interest rate risk that was not disclosed in the Offering Materials.

5.    As shown in greater detail below, the Offering Materials were rife with materially false and misleading statements and omissions as to the significant, undisclosed market risks, including severe interest rate risk, uninsured depositor risk and liquidity risk, that SVB faced.  Among other matters, the Offering Materials failed to disclose that:

(a)    Higher interest rates were already jeopardizing the bank's financial future, and worse, instead of mitigating such risks, SVB exacerbated them by, among other things, overconcentrating its investments in long-term investments to deliver short-term profits;

(b)    As more deposits flowed in, SVB's executives had disregarded internal assessments, including recommendations to purchase shorter-term bonds and implement other strategies to mitigate the risks to SVB's portfolio of a rise in interest rates, and instead continued investing in long-term bonds in order to drive short-term profits;

(c)    SVB had ignored internal risk management alarms, had failed to reasonably address and comply with key risk metrics, and had altered assumptions underlying internal models that showed higher interest rates would sharply reduce the value of SVB's investment portfolio, using unreasonable and improper adjustments to those models to mask the undisclosed risks and facilitate SVB's strategy of prioritizing short-term profits over sound investment strategy;

(d)    SVB lacked effective internal controls, had deficient risk management systems, its holding Company had been rated as deficient under the CAMELS (acronym for Capital adequacy, Assets, Management capability, Earnings, Liquidity, Sensitivity) rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was already facing various operational and technological problems, impairing the Company's ability to track risks, including interest rate risks, among other matters;

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

(e)     SVB lacked a diversified customer base, and was over-reliant on large depositors whose accounts exceeded the $250,000 Federal Deposit Insurance Corporation maximum, making SVB particularly vulnerable to a bank run if doubts arose as to its solvency; and

(f)     SVB's liquidity was less than disclosed by Defendants and, in truth, inadequate in view of its customers' business and their collective deposits.

6.     Moreover, with respect to interest rate risk, SVB failed to disclose the foreseeable risk that an increase in interest rates would impair the value of its long term fixed rate investment portfolio, creating catastrophic risks to SVB's balance sheet.  The Offering Materials' risk factor disclosures were materially incomplete and misleading, framing potential interest rate increases as an entirely *positive* development for SVB, without disclosing the risks of an increase in interest rates to SVB's investment portfolio. According to the Offering Materials, such increases would increase its interest rate spread, allowing SVB to charge more for its loans and buy higher yielding securities at a rate that would outpace the increased interest it would be obligated to pay on its customer deposits. But that same risk factor disclosure omitted that higher rates would reduce the market value of SVB's marketable securities, resulting in material unrealized losses from their decline in market value and realized losses if they had to be liquidated.

7.     On March 9, 2023, the Company announced in a mid-quarter update that it had sold "substantially all of our Available for Sale (AFS) securities portfolio" resulting in an estimated realized post-tax loss of $1.8 billion. SVB's stock plummeted more than 60% the next day.

8.     Since March 8, 2023, the stock has lost substantially all of its value. SVB terminated its previously announced equity offerings; Silicon Valley Bank was shut down by the California Department of Financial Protection and Innovation; and on March 17, 2023, SVB announced it had filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

9.     The Federal Reserve System has since undertaken a review of the SVB failure. According to prepared testimony given by Michael Barr, the Fed's Vice Chair for Supervision, to the Senate Committee on Banking, Housing, and Urban Affairs, "[t]he picture that has emerged thus far shows SVB had inadequate risk management and internal controls . . . ." In fact, as reported in

1   the *New York Times*, at around the time of the Merger the Fed alerted SVB that it "was doing a bad

2   job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble." And the

3   *Washington Post* reported in April 2023 that an internal model at SVB "showed that higher interest

4   rates could have a devastating impact on the bank's future earnings" but that, "[i]nstead of heeding

5   that warning—and over the concerns of some staffers—SVB executives simply changed the model's

6   assumptions . . . ."

7   　　　　10.　　Plaintiffs Kim Stevenson and Howard Tarlow owned Boston Private stock before the

8   Merger and acquired SVB stock pursuant to the Offering Materials in the Merger.  Plaintiffs assert

9   causes of action under §§ 11, 12, and 15 of the Securities Act against Defendants: the directors and

10   officers who signed the Offering Materials, and KPMG, SVB's independent auditor.

11   　　　　　　　　　　　　　**JURISDICTION AND VENUE**

12   　　　　11.　　This Court has original subject matter jurisdiction under the California Constitution,

13   Article VI, Section 10.  Removal is barred by Section 22 of the 1933 Act.

14   　　　　12.　　This Court has personal jurisdiction and venue is proper under California Code of

15   Civil Procedure § 410.10. Certain Defendants and their agents reside in California. Further, certain

16   Defendants drafted and signed the Offering Materials, and controlled SVB's operations, within

17   California and this county. KPMG signed the "Consent of Independent Registered Public

18   Accounting Firm" authorizing use of its reports concerning SVB's consolidated balance sheets, and

19   vouched for the effectiveness of internal controls over financial reporting in the Offering Materials

20   and the "Report of Independent Registered Public Accounting Firm," in California. Certain

21   Defendants and their agents also affirmatively solicited the subject securities and disseminated the

22   false and misleading statements and omissions to investors in California and this county. Individually

23   and collectively, these contacts with California are substantially connected to the claims set forth in

24   this complaint.

25   　　　　13.　　This Court is a proper venue under California Code of Civil Procedure § 395.

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

## **PARTIES**

14.     Plaintiff Kim Stevenson is a citizen and resident of Woolford, Maryland. Ms. Stevenson acquired SVB common stock via the Merger, in exchange for Boston Private shares, pursuant to the Offering Materials and was damaged thereby.

15.     Plaintiff Howard Tarlow is a citizen and resident of Lexington, Massachusetts. Mr. Tarlow acquired SVB common stock via the Merger, in exchange for Boston Private shares, pursuant to the Offering Materials and was damaged thereby.

16.     Defendant Greg W. Becker was, at all relevant times, President, Chief Executive Officer, and a Director of SVB. Defendant Becker reviewed, contributed to, and signed the Offering Materials.

17.     Defendant Daniel J. Beck was, at all relevant times, the Chief Financial Officer of SVB. Defendant Beck reviewed, contributed to, and signed the Offering Materials.

18.     Defendant Roger F. Dunbar was, at all relevant times Chairman of the Board of Directors of SVB. Defendant Dunbar was the chairperson of the Risk Committee at the time of the Merger. Defendant Dunbar reviewed, contributed to, and signed the Offering Materials.

19.     Defendant Karen Hon was, at all relevant times, the Chief Accounting Officer of SVB. Defendant Hon reviewed, contributed to, and signed the Offering Materials.

20.     Defendant Eric A. Benhamou was, at all relevant times, a Director of SVB. Defendant Benhamou was a member of the Risk Committee at the time of the Merger. Defendant Benhamou reviewed, contributed to, and signed the Offering Materials.

21.     Defendant John S. Clendening was, at all relevant times, a Director of SVB. Defendant Clendening reviewed, contributed to, and signed the Offering Materials.

22.     Defendant Richard D. Daniels was, at all relevant times, a Director of SVB. Defendant Daniels reviewed, contributed to, and signed the Offering Materials.

23.     Defendant Allison Davis was, at all relevant times, a Director of SVB. Defendant Davis reviewed, contributed to, and signed the Offering Materials.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

24.     Defendant Joel L. Friedman was, at all relevant times, a Director of SVB. Defendant Friedman was a member of the Risk Committee at the time of the Merger. Defendant Friedman reviewed, contributed to, and signed the Offering Materials.

25.     Defendant Jeffrey N. Maggioncalda was, at all relevant times, a Director of SVB. Defendant Maggioncalda reviewed, contributed to, and signed the Offering Materials.

26.     Defendant Beverly Kay Matthews was, at all relevant times, a Director of SVB. Defendant Matthews reviewed, contributed to, and signed the Offering Materials.

27.     Defendant Mary J. Miller was, at all relevant times, a Director of SVB. Defendant Miller was a member of the Risk Committee at the time of the Merger. Defendant Miller reviewed, contributed to, and signed the Offering Materials.

28.     Defendant Kate D. Mitchell was, at all relevant times, a Director of SVB. Defendant Mitchell was a member of the Risk Committee at the time of the Merger. Defendant Mitchell reviewed, contributed to, and signed the Offering Materials.

29.     Defendant John F. Robinson was, at all relevant times, a Director of SVB. Defendant Robinson was a member of the Risk Committee at the time of the Merger. Defendant Robinson reviewed, contributed to, and signed the Offering Materials.

30.     Defendant Garen K. Staglin was, at all relevant times, a Director of SVB. Defendant Staglin was a member of the Risk Committee at the time of the Merger. Defendant Staglin reviewed, contributed to, and signed the Offering Materials.

31.     The Defendants named in ¶¶ 16-30 are referred to herein as the "Individual Defendants."  Each of them signed and/or was identified as an incoming officer or director in the Offering Materials, solicited the securities issued pursuant thereto, and planned and contributed to the Merger and Offering Materials.

32.     Defendant KPMG LLP ("KPMG") is a New York Registered Foreign Limited Liability Partnership headquartered in New York, New York.  KPMG was the auditor for SVB from 1994 to 2023, including for the calendar year ended December 31, 2020.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

# FACTUAL BACKGROUND

## Relevant Banking Background

33.     A commercial bank is licensed to accept deposits and originate loans. Banks contract with customers to repay to the customer the amount deposited, with any interest provided for under the deposit agreement, upon the customer's demand.  For this reason, banks account for deposits as balance sheet liabilities.

34.     Commercial banks seek to profit from the funds on deposit by originating commercial loans. Banks require cash to fund operations and meet customer requests for cash withdrawals. Banks may also accumulate cash if the flow of deposits exceeds available lending opportunities.  To promote sound banking practice, regulations limit the types of investments banks are permitted to make with customer deposits. Banks account for commercial loans and investment securities as balance sheet assets.  Banks seek to profit on the difference between the interest that its assets earn and the interest that it must pay on its liabilities. This difference is called the "interest rate spread."

35.     Low interest rates generally correspond to a low interest rate spread. And because a bank makes its profit off the interest rate spread, low interest rates can result in lower bank profits than a higher interest rate environment.

36.     The securities that banks purchase generally fall into two categories: (1) "available-for-sale," or "AFS," and (2) "hold-to-maturity," or "HTM." AFS securities are those that might be sold to raise revenue, so their book value—their value on a balance sheet—is adjusted periodically to reflect changes in their market value, such as due to interest rate fluctuations. HTM securities are intended to be held to maturity, so their book value is kept fixed throughout their life. Selling HTM securities prior to their date of maturity results in the portfolio being immediately "marked to market" (valued at current market value versus value at maturity). Sales at a loss of a bank's investment securities reduce stockholder's equity.  If the loss is sufficient, the bank may need to raise new capital to avoid insolvency.

## SVB's Origins and Development to 2021

37.     SVB was founded in Santa Clara County in 1983 and has been headquartered in the same county ever since. Until its bankruptcy, SVB (through its primary subsidiary, Silicon Valley

Bank) specialized in accepting deposits from and lending to startup companies, particularly ones based in the Silicon Valley region of the San Francisco Bay Area.

38.     Throughout the 2010s, interest rates were low by historical standards, resulting in lower-than-desired profits at SVB. The concerns about profitability became more acute by the late 2010s, as SVB's assets approached $50 billion. The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 subjected all bank holding companies with $50 billion or more in assets to enhanced regulation due to their presumed systemic importance.

39.     In 2017, there was a change in leadership within SVB's key finance functions, and in 2018, the new financial leadership at SVB sought greater returns on the bank's assets. To that end, SVB shifted a greater portion of its investment portfolio from short-term bonds to long-term bonds. The latter pay higher interest rates but require a longer-term capital commitment by the bank.

40.     From the fourth quarter of 2019 through 2021, in part because the COVID-19 pandemic led to an increase in the use of the Internet for most activities and the federal government injected money into the economy to prevent a recession, SVB experienced massive growth in deposits. In 2018, SVB's deposits were just under $50 billion. In 2020, its deposits had grown to $102 billion. By 2021, its deposits were approaching $190 billion.

41.     More deposits came in than SVB could lend out. Loans to startups were a relatively small part of SVB's business in the early 2020s, both because startups were primarily funded through equity investments and because the typical startup lacked sufficient creditworthiness. SVB made home loans and performed other kinds of business lending, such as vineyard finance, but in accordance with the strategy it had adopted a few years earlier, much of the inflow of deposits to SVB in 2020 and 2021 went to purchasing long-term securities, such as U.S. Treasury bonds.

42.     SVB classified its investments as HTM securities (as opposed to AFS securities) for regulatory and accounting purposes. (*See supra* ¶ 36.)

43.     As a consequence of these developments, SVB's balance sheet in 2021 had the following essential characteristics:

- First, SVB's liabilities consisted primarily of recent deposits, often from startups and/or venture capital firms. These deposits brought significant risk. Venture capital

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

firms invest in startups to earn returns, but as interest rates rise, safer alternatives to investing in startups become more viable by paying a higher return. When interest rates rise, therefore, fewer startups receive funding, startups have less cash to deposit in a bank, and some may need to withdraw funds.

- Second, a substantial proportion of SVB's assets were long-term U.S. Treasury notes and bonds and other government-affiliated debt securities.

44.    U.S. Treasury notes and bonds are sometimes described as "safe" investments. But, while U.S. Treasury bonds are safe from *credit* risk (*i.e.*, the U.S. Treasury has never failed to repay creditors), all fixed-interest bonds are subject to significant interest rate risk. A U.S. Treasury bond or note provides payments at a fixed interest rate for a set number of years, but when interest rates rise, a bond at the older, lower rate *loses* value because investors can buy bonds at a new, higher rate.

45.    Long-term bonds pose additional risks. By definition, the holder must commit capital for a longer period. Hence, if there is an unexpected need for liquidity, bonds must be sold. If interest rates have risen, bonds must be sold at a loss.

46.    In the 2010s, interest rates had been low for years. The Federal Funds Rate, a key benchmark, dropped close to zero during the financial crisis in 2007 and 2008, and remained close to zero thereafter, except for a few small increases between 2017 and 2020, which were quickly reversed.

47.    By early 2021, market conditions had changed enough that SVB's exposure to rising interest rates was no longer a potential future risk: It presented a near-term crisis. Typically, the Federal Reserve raises interest rates to fight inflation. Accordingly, by early 2021, with interest rates at near historic lows, and increasing risks of inflation, a rise in interest rates was increasingly foreseeable.[1] Before 2022, interest rates were historically low: from the end of 2008 to early 2022, rates were lower than they had ever been in any previous time period of comparable length.

---

[1] The Federal Reserve announced seven rate increases in 2022, beginning in March, amounting to a total of four percentage points. Another rate hike followed in early 2023.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Historically, though, the Federal Reserve has lowered ***and raised*** interest rates to respond to macroeconomic conditions. Near-zero rates could not persist indefinitely.

### DEFENDANTS' FALSE AND MISLEADING OFFERING MATERIALS

48.     On January 4, 2021, SVB announced that it had entered into a definitive merger agreement pursuant to which it would acquire Boston Private Bank & Trust Company. Under the terms of the merger agreement, Boston Private shareholders would receive 0.0228 shares of SVB common stock and $2.10 of cash for each Boston Private share they owned.

**The Offering Materials**

49.     On February 11, 2021, SVB filed with the SEC on Form S-4 a draft registration statement to register the SVB shares to be issued and exchanged in the Merger under the federal securities laws.

50.     On March 16, 2021, SVB filed with the SEC a final amendment to the registration statement. As amended, the registration statement incorporated by reference previous SVB SEC filings, namely:

- Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed with the SEC on March 1, 2021;

- Definitive Proxy Statement on Schedule 14A for the 2021 annual meeting of stockholders, filed with the SEC on March 4, 2021;

- Current Reports on Form 8-K filed with the SEC on January 4, 2021, January 8, 2021, January 21, 2021 (only with respect to Item 8.01) and February 2, 2021; and

- Description of SVB common stock, par value $0.001 per share, contained in the registration statement on Form 8-A filed with the SEC on April 23, 1987, including any amendment or report filed for the purposes of updating such description.

51.     The SEC declared the amended registration statement effective on March 17, 2021.

52.     On March 18, 2021, SVB filed a prospectus on Form 424B3 for the SVB shares issued and exchanged in the Merger.

53.     On July 1, 2021, the Merger closed. On that date, Boston Private shareholders received 0.0228 shares of SVB common stock and $2.10 of cash for each Boston Private share they

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

owned. The final closing price of Boston Private stock was $14.75. Before then, Boston Private shareholders could sell their shares on the open market if they did not want to receive SVB stock in the Merger.

**The Offering Materials' False and Misleading Statements and Omissions Regarding Interest Rate and Deposit Risk**

54.     The Offering Materials contained untrue statements of material fact and omitted material facts that were both required by governing regulations and necessary to make the statements made not misleading.

55.     The Offering Materials failed to disclose that SVB faced significant interest rate risk, including on both the asset and liability sides of its balance sheet from its concentrations of long-term, fixed-rate, government-backed debt securities.  On the asset side of SVB's balance sheet, higher interest rates risked decreasing the value of SVB's long-term debt securities. On the liability side, higher interest rates meant increased risk that investors would allocate less capital to venture capital investments, which would serve to reduce SVB's deposits.

56.     The Offering Materials failed to disclose the interest rate risk associated with SVB's deposit base and longer-term fixed income securities, including the risk that if interest rates increased significantly, SVB would need to sell its longer term assets at market in a higher interest rate environment, such that SVB would realize losses on its investment portfolio. As detailed below, this relationship between the interest rate risk in SVB's deposits and its assets—which was an existing material risk by early 2021—materialized in March 2023 and precipitated the bank run that caused SVB's collapse.

57.     The Risk Factors section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, failed to disclose the grave interest rate risk that SVB faced.

58.     The Risk Factors section stated the following:

> **Our interest rate spread has declined, and may continue to decline in the future. Any material reduction in our interest rate spread could have a material adverse effect on our business, results of operations or financial condition.[2]**

---

[2] Bolding in original.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

A significant portion of our net income comes from our interest rate spread, which is the difference between the interest rates paid by us on interest-bearing liabilities, such as deposits and internal borrowings, and the interest rates and fees we receive on our interest-earning assets, such as loans extended to our clients, securities held in our investment portfolio and excess cash held to manage short-term liquidity. Our interest rate spread can be affected by the mix of loans, investment securities, deposits and other liabilities on our balance sheet, as well as a variety of external factors beyond our control that affect interest rate levels, such as competition, inflation, recession, global economic disruptions, unemployment and the fiscal and monetary policies of various governmental bodies. For example, changes in key variable market interest rates, such as the Federal Funds, National Prime ("Prime"), LIBOR or Treasury rates, generally impact our interest rate spread. While changes in interest rates do not generally produce equivalent changes in the revenues earned from our interest-earning assets and the expenses associated with our interest-bearing liabilities, increases in market interest rates are nevertheless *likely to cause our interest rate spread to increase. Conversely, if interest rates decline, our interest rate spread will likely decline. In the first quarter of 2020, the Federal Reserve lowered the target Federal Funds rate to between zero and 0.25%, which contributed to the decline of our interest rate spread, and also led to a decrease in the rates and yields on U.S. Treasury securities. If interest rates do not rise, or if the Federal Reserve lowers the target Federal Funds rate to below 0%, these low rates could continue to constrain our interest rate spread and may adversely affect our business forecasts*. On the other hand, increases in interest rates may result in a change in the mix of non-interest and interest-bearing accounts, and the level of off-balance sheet market-based investment preferred by our clients, which may also impact our interest rate spread.

(emphasis added).

59.     This paragraph incorporated into the Offering Materials was materially misleading because, among other matters, it portrays an increase in interest rates as "likely to cause [SVB's] interest rate spread to increase," which would increase the Company's net income from the spread. In other words, SVB could charge more for its loans and buy higher yielding securities. This statement was materially incomplete because SVB failed to disclose that an increase in interest rates also would sharply reduce the value of SVB's long-term debt securities and create the added risk of a sharp reduction in deposits as investors allocated less capital to venture capital investments.

60.     SVB's omissions regarding its interest rate risk rendered the Offering Materials false and misleading. Specifically, the Offering Materials failed to disclose the substantial risk that higher interest rates posed to SVB, including that higher interest rates would lower the market value of SVB's long-term debt securities, resulting in material unrealized losses from their declining market

value and realized losses if the securities were liquidated. Instead of informing investors of this risk, the Offering Materials presented future rate increases as a purely positive development for SVB.

61.     In late 2020, as SVB's deposits increased, Company executives rejected an internal recommendation to purchase shorter-term bonds to reduce the risk of material losses from interest rate increases.  As Bloomberg reported on March 13, 2023:

> In late 2020, the firm's asset-liability committee received an internal recommendation to buy shorter-term bonds as more deposits flowed in, according to documents viewed by Bloomberg. That shift would reduce the risk of sizable losses if interest rates quickly rose. But it would have a cost: an estimated $18 million reduction in earnings, with a $36 million hit going forward from there.

> Executives balked. Instead, the company continued to plow cash into higher-yielding assets. That helped profit jump 52% to a record in 2021 and helped the firm's valuation soar past $40 billion. But as rates soared in 2022, the firm racked up more than $16 billion of unrealized losses on its bond holdings.

> Throughout last year, some employees pleaded to reposition the company's balance sheet into shorter duration bonds. The asks were repeatedly rejected, according to a person familiar with the conversations. The firm did start to put on some hedges and sell assets late last year, but the moves proved too late.[3]

62.     Nor did the Offering Materials disclose that, to drive short-term profits, the Company ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that (correctly) showed that higher interest rates could force SVB into realizing devastating losses.  As reported by the Washington Post in an article titled, "*Silicon Valley Bank's risk model flashed red. So its executives changed it*":

> Flush with cash from a booming tech industry, **Silicon Valley Bank executives embarked on a strategy in 2020 to juice profits that quickly triggered an internal alarm. In buying longer-term investments that paid more interest, SVB had fallen out of compliance with a key risk metric. An internal model showed that higher interest rates could have a devastating impact on the bank's future earnings, according to two former employees familiar with the modeling who spoke on the condition of anonymity to describe confidential deliberations.**

> **Instead of heeding that warning — and over the concerns of some staffers — SVB executives simply changed the model's assumptions, according to the former**

---

[3] https://www.bloomberg.com/news/articles/2023-03-13/svb-failure-sparks-blame-game-over-trump-era-regulatory-rollback#xj4y7vzkg.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

*employees and securities filings.* The tweaks, which have not been previously reported, initially predicted that rising interest rates would have minimal impact.

The new assumptions validated SVB's profit-driven strategy, but they were profoundly misplaced. Over the past year, interest rates have climbed nearly five percentage points, the fastest pace since the 1980s. Meanwhile, the tech industry has entered a post-pandemic swoon, causing SVB's elite clientele to withdraw cash far faster than bank executives had expected.

On March 8, the bank was forced to raise additional cash by selling securities at a $1.8 billion loss. That touched off panic among SVB clients, who staged one of the biggest bank runs in U.S. history. Fanned by social media, depositors tried to withdraw $42 billion in a single day. The next morning, the bank collapsed and federal regulators took control.

*The episode shows that executives knew early on that higher interest rates could jeopardize the bank's future earnings. Instead of shifting course to mitigate that risk, they doubled down on a strategy to deliver near-term profits, displaying an appetite for risk that set the stage for SVB's stunning meltdown.*

\*       \*       \*

"They thought they could never go wrong," said a former bank official who spoke on the condition of anonymity to discuss internal business practices, recalling an internal stress test in late 2018 or 2019 that showed SVB could lose at least a third of its deposits over two years. Executives directed that that model also be reworked. "If they see a model they don't like," the official said, "they scrap it."

Kate Mitchell, a venture capitalist and chair of the SVB board's risk committee, didn't respond to a request for comment.

The behavior of customers depositing money is a key variable that banks use in developing risk models. One metric, closely tracked by banks and their examiners, estimates future cash flows and how sensitive they are to changes in interest rates. It was this metric, called the economic value of equity, that triggered a warning in mid-2020, according to the former employees.[4]

63.     The Offering Materials failed to disclose the risks from SVB's comparatively narrow and impulsive base of clients which rendered SVB's deposit base particularly at risk.  As Bloomberg reported on April 1, 2023: "There's all these venture-capital funded companies that have $5, $10, $20, $25, sometimes hundreds of millions of dollars parked with this little bank," he said. "And you

---

[4] "Silicon Valley Bank's risk model flashed red. So its executives changed it," *Washington Post* (Apr. 2, 2023), https://www.washingtonpost.com/business/2023/04/02/svb-collapse-risk-model/.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

can move money with the click of a mouse now. And then they're all talking to one another. So in retrospect, it's like yeah, should have seen that one coming more easily."[5]

64.     The Offering Materials failed to disclose that the deposit risk the Company faced because it lacked a diversified customer base was amplified by the large percentage of uninsured deposits at SVB.[6]

65.     Because depositors with uninsured deposits are exposed to the danger that they will lose their deposit if a bank fails, they are much more likely to withdraw their money if the bank reports adverse financial results, triggering a self-fulfilling cycle in which customers withdraw cash, forcing the bank into a fire sale of assets that further drives down their value.  The Offering Materials did not disclose the uninsured depositor risk that SVB faced.

66.     Further, there are several additional false, misleading, and incomplete disclosures in the Offering Materials. As set forth more fully below, none of the statements discloses SVB's failure to mitigate its interest rate and deposit risk, including through ignoring internal recommendations and alarms.

67.     The Risk Factors section of SVB's 2020 10-K stated:

**Liquidity risk could impair our ability to fund operations and jeopardize our financial condition.[7]**

Liquidity is essential to our business, both at the SVB Financial and the Bank level. We require sufficient liquidity to meet our expected financial obligations, as well as unexpected requirements stemming from client activity and market changes, such as the unexpected cash outflows that occurred at the onset of the COVID-19 pandemic when certain clients increased utilization of their credit lines. . . . ***The primary source of liquidity for the Bank is client deposits***. When needed, our liquidity is supplemented by wholesale borrowing capacity in the form of short- and long-term borrowings secured by our portfolio of high-quality investment securities, long-term capital market debt issuances and unsecured overnight funding channels available to us in the Federal Funds market. An inability to maintain or raise funds through these

---

[5] https://www.bloomberg.com/news/articles/2023-04-01/svb-s-fall-stunned-even-the-one-stock-analyst-who-said-to-sell.

[6] While the Federal Deposit Insurance Corporation (FDIC) insures bank deposits up to $250,000, the great majority of deposits in SVB (by value) were above $250,000.

[7] Bolding in original.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

sources could have a substantial negative effect, individually or collectively, on SVB Financial and the Bank's liquidity. Our access to funding sources in amounts adequate to finance our activities, or on terms attractive to us, could be impaired by factors that affect us specifically or the financial services industry in general. For example, *factors that could detrimentally impact our access to liquidity sources include a decrease in the level of our business activity due to a market downturn or adverse regulatory action against us, a downturn in asset markets such that the collateral we hold cannot be realized or is liquidated at prices not sufficient to recover the full amount of our secured obligations, a reduction in our credit rating, any damage to our reputation or any other decrease in depositor or investor confidence in our creditworthiness and business. Our access to liquidity could also be impaired by factors that are not specific to us, such as laws and regulations that limit the amount of intercompany dividends that bank subsidiaries may pay, severe volatility or disruption of the financial markets or negative views and expectations about prospects for the financial services industry as a whole.* Any such event or failure to manage our liquidity effectively could affect our competitive position, increase our borrowing costs and the interest rates we pay on deposits, limit our access to the capital markets and have a material adverse effect on our financial condition.

(emphasis added).

68.     The MD&A section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, stated:

Net gains on investment securities include gains and losses from our non-marketable and other equity securities, which include public equity securities held as a result of exercised equity warrant assets, as well as gains and losses from sales of our AFS debt securities portfolio, when applicable.

Our non-marketable and other equity securities portfolio primarily represents investments in venture capital and private equity funds, including a joint venture bank in China, debt funds, the newly acquired managed credit platform, private and public portfolio companies and qualified affordable housing projects. We experience variability in the performance of our non-marketable and other equity securities from period to period, which results in net gains or losses on investment securities (both realized and unrealized). This variability is due to a number of factors, including unrealized changes in the values of our investments, changes in the amount of realized gains and losses from distributions, changes in liquidity events and general economic and market conditions. Unrealized gains or losses from non-marketable and other equity securities for any single period are typically driven by valuation changes, and are therefore subject to potential increases or decreases in future periods. Such variability may lead to volatility in the gains or losses from investment securities. As such, our results for a particular period are not necessarily indicative of our expected performance in a future period.

The extent to which any unrealized gains or losses will become realized is subject to a variety of factors, including, among other things, the expiration of certain sales

restrictions to which these equity securities may be subject to (e.g. lock-up agreements), changes in prevailing market prices, market conditions, the actual sales or distributions of securities and the timing of such actual sales or distributions, which, to the extent such securities are managed by our managed funds, are subject to our funds' separate discretionary sales/distributions and governance processes.

Our AFS securities portfolio is a fixed income investment portfolio that is managed with the objective of earning an appropriate portfolio yield over the long-term while maintaining sufficient liquidity and credit diversification as well as addressing our asset/liability management objectives. ***Though infrequent, sales of debt securities in our AFS securities portfolio may result in net gains or losses and are conducted pursuant to the guidelines of our investment policy related to the management of our liquidity position and interest rate risk***.

(emphasis added).

69.     With respect to interest rate derivatives and swaps, the MD&A section of SVB's 2020 10-K, incorporated by reference into the Offering Materials, also stated:

*Client Interest Rate Derivatives*

We sell interest rate contracts to clients who wish to mitigate their interest rate exposure. ***We economically reduce the interest rate risk from this business by entering into opposite way contracts with correspondent banks***. . . .

*Interest Rate Swaps*

***To manage interest rate risk on our variable-interest rate loan portfolio, we enter into interest rate swap contracts to hedge against future changes in interest rates*** by using hedging instruments to lock in future cash inflows that would otherwise be impacted by movements in the market interest rates.

(emphasis added; italics in original).

70.     With respect to interest rate risk management, SVB's 2020 10-K, incorporated by reference into the Offering Materials, stated:

**Interest Rate Risk Management[8]**

Market risk is defined as the risk of adverse fluctuations in the market value of financial instruments due to changes in market interest rates. ***Interest rate risk is our primary market risk and can result from timing and volume differences in the repricing of our rate-sensitive assets and liabilities, widening or tightening of credit spreads, changes in the general level of market interest rates and changes in the***

_____

[8] Bolding in original.

*shape and level of the benchmark interest rates. Additionally, changes in interest rates can influence the rate of principal prepayments on mortgage securities, which affects the rate of amortization of purchase premiums and discounts.* Other market risks include foreign currency exchange risk and equity price risk (including the effect of competition on product pricing). These risks and related impacts are important market considerations but are inherently difficult to assess through simulation results. Consequently, simulations used to analyze the sensitivity of net interest income to changes in interest rates will differ from actual results due to differences in the timing and frequency of rate resets, the magnitude of changes in market rates, the impact of competition, fluctuating business conditions and the impact of strategies taken by management to mitigate these risks.

. . .

*Interest rate risk is managed primarily through strategies involving our fixed income securities portfolio, available funding channels and capital market activities. In addition, our policies permit the use of off-balance sheet derivatives, such as interest rate swaps, to assist with managing interest rate risk.*

(emphasis added).

71.     Each of the statements excerpted in paragraphs 67-70 above, was incomplete and misleading for numerous reasons.  The Offering Materials failed to disclose that higher interest rates jeopardized the bank's financial future but that instead of mitigating such risks, the bank doubled down on a strategy of investing in long-term investments to deliver short-term profits.  Moreover, the Offering Materials failed to disclose that despite internal recommendations at the bank to purchase shorter-term bonds as it took in more deposits, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits and disregarded duration risks despite pleas from employees to hedge SVB's balance sheet with shorter duration bonds. Additionally, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, using unreasonable and improper adjustments to the model to validate SVB's strategy of maximizing near term profits at the expense of assuming risks to the bank's solvency over the longer term.  The Offering Materials also failed to disclose that SVB lacked effective internal controls, had poor risk management, its holding Company was rated as deficient under the CAMELS rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was

riddled with many serious operational and technological problems that impeded Defendants' ability to track risks, including interest rate risks, among other matters.  Further still, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits—the primary source of the Company's liquidity—were particularly sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore reduced deposits at Silicon Valley Bank. Altogether, then, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including the interest rate risk, uninsured depositor risk and liquidity risk that SVB faced.

72.     SVB's 2020 10-K, incorporated by reference into the Offering Materials, also discussed a model for the effect of interest rate changes of 1 and 2 percentage points (100 and 200 basis points). In pertinent part, SVB's 2020 10-K stated:

> **Rapid deposit growth has exceeded the pace of our loan growth**, and as a result, a significant amount of excess deposits not used to fund loan growth have contributed to the growth of our cash and investments balances. Much of the investment portfolio is held in fixed rate MBS and CMOs which generally have a higher market value sensitivity than variable rate loans or cash. Thus, **under an upward rate shock scenario, the market value of investments changes more than the market value of deposits resulting in a negative EVE [economic value of equity, defined as the market value of assets, less the market value of liabilities] sensitivity in those scenarios**.

(emphasis added).

73.     These generalized cautionary statements were devoid of the context investors needed to evaluate them. They were, accordingly, incomplete and misleading for several reasons. First, SVB's deposit growth had not merely exceeded the pace of its loan growth. The Company's loans, which paid higher interest rates and were more profitable than its long-term debt security assets, were highly dependent on the performance of the technology market in Silicon Valley, which had been performing as well as it ever had in 2020, and hence it was unlikely that SVB would be able to substantially increase its loan portfolio without changing its lending model.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

74.     For example, more than half of SVB's loans were capital call loans, which are short-term loans to bridge the time between a call for capital from an investment firm's partners to fund an investment and the actual receipt of the funds. Demand for capital call loans from SVB depended on the frequency of capital calls among venture capital firms investing in technology companies. That frequency was very high by historical standards in 2020 and was unlikely to continue at the same level indefinitely, much less increase.

75.     The Offering Materials failed to disclose that SVB could not substantially grow its loan business from its size in 2020.

76.     Second, an upward rate shock would not simply result in a negative economic value of equity, as SVB suggested. It would also decrease liquidity. Hence, just as SVB's assets were decreasing in value, SVB would also need to sell assets to raise cash, creating the risk of catastrophic losses.

77.     Third, the effect of an upward rate shock was nonlinear. SVB's simulation—which only tested up to 2 percentage points—showed that an increase of 1 percentage point in interest rates would result in a 5.9% decrease in economic value of equity, and a 2 percentage point increase would result in a 15.4% decrease in economic value of equity. But SVB did not disclose that as interest rates continued to increase (a highly probable outcome), they would exert an *exponential* effect on SVB's economic value of equity, resulting in complete collapse of the Company at around 4-5 percentage points.

**The Offering Materials' False and Misleading Statements and Omissions Regarding Compliance with Generally Accepted Accounting Principles**

78.     Despite the Offering Materials' representations to the contrary, SVB violated Generally Accepted Accounting Principles ("GAAP").

**GAAP Overview**

79.     SEC Regulation S-X, 17 C.F.R. § 210.4 01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

80.     GAAP reflects those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB") and the American Institute of Certified Public Accountants ("AICPA").  SEC Regulation S-X, Rule 4-01, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

81.     GAAP consists of a hierarchy of authoritative literature. The highest authority is the Accounting Standards Codification, or ASC, formerly the FASB Statements of Financial Accounting Standards (FAS), followed by FASB Interpretations (FIN), FASB Staff Positions (FSP), Accounting Principles Board Opinions (APB), AICPA Accounting Research Bulletins (ARB), AICPA Statements of Position (SOP), and AICPA Industry Audit and Accounting Guides (AAG). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements (FASCON).

82.     As set forth in ASC 105-10-05-1, the Financial Accounting Standards Board (FASB) Accounting Standards Codification is the source of authoritative GAAP:

> This Topic establishes the Financial Accounting Standards Board (FASB) Accounting Standards Codification® (Codification) as the source of authoritative generally accepted accounting principles (GAAP) recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the Securities and Exchange Commission (SEC) under authority of federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to the SEC's rules and interpretive releases, the SEC staff issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and it utilizes SEC Staff Announcements and Observer comments made at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants.

83.     Additionally, under ASC 105-10-05-3, the following non-authoritative sources of accounting guidance may be relevant depending on circumstances, including the specificity of the guidance, the general recognition of the issuer or author as an authority, and the extent of its use in practice:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Accounting and financial reporting practices not included in the Codification are nonauthoritative. Sources of nonauthoritative accounting guidance and literature include, for example, the following:

    a.  Practices that are widely recognized and prevalent either generally or in the industry
    b.  FASB Concepts Statements (FASCON)
    c.  American Institute of Certified Public Accountants (AICPA) Issues Papers
    d.  International Financial Reporting Standards of the International Accounting Standards Board
    e.  Pronouncements of professional associations or regulatory agencies
    f.  Technical Information Service Inquiries and Replies included in AICPA Technical Practice Aids
    g.  Accounting textbooks, handbooks, and articles.

The appropriateness of other sources of accounting guidance depends on its relevance to particular circumstances, the specificity of the guidance, the general recognition of the issuer or author as an authority, and the extent of its use in practice.

84.    SVB was also expected to adhere to fundamental accounting principles that require that a Company's financial statements should be presented in a manner which, among other things, should:

(a) Provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASCON 1 ¶ 34);

(b) Provide information about an enterprise's economic resources, obligations, and owners' equity. That information helps investors, creditors, and others identify the enterprise's financial strengths and weaknesses and assess its liquidity and solvency. (FASCON 1 ¶ 40);

(c) Provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶ 42);

(d) Include explanations and interpretations to help users understand financial information because management knows more about the enterprise and its affairs than investors, creditors, or other "outsiders" and can often increase the usefulness of financial information by identifying certain transactions, other events, and circumstances that affect the enterprise and explaining their financial impact on it. (FASCON 1 ¶ 54);

(e) Be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. (FASCON 2 ¶¶ 58-59);

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

(f) Be complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASCON 2 ¶ 79);

(g) Be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent. (FASCON 2 ¶ 81); and

(h) Reflect that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶ 95, 97).

85.    SVB was subject to risks associated with depository and lending institutions. One such risk factor identified by the AICPA in the applicable AAG was "significant declines in customer demand and increasing business failures in either the industry or overall economy," including "deteriorating economic conditions . . . within industries or geographic regions in which the institution has significant credit concentrations." (Ch. 5, Audit Considerations and Certain Financial Reporting Matters, Ex. 5-1, Fraud Risk Factors).

86.    The AAG identifies another risk factor for lenders as occurring when "[v]acant staff positions remain unfulfilled for extended periods, thereby preventing the proper segregation of duties," and when there exists an "[u]nderstaffed accounting or information technology department, inexperienced or ineffective accounting or information technology personnel, or high turnover."

87.    Among the risk factors the AICPA identifies are "concentration in a particular type of financial instrument" and "a failure by management and those charged with governance to set parameters (for example, trading limits, credit limits, and aggregate market risk limits) and to continuously monitor trading activities against those parameters."

88.    ASC 450 (formerly Statement of Financial Accounting Standards No. 5, Accounting for Contingencies) defines a loss contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to [a] possible . . . loss to an enterprise that will ***ultimately be resolved when one or more future events occur or fail to occur***."  Under ASC 450, a charge to income should be taken if "(1) Information (before financial statements are issued) indicates that it is probable that an asset has been impaired or a liability incurred at the date of the financial statement; and (2) Amount of loss is reasonably estimable.  Further, ASC 450 requires disclosure in the

footnotes to the financial statements for material loss contingencies and/or significant risks and uncertainties. The occurrence, or non-occurrence, of a future event meets the definition of a loss contingency under GAAP.  Under ASC 450, disclosing a loss contingency in the notes to the financial statements  is *required* when there is more than a remote chance that a loss will be incurred (even in the event that a reliable estimate of eventual losses cannot be made at the time). The threshold for disclosure of a loss contingency (as opposed to a higher threshold for the *accrual* of a loss contingency) is very low—GAAP requires disclosure if, "*[t]he chance of the future event or events occurring is more than remote but less than likely*."  Under ASC 450: "*The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made*." Defendants failed to account for or disclose the loss contingencies SVB faced, including from material market risks such as interest rate risk, uninsured depositor risk and liquidity risks.

89.     Contrary to Defendants' representations in the Offering Materials, SVB's incorporated financial statements and other disclosures were not in compliance with GAAP. In numerous respects, SVB violated GAAP, including the standards detailed above, including by failing to properly account for the following matters.  The Offering Materials failed to disclose that higher interest rates jeopardized the bank's financial future but that instead of mitigating such risks, the bank doubled down on a strategy of investing in long-term investments to deliver short-term profits. Moreover, the Offering Materials failed to disclose that despite internal recommendations at the bank to purchase shorter-term bonds as it took in more deposits, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits and disregarded duration risks despite pleas from employees to hedge SVB's balance sheet with shorter duration bonds. Additionally, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, using unreasonable and improper tweaks to the model to validate SVB's profit-driven strategy.  Further, the Offering Materials failed to provide requisite quantitative disclosures to reflect reasonably possible near term changes to interest rates, thereby misrepresenting and failing to disclose the critical change in the Company's market

risk exposure, including interest rate risk, as well as how it would manage such risk.  The Offering Materials also failed to disclose that SVB lacked effective internal controls, had poor risk management, its holding Company was rated as deficient under the CAMELS rating system, regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations, and SVB was riddled with many serious operational and technological problems that impeded Defendants' ability to track risks, including interest rate risks, among other matters.  Further still, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits—the primary source of the Company's liquidity—were particularly sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank.  Accordingly, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including interest rate risk, uninsured depositor risk and liquidity risk, that SVB faced.

**The Offering Materials Falsely Represented that SVB's Internal Controls Over Financial Reporting Were Effective Despite Pervasive Operational and Technological Issues, Including Critical Problems Tracking Interest Rate Risk**

90.     SVB falsely asserted in its Offering Materials that it maintained effective internal controls over financial reporting. In fact, SVB lacked effective internal controls and the absence of such controls facilitated SVB misrepresenting, among other matters, that:

(a)     It was exposed to significantly less risk, including market risk such as interest rate risk, liquidity risk, and uninsured depositor risk, than was inherent in the assets it held;

(b)     Its risk management personnel and procedures were effective and reliable, when they were not;

(c)     It was able to make reasonable estimates of the fair value of its financial instruments; and

(d)     The fair value of the Company's financial instruments and other assets was reasonable.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

91.     COSO defines "internal controls" in Chapter 1 of its Framework as follows:

Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) Reliability of financial reporting; (iii) Compliance with applicable laws and regulations.

92.     COSO emphasizes the importance of a strong control environment, which sets a positive "tone at the top" and then flows down through the Company. The COSO Framework Executive Summary identifies the pervasive influence that the control environment has on the Company, as follows:

The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.

93.     In addition, the COSO Framework, Ch. 2, establishes that management's philosophy and operating style directly affect how the company is managed, the amount of risk that the company accepts, and ultimately its success. Chapter 2 of the COSO Framework states:

Management's philosophy and operating style affect the way the enterprise is managed, including the kinds of business risks accepted . . . . Other elements of management's philosophy and operating style include attitudes toward financial reporting, conservative or aggressive selection from available alternative accounting principles, conscientiousness and conservatism with which accounting estimates are developed, and attitudes toward data processing and accounting functions and personnel. . . . The impact of an ineffective control environment could be far reaching, possibly resulting in a financial loss, a tarnished public image or a business failure.

94.     Section 404 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley Act") requires management to assess the effectiveness of the internal control structure and the financial reporting for procedures. Management is responsible for performing this assessment in the context of a top-down risk assessment, which requires management to base both the scope of its assessment and the evidence gathered on risk. Management's conclusion of its assessment of the effectiveness of the Company's internal control must be included in the Company's annual report. Moreover, it was crucial for SVB to regularly monitor those controls to verify their operating effectiveness.

- 26 -

95.     Further, SEC rules require management to report publicly all material weaknesses in the Company's internal controls.

96.     Defendants Becker and Beck were required under Rule 302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's "internal control over financial reporting." Rule 302 states as follows:

> [E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting.

97.     In connection with the Offering Materials, Defendants Becker and Beck executed the applicable Rule 302 certification on March 1, 2021.

98.     As explained above and in the Company's regulatory filings, in doing so Defendants Becker and Beck represented to the marketplace that their assessment of internal controls over financial reporting was reliable and based upon the framework established by COSO. Also, Defendants Becker and Beck stated in the Company's Form 10-K filings that "management concluded that the Company's internal control over financial reporting was effective as of" the year ended 2020. These statements were false because: SVB lacked effective internal controls, including over market rate risk, interest rate risk, uninsured deposit liability risk and liquidity risk; engaged in poor risk management; its holding Company was rated as deficient under the CAMELS rating system; federal regulators had warned SVB that its risk management systems were inadequate and below the Federal Reserve's expectations; SVB was riddled with many serious operational and technological problems, impairing Defendants' ability to track risks, including interest rate risks, among other matters; and Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered new assumptions to internal models that showed that higher interest rates could impair SVB's capital base, to facilitate SVB's profit-driven strategy.  Thus, because SVB's internal controls were ineffective, management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes-Oxley Act, were materially false and misleading. Defendants Becker's and Beck's statements were false and misleading because SVB's internal controls were significantly

deficient and ineffective to prevent or detect errors or misstatements in its financial and operations reporting.

99.     Management's assessment of internal control over financial reporting was a significant matter for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws. However, SVB did not properly assess its internal controls over financial reporting; it consequently violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and Sarbanes-Oxley Act.

100.     The Offering Materials failed to disclose that in January 2019, regulators warned SVB that its risk management systems were inadequate, and also warned SVB in 2020 that its risk management systems were below the Federal Reserve's expectations.  As reported by the Wall Street Journal on March 19, 2023:

> The Federal Reserve raised concerns about risk management at Silicon Valley Bank starting at least four years before its failure earlier this month, documents show.
>
> In January 2019, the Fed issued a warning to SVB over its risk-management systems, according to a presentation circulated last year to employees of SVB's venture-capital arm, which was viewed by The Wall Street Journal.
>
> The Fed issued what it calls a Matter Requiring Attention, a type of citation that is less severe than an enforcement action. Regulators are supposed to make sure the problem is addressed, but it couldn't be learned if the Fed held SVB to that standard in 2019.
>
> *     *     *
>
> Following the 2019 warning, the Fed informed SVB in 2020 that its system to control risk didn't meet the expectations for a large financial institution, or a bank holding company with more than $100 billion in assets, the presentation to employees at SVB's venture-capital arm said.
>
> Large banks that don't meet the Fed's expectations are supposed to take corrective action to fix the problems or potentially face enforcement actions.
>
> At that time, the bank was growing quickly as deposits poured in during the early months of the pandemic. The average level of interest-earning assets grew 76% in the first quarter of 2021, compared with the same period one year earlier, the presentation said.

The bank's assets rose to $114 billon at the end of 2020, from about $70 billion in 2019, the year the Fed voiced its concerns. They nearly doubled from 2020 to the end of 2021 to about $209 billion, according to Federal Deposit Insurance Corp. data.

The Fed's criticism of SVB's risk-management systems raises the question of "why were they allowed to double their size after that," said Keith Noreika, an executive vice president at Patomak Global Partners who served as acting Comptroller of the Currency in 2017.[9]

101.     The Offering Materials failed to disclose that SVB lacked effective internal controls to reduce the risk of material losses from quickly rising interest rates:

In late 2020, the firm's asset-liability committee received an internal recommendation to buy shorter-term bonds as more deposits flowed in, according to documents viewed by Bloomberg. That shift would reduce the risk of sizable losses if interest rates quickly rose. But it would have a cost: an estimated $18 million reduction in earnings, with a $36 million hit going forward from there.

Executives balked. Instead, the company continued to plow cash into higher-yielding assets. That helped profit jump 52% to a record in 2021 and helped the firm's valuation soar past $40 billion. But as rates soared in 2022, the firm racked up more than $16 billion of unrealized losses on its bond holdings.

Throughout last year, some employees pleaded to reposition the company's balance sheet into shorter duration bonds. The asks were repeatedly rejected, according to a person familiar with the conversations. The firm did start to put on some hedges and sell assets late last year, but the moves proved too late.[10]

102.     The Offering Materials also failed to disclose that SVB had many serious operational and technological problems and weaknesses that examiners appointed by the Federal Reserve Bank of San Francisco identified, and that triggered formal warnings to SVB's executives.  As reported by Bloomberg on March 17, 2023:

Just over a year before Silicon Valley Bank's collapse threatened a generation of technology startups and their backers, the Federal Reserve Bank of San Francisco appointed a more senior team of examiners to assess the firm. They started calling out problem after problem.

---

[9]https://www.wsj.com/articles/fed-raised-concerns-about-svbs-risk-management-in-2019-4a1d802c.

[10]https://www.bloomberg.com/news/articles/2023-03-13/svb-failure-sparks-blame-game-over-trump-era-regulatory-rollback#xj4y7vzkg.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

> As the upgraded crew took over, it fired off a series of formal warnings to the bank's leaders, pressing them to fix serious weaknesses in operations and technology, according to people with knowledge of the matter.
>
> Then late last year they flagged a critical problem: The bank needed to improve how it tracked interest-rate risks, one of the people said, an issue at the heart of its abrupt downfall this month.[11]

103.    The Offering Materials also failed to disclose that SVB had critical problems in tracking interest rate risk including billions of dollars in unrealized losses. As Bloomberg reported on March 31, 2023, Federal Reserve examiners identified this "critical problem" at SVB in late 2022:

> Late last year, Fed examiners identified a critical problem: the bank needed to improve how it tracked interest-rate risks. The firm had about $15 billion in unrealized losses at year-end on mortgage-backed securities that it loaded up when rates were lower.[12]

104.    By 2021, as well, SVB's liquidity problems were clear to insiders. According to the *New York Times*, in 2021, "[s]upervisors at the Federal Reserve Bank of San Francisco, which oversaw Silicon Valley Bank, issued six citations" designated as "matters requiring attention" (MRAs) or "matters requiring immediate attention" (MRIAs). The warnings "flagged that the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble."  The article stated in part:

> Silicon Valley Bank's risky practices were on the Federal Reserve's radar for more than a year — an awareness that proved insufficient to stop the bank's demise.
>
> The Fed repeatedly warned the bank that it had problems, according to a person familiar with the matter.
>
> In 2021, a Fed review of the growing bank found serious weaknesses in how it was handling key risks. Supervisors at the Federal Reserve Bank of San Francisco, which oversaw Silicon Valley Bank, issued six citations. Those warnings, known as "matters requiring attention" and "matters requiring immediate attention," flagged that the firm was doing a bad job of ensuring that it would have enough easy-to-tap cash on hand in the event of trouble.

---

[11]https://www.bloomberg.com/news/articles/2023-03-17/fed-alarms-at-svb-began-more-than-year-ago-as-examiners-changed.

[12]https://www.bloomberg.com/news/articles/2023-03-21/svb-s-loans-to-insiders-tripled-to-219-million-before-it-failed?re_source=boa_related.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

But the bank did not fix its vulnerabilities. By July 2022, Silicon Valley Bank was in a full supervisory review — getting a more careful look — and was ultimately rated deficient for governance and controls. It was placed under a set of restrictions that prevented it from growing through acquisitions. Last autumn, staff members from the San Francisco Fed met with senior leaders at the firm to talk about their ability to gain access to enough cash in a crisis and possible exposure to losses as interest rates rose.

It became clear to the Fed that the firm was using bad models to determine how its business would fare as the central bank raised rates: Its leaders were assuming that higher interest revenue would substantially help their financial situation as rates went up, but that was out of step with reality.

\*       \*       \*

The picture that is emerging is one of a bank whose leaders failed to plan for a realistic future and neglected looming financial and operational problems, even as they were raised by Fed supervisors. For instance, according to a person familiar with the matter, executives at the firm were told of cybersecurity problems both by internal employees and by the Fed — but ignored the concerns.[13]

105.     The Federal Reserve describes MRAs as "a call for action to address weaknesses that could lead to deterioration in a banking organization's soundness. MRAs are confidential and not publicly issued."

106.     The Federal Reserve describes MRIAs as "a call for more immediate action to address acute or protracted weaknesses that could lead to further deterioration in a banking organization's soundness, may result in harm to consumers, or have caused, or could lead to, noncompliance with laws and regulations. MRIAs are confidential and not publicly issued."

107.     Although the MRAs and MRIAs issued by SVB's primary regulator—as well as the risk management failings that led to them—were known to SVB, investors remained in the dark.

**The Offering Materials Violated Affirmative Disclosure Obligations Under SEC Regulation S-K**

108.     Regulation S-K, Item 305, sets forth quantitative and qualitative disclosure requirements regarding market risk, including interest rate risk.

---

[13]https://www.nytimes.com/2023/03/19/business/economy/fed-silicon-valley-bank.html.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

109.    As to quantitative disclosures about market risk, Item 305(a) provides registrants three disclosure alternatives: (1) tabular presentation of fair values of the market risk sensitive instruments and contract terms sufficient to determine future cash flows from those instruments, categorized by expected maturity dates; (2) sensitivity analysis disclosures that express the potential loss in future earnings, fair values, or cash flows of market risk sensitive instruments resulting from one or more selected hypothetical changes in interest rates, foreign currency exchange rates, commodity prices, and other relevant market rates or prices over a selected period of time: or (3) value at risk disclosures that express the potential loss in future earnings, fair values, or cash flows of market risk sensitive instruments over a selected period of time, with a selected likelihood of occurrence, from changes in interest rates, foreign currency exchange rates, commodity prices, and other relevant market rates or prices.  17 C.F.R. § 229.305(a)(1)(i)-(iii).

110.    For sensitivity analysis disclosures, Item 305(a)(1)(ii) requires registrants to describe the model, assumptions and parameters necessary to understand the sensitivity analysis disclosures. The instructions to sensitivity analysis disclosures under paragraph 305(a)(1)(ii) make clear that "Registrants should select *hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices*. In this regard, absent economic justification for the selection of a different amount, registrants should use changes that are not less than 10 percent of end of period market rates or prices."  The same instructions state that "the term reasonably possible has the same meaning as defined by generally accepted accounting principles (*see, e.g.*, FASB ASC Master Glossary). The FASB ASC Master Glossary defines "reasonably possible" as "[t]he chance of the future event or events occurring is more than remote but less than likely."  Moreover, the same instructions state: "For purposes of instruction 3.A. of the Instructions to Paragraph 305(a), the term near term means a period of time going forward up to one year from the date of the financial statements (*see* FASB ASC Master Glossary)."

111.    The instructions to Item 305(a)(1)(ii) also set forth the following requirements:

Model, assumptions, and parameters that should be described include, but are not limited to, how *loss* is defined by the model (*e.g.*, loss in earnings, fair values, or cash flows), a general description of the modeling technique (*e.g.*, duration modeling, modeling that measures the change in net present values arising from selected

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

hypothetical changes in market rates or prices, and a description as to how optionality is addressed by the model), the types of instruments covered by the model (*e.g.*, derivative financial instruments, other financial instruments, derivative commodity instruments, and whether other instruments are included voluntarily, such as certain commodity instruments and positions, cash flows from anticipated transactions, and certain financial instruments excluded under instruction 3.C.ii. of the General Instructions to Paragraphs 305(a) and 305(b), and other relevant information about the model's assumptions and parameters, (*e.g.*, the magnitude and timing of selected hypothetical changes in market rates or prices used, the method by which discount rates are determined, and key prepayment or reinvestment assumptions).

112.    Contrary to these requirements, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates likely would devastate SVB's financial future, making unreasonable and improper tweaks to the model to validate and advance SVB's profit-driven strategy.

113.    As to qualitative disclosures about market risk, Item 305(b) requires registrants to describe, to the extent material, market risks including interest rate risk:

(i) The registrant's primary market risk exposures;

(ii) How those exposures are managed. Such descriptions shall include, but not be limited to, a discussion of the objectives, general strategies, and instruments, if any, used to manage those exposures; and

(iii) Changes in either the registrant's primary market risk exposures or how those exposures are managed, when compared to what was in effect during the most recently completed fiscal year and what is known or expected to be in effect in future reporting periods.

114.    The instructions accompanying Item 305(b) make clear that "primary market risk exposure" includes "interest rate risk," stating:

1. For purposes of disclosure under paragraph 305(b), primary market risk exposures means:

A. The following categories of market risk: interest rate risk, foreign currency exchange rate risk, commodity price risk, and other relevant market rate or price risks (e.g., equity price risk); and

B.  Within each of these categories, the particular markets that present the primary risk of loss to the registrant. For example, if a registrant has a material exposure to foreign currency exchange rate risk and, within this category of

- 33 -

market risk, is most vulnerable to changes in dollar/yen, dollar/pound, and dollar/peso exchange rates, the registrant should disclose those exposures. Similarly, *if a registrant has a material exposure to interest rate risk and, within this category of market risk, is most vulnerable to changes in short-term U.S. prime interest rates, it should disclose the existence of that exposure.*

2. For purposes of disclosure under paragraph 305(b), registrants should describe primary market risk exposures that exist as of the end of the latest fiscal year, and how those exposures are managed.

115.   As to the materiality assessment required under Item 305, the accompanying instructions make clear that registrants should evaluate:

> i. The materiality of the fair values of derivative financial instruments, other financial instruments, and derivative commodity instruments outstanding as of the end of the latest fiscal year; and

> ii. The materiality of potential, near-term losses in future earnings, fair values, and/or cash flows from reasonably possible near-term changes in market rates or prices.

> iii. If either paragraphs B.i. or B.ii. in this instruction of the General Instructions to Paragraphs 305(a) and 305(b) are material, the registrant should disclose quantitative and qualitative information about market risk, if such market risk for the particular market risk exposure category is material.

116.   In conducting the materiality assessment, moreover, "registrants generally should not net fair values, except to the extent allowed under generally accepted accounting principles," and "registrants should consider, among other things, the magnitude of:

> i. Past market movements;

> ii. Reasonably possible, near-term market movements; and

> iii. Potential losses that may arise from leverage, option, and multiplier features."

117.   The SEC's Office of the Chief Accountant and the Division of Corporation Finance have provided the following guidance on determining whether its market risk exposures are material enough to require the quantitative and qualitative disclosures under Item 305:

To determine if the quantitative and qualitative disclosures must be furnished, a company must perform the following procedure:

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Step 1: Categorize its market risk sensitive instruments into two portfolios: instruments entered into for trading purposes, and all other instruments.

Step 2: further categorize instruments within the two portfolios by type of market risk exposure category (interest rate risk, foreign currency exchange rate risk, commodity price risk, etc.).

Step 3: the company must assess the materiality of the market risk exposure for each category within each portfolio. ***This assessment must evaluate both (1) the materiality of the fair values of market sensitive instruments as of the end of the latest fiscal year, and (2) the materiality of potential, near-term losses in future earnings, fair values and cash flows from reasonably possible near-term changes in market rates or prices. If either is material, then the company should disclose the quantitative and qualitative information for that particular market risk exposure***. For these tests, registrants should not net favorable and unfavorable fair values, except where allowed under generally accepted accounting principles.

For example, assume a company has both a trading and non-trading portfolio. Each portfolio contains instruments that expose the company to changes in interest rates, foreign currency exchange rates, and commodity prices.

The company initially determines whether the fair values of market risk sensitive instruments were material at period end. If they were material, disclosure is material. If the fair values at period end were not material, the company would assess whether the interest rate sensitive instruments in its trading portfolio create a material exposure to changes in interest rates. That assessment should be made based on of [sic] fair values, cash flows, or earnings. If any of those measures is material, the company would provide quantitative information regarding its interest rate sensitive trading portfolio. Similar assessments are necessary for interest rate sensitive instruments in its non-trading portfolio, and all other exposures.

Quantitative disclosures are required only for material exposures. Thus, if the company's only material exposure is to changes in interest rates in its trading portfolio, it must present quantitative information only for that specific exposure. Quantitative disclosures about other, immaterial exposures are elective.[14]

118.   With respect to sensitivity analysis disclosures, the SEC's Office of the Chief Accountant and the Division of Corporation Finance further directed that:

Companies using sensitivity analysis should select hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices. Companies should use changes not less than 10% of end-of-period market rates or prices unless there is economic justification for a different

---

[14] https://www.sec.gov/divisions/corpfin/guidance/derivfaq.htm

- 35 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

amount. The rule provides that the magnitude of selected hypothetical changes in rates or prices may differ among and within market risk exposure categories.[15]

\*          \*          \*

Companies must select hypothetical changes in market rates or prices that are expected to reflect reasonably possible near-term changes in those rates and prices. The rules specified the use of a change that is not less than 10%, unless there is justification for using another amount. If a company has sufficient historical data indicating that a reasonably possible near-term change will be an amount less than 10%, it may use that amount. The Company should disclose why it chose a hypothetical change less than 10%.

119.    The SEC's Office of the Chief Accountant and the Division of Corporation Finance also made clear that Item 305 requires the following qualitative disclosures about market risks:

Qualitative disclosure about interest rate risk in a non-trading portfolio would include:

1) the nature of the interest rate exposure,

2) how interest rate risks are managed,

3) changes in interest rate exposures or how the interest rate exposures were managed when compared to the conditions that existed during the most recently completed fiscal year, and

4) known trends in interest rates, or anticipated rates in future reporting periods.

120.    The Offering Materials failed to provide the required disclosures under Item 305.  The quantitative disclosures violated Item 305 because they failed to reflect "reasonably possible near term changes." Instead, SVB used only a maximum 200 bps rate increase.  It was reasonably possible at the time of the Offering Materials that the Federal Reserve would (as it ultimately did) raise interest rates to a greater degree.

121.    The Offering Materials qualitative disclosures also violated Item 305, as they misrepresented and failed to disclose the critical change in the Company's market risk exposure, including from interest rate risk, as well as how it would manage such risk.  Further, the Offering

---

[15] https://www.sec.gov/divisions/corpfin/guidance/derivfaq.htm

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, making unreasonable and improper adjustments to the model to validate and advance SVB's profit-driven strategy.

122.    SEC Regulation S-K, Item 105, requires disclosure of "material" risk factors. As detailed therein, the "Risk Factor" section of the Offering Materials must "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.[16]  Item 105 requires disclosure of the risks to which reasonable investors would attach importance in making investment or voting decisions. Contrary to Item 105's requirements, the Offering Materials failed to disclose that higher interest rates would jeopardize the bank's financial future but that, instead of mitigating such risks, the Company had doubled down on a strategy to deliver short-term profits.   Further, the Offering Materials failed to disclose that despite internal recommendations to purchase shorter-term bonds as more deposits flowed in, to offset the material risk of losses from rising interest rates, SVB's executives focused on short-term profits, and disregarded duration risks despite strong recommendations from employees to prudently hedge SVB's balance sheet with shorter duration bonds.  Further still, the Offering Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk metrics, and engineered assumptions to internal models that showed that higher interest rates could devastate SVB's financial future, using unreasonable and improper tweaks to the model to validate SVB's profit-driven strategy.   Additionally, the Offering Materials failed to disclose that SVB lacked effective internal controls and was riddled with many serious operational and technological problems, plaguing Defendants' ability to track risks, including interest rate risks.   Moreover, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to trigger a run on the bank. Indeed, SVB failed to disclose that its startup clients' deposits, the primary source of the Company's liquidity, were especially

---

[16] Before April 2, 2019, current Item 105 was Item 503(c).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

1   sensitive to interest rates: higher interest rates result in lower overall investment in startups and

2   therefore lower deposits in Silicon Valley Bank.  Additionally, SVB never disclosed the relationship

3   between the interest rate risk in the Company's deposits and its long-term debt security assets.

4   Moreover, SVB also failed to disclose that it largely did *not* manage its interest rate risk in its fixed

5   income securities portfolio—in fact, it faced enormous interest rate risk from that portfolio. And it

6   made grossly inadequate use of derivatives or other hedging strategies, such as interest rate swaps,

7   to mitigate interest rate risk.  While the Offering Materials' discussion of risk factors listed market

8   and liquidity risks in vague and generic terms, it did not even mention the actual material risks posed

9   by the foregoing, much less adequately describe those risks as required by Item 105.

10          123.    SEC Regulation S-K, Item 303, requires that management's discussion and analysis

11   (MD&A) "[i]dentify any known trends or any known demands, commitments, events or

12   uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity

13   increasing or decreasing in any material way" and "[d]escribe any known trends or uncertainties that

14   have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales

15   or revenues or income from continuing operations." 17 C.F.R. § 229.303. Contrary to Item 303's

16   requirements, the Offering Materials failed to disclose the material market risks, including the

17   interest rate risk, uninsured depositor risk and liquidity risk that SVB faced, and which resulted in,

18   and were reasonably likely to result in, SVB's liquidity materially decreasing and having a materially

19   unfavorable impact on SVB's revenues and income.  As detailed herein, the Offering Materials failed

20   to disclose that higher interest rates jeopardized the bank's financial future but that, instead of

21   mitigating such risks, the bank had doubled down on a strategy to deliver short-term profits.  Further,

22   the Offering Materials failed to disclose that despite internal recommendations to purchase shorter-

23   term bonds as more deposits flowed in to offset the material risk of losses from rising interest rates,

24   SVB's executives focused on short-term profits, disregarding duration risks despite pleas from

25   employees to hedge SVB's balance sheet with shorter duration bonds.  Further still, the Offering

26   Materials failed to disclose that Defendants ignored internal alarms, failed to comply with key risk

27   metrics, and engineered assumptions to internal models that showed that higher interest rates could

28   devastate SVB's financial future, using unreasonable and improper tweaks to the model to validate

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

SVB's profit-driven strategy.  Additionally, the Offering Materials failed to disclose that SVB lacked effective internal controls and was riddled with many serious operational and technological problems, plaguing Defendants' ability to track risks, including interest rate risks.  Moreover, the Offering Materials failed to disclose that SVB lacked a diversified customer base and that a large percentage of the deposits of that non-diversified customer base were uninsured and therefore much more likely to seek to withdraw their money *en masse*. Indeed, SVB failed to disclose that its startup clients' deposits, the primary source of the Company's liquidity, were especially sensitive to interest rates: higher interest rates result in lower overall investment in startups and therefore lower deposits in Silicon Valley Bank.  Additionally, SVB never disclosed the relationship between the interest rate risk in the Company's deposits and its long-term debt security assets. SVB also failed to disclose that SVB largely did *not* manage its interest rate risk in its fixed income securities portfolio; instead, it faced enormous interest rate risk from that portfolio. And it made grossly inadequate use of derivatives or other hedging strategies, such as interest rate swaps, to mitigate interest rate risk. Accordingly, the Offering Materials failed to disclose the extent and severity of the undisclosed material market risks, including interest rate risk, uninsured depositor risk and liquidity risk that SVB faced.  These undisclosed trends, events, and their likely consequences, were known at the time and thus Item 303 required disclosure.

### KPMG's Liability

**Overview of Allegations Against KPMG**

124.    KPMG began auditing SVB in 1994, and audited SVB's financial statements and its system of internal controls over financial reporting for the year ended December 31, 2020.  KPMG also issued and signed audit opinions in which it certified that KPMG's internal controls were adequate and that the Company's financial statements were free of material misstatements and fairly presented SVB's financial position.

125.    The 2020 10-K includes as Item 8 a "Report of Independent Registered Public Accounting Firm," signed by KPMG. The KPMG Report states in relevant part:

*Opinions on the Consolidated Financial Statements and Internal Control Over Financial Reporting*

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

We have audited the accompanying consolidated balance sheets of SVB Financial Group and subsidiaries (the Company) as of December 31, 2020 and 2019, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2020, and the related notes (collectively, the consolidated financial statements). We also have audited the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles. **Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020 based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission**.

(bolding added; italics in original).

126.    KPMG consented to the incorporation by reference of its above-described report concerning the effectiveness of SVB's internal controls into the Offering Materials. Specifically, the Offering Materials included as an exhibit a "Consent of Independent Registered Public Accounting Firm" that provides in relevant part:

We consent to the use of our report dated March 1, 2021, with respect to the consolidated balance sheets of SVB Financial Group as of December 31, 2020 and 2019, the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2020, and the related notes, and the effectiveness of internal control over financial reporting as of December 31, 2020, incorporated herein by reference and to the reference to our firm under the heading "Experts" in this prospectus.

127.    KPMG's unqualified opinions on SVB's financial statements, incorporated by reference into the Offering Materials, were materially false and misleading.  Contrary to its representations, KPMG's audits of those financial statements were not conducted in accordance with Generally Accepted Auditing Standards ("GAAS") or Public Company Accounting Oversight Board ("PCAOB") standards, and SVB's financial condition and results of operations were not presented

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

in conformity with GAAP.  In issuing unqualified audit opinions and consenting to their incorporation in SVB's SEC filings, KPMG made false and misleading statements in violation of Section 11 of the Securities Act.

**Overview of GAAS**

128.   As SVB's external auditor, KPMG was required to audit the Company's financial statements and the effectiveness of SVB's internal controls over financial reporting in accordance with GAAS.

129.   The PCAOB, established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, Generally Accepted Auditing Standards, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. For simplicity, all references to GAAS hereinafter include the standards of the PCAOB. The standards adopted by PCAOB that also have been approved by the SEC are designated with the prefix "AS."  Preexisting interim standards that have been adopted by the PCAOB are designated by the prefix "AU."

130.   GAAS is comprised of ten standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. Auditors are required to follow those standards in each and every audit they conduct.

131.   The GAAS standards fall into three categories: General Standards; Fieldwork Standards; and Reporting Standards. The General Standards require, among other things, that the auditor exercise professional skepticism. The General Standards provide guidance to an auditor on the exercise of due professional care in the performance of the audit.  The Field Work Standards require, among other things, that an auditor obtain a sufficient understanding of the entity's business and operating environment to properly plan an audit in accordance with GAAS. Finally, the Reporting Standards require that an auditor express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed.

132.    An audit is a risk-based process during which the auditor should exercise due care. An auditor should be always aware of the risk of misstatements due to fraud or error.  As those risks increase or materialize, auditors are obligated by GAAS and PCAOB standards to alter their audit procedures accordingly.  KPMG failed to recognize glaring risks, and consequently, failed to adjust its audit procedures, leading to an unqualified audit report that was materially false and misleading.

133.    KPMG failed to exercise sufficient professional care in its audits of SVB's financial statements, and thus violated GAAS General Standard No. 3, which requires due professional care to be exercised in the performance of the audit and the preparation of the report, and AU § 230, Due Professional Care in the Performance of Work, which states that "[d]ue professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting." AU § 230.02.  The duty to exercise due care required KPMG to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.  AU § 230.10.  KPMG did not obtain such assurances.

134.    KPMG also failed to exercise sufficient professional skepticism in violation of AU § 316:

> Due professional care requires the auditor to exercise professional skepticism. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks.  Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity.  Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU § 316.13 (internal citations omitted).

135.    AU § 316 therefore required KPMG to be continually alert for indications of misstatements of SVB's financial statements, whether due to error or fraud.  The PCAOB standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present."  AU § 316.13.  As detailed above, due to the presence

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

of multiple red flags, KPMG knew or should have known that there was a strong possibility of material misstatements in connection with SVB's financial statements for the 2020 fiscal year.

136.   KPMG should have been aware that there was a heightened risk associated with the market risks, including the interest rate risk, uninsured depositor risk and liquidity risk, that SVB faced.   That heightened risk obligated KPMG to perform more stringent and rigorous audit procedures compared to those it otherwise performed.   For example paragraphs 6 and 9 of AS No. 13, The Auditor's Responses to the Risk of Material Misstatements, state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement.   Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment.
>
> *       *       *
>
> In designing the audit procedures to be performed, the auditor should . . . obtain more persuasive audit evidence the higher the auditor's assessment of risk.

137.   AS No. 13.14 provides specific examples of how KPMG should have modified its audit procedures to address its assessed risks.   In that regard, KPMG should have:

> (a) Chang[ed] the nature of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information;
> (b) Chang[ed] the timing of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and
> (c) Chang[ed] the extent of the procedures applied to obtain more evidence, *e.g.*, by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

138.   In failing to modify its audit procedures, KPMG failed to comply with AS No. 13. Had KPMG appropriately modified its audit procedures to be responsive to the risk of material misstatement of the Company's financial statements and carried out those procedures with the appropriate degree of professional skepticism, it would have discovered that the Company's financial statements failed to account for material market risks, including interest rate risk, uninsured depositor risk and liquidity risk.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

139.    KPMG failed to obtain sufficient appropriate evidentiary matter regarding the market risks that SVB faced, including the interest rate risk, uninsured depositor risk and liquidity risk. KPMG also did not comply with PCAOB auditing standards.  For example, KPMG violated GAAS Standard of Fieldwork No. 3, which requires sufficient appropriate evidentiary matter to afford a reasonable basis for: (1) the opinion regarding the financial statements and (2) the opinion regarding internal control over financial reporting.  KPMG likewise violated AS No. 15: Audit Evidence, which states that "as the risk increases, the amount of evidence that the auditor should obtain also increases. . . . [O]rdinarily more evidence is needed to respond to significant risks."  Despite ample indicators of increased market risks faced by SVB, including interest rate risk, uninsured depositor risk and liquidity risk, KPMG failed to obtain more evidence than it typically would in the absence of increased risk.

140.    KPMG also violated GAAS Standards of Reporting Nos. 1 and 4 by falsely representing that SVB's financial statements were presented in conformity with GAAP when they were not and by improperly providing unqualified opinions on SVB's financial statements for the year ended December 31, 2020, even though its audits were not conducted in accordance with PCAOB auditing standards and the financial statements were not prepared in accordance with GAAP.

141.    Under AS No. 5, KPMG was required to complete a careful examination regarding SVB's effective controls over financial reporting.  PCAOB's rulemaking in connection with AS No. 5 makes clear that KPMG could not simply rely on the assessment of internal controls reached and communicated to it by SVB's management or third parties but was instead required to independently assess the internal controls before it could issue a "clean" opinion.  According to AS No. 5: "The auditor is required to provide an independent opinion on the effectiveness of the company's internal control over financial reporting. . . . The auditor cannot obtain sufficient evidence to support an opinion on the effectiveness of internal controls based solely on observation of or interaction with the company's controls.  Rather, the auditor needs to perform procedures such as inquiry, observation, and inspection of documents, or walkthroughs, which consist of a combination of these procedures, in order to fully understand and identify the likely sources of potential misstatements[.]"

After performing an independent analysis, an independent auditor is not permitted to issue a clean opinion if any "material weaknesses" exist.

142.    KPMG's certifications and representations were incomplete and misleading. The above-described misrepresentations and omissions, SVB's failure to adequately manage interest rate risk, and its attendant collapse demonstrate significant deficiencies in its internal controls. In his prepared Senate testimony, Michael S. Barr, the Vice Chair for Supervision of the Board of Governors of the Federal Reserve System, attributed SVB's failure to "inadequate risk management and internal controls that struggled to keep pace with the growth of the bank." These risk management and internal control failures prompted six "supervisory findings" by the Fed in 2021 which included the MRAs and MRIAs described above (*supra* ¶¶ 104-107).

143.    KPMG, moreover, erroneously did not identify SVB's interest rate and deposit risk as "Critical Audit Matters."  According to AS No. 3101.11:

> The auditor must determine whether there are any critical audit matters in the audit of the current period's financial statements. A critical audit matter is any matter arising from the audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved especially challenging, subjective, or complex auditor judgment.

144.    According to AS No. 3101.12:

> In determining whether a matter involved especially challenging, subjective, or complex auditor judgment, the auditor should take into account, alone or in combination, the following factors, as well as other factors specific to the audit:
>
> a.  The auditor's assessment of the risks of material misstatement, including significant risks;
>
> b.  The degree of auditor judgment related to areas in the financial statements that involved the application of significant judgment or estimation by management, including estimates with significant measurement uncertainty;
>
> c.  The nature and timing of significant unusual transactions and the extent of audit effort and judgment related to these transactions;
>
> d.  The degree of auditor subjectivity in applying audit procedures to address the matter or in evaluating the results of those procedures;

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

e.   The nature and extent of audit effort required to address the matter, including the extent of specialized skill or knowledge needed or the nature of consultations outside the engagement team regarding the matter; and

f.   The nature of audit evidence obtained regarding the matter.

145.   SVB's interest rate risk and deposit risk qualified as Critical Audit Matters, but were unidentified as such by KPMG.

146.   With the foregoing misrepresentations and omissions in the Offering Materials, Defendants were able to complete the Merger. But in 2023, the price of SVB shares plunged, and the stock ultimately lost all value.

### DEFENDANTS' MISSTATEMENTS AND OMISSIONS WERE MATERIAL

147.   In April 2022, SVB terminated its Chief Risk Officer Laura Izurieta, paying her severance of over $7.1 million. SVB did not fill the position of Chief Risk Officer until Kim Olson "succeeded to the role of Chief Risk Officer on December 27, 2022."

148.   SVB's deficient risk management protocols and internal controls led to its March 2023 failure.

149.   Throughout 2022, and continuing in the first three months of 2023, as interest rates rose, depositors withdrew substantial funds from SVB, exhausting the cash that the Company kept on hand to manage day-to-day deposits and withdrawals. Deposits fell from $198 billion at the end of March 2022 to $173 billion at the end of 2022 and to $165 billion at the end of February 2023.

150.   Much of the rest of the Company's funds were tied up in long-term HTM securities. Many of those investments were purchased when the Company's deposits skyrocketed in 2020 and 2021 and thus would not mature—and return the principal invested in them—until several years in the future.

151.   To raise cash, SVB decided to sell its entire portfolio of AFS securities.

152.   According to SVB's 2022 disclosure on Form 10-K, as of December 31, 2022, SVB held roughly $26 billion in AFS securities. By March 8, 2023, the Company had sold substantially all of these securities.

153.   Due to the rise in interest rates, however, SVB sold these securities at a $1.8 billion loss.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

154.    According to Axios, early in the week of February 27, 2023, SVB was informed that the credit rating agency Moody's was considering a double downgrade of SVB's debt. SVB asked Moody's to postpone the downgrade, and Moody's agreed.

155.    By the middle of the week, SVB was speaking with Goldman Sachs and private equity firms about raising capital. The next week, in early March, SVB decided to sell $2.25 billion in shares to raise revenue, including $500 million to private equity firm General Atlantic.

156.    On March 8, 2023, Moody's downgraded SVB's debt. On the same day, SVB announced its $1.8 billion loss and its plan to sell $2.25 billion in shares to raise revenue (though the Company had not found investors to purchase all the shares it intended to sell).

157.    SVB stated in a March 8 letter to investors:

> The sale of substantially all of our AFS securities will enable us to increase our asset sensitivity, particularly lock in funding costs, better insulate net interest income (NII) and net interest margin (NIM) from the impact of higher interest rates, and enhance profitability.
> . . .
>
> While *we will realize a one-time, post tax earnings loss of approximately $1.8 billion* in connection with the sale, we expect the reinvestment of the proceeds to be immediately accretive to net interest income (NII) and net interest margin (NIM), resulting in a short payback period of approximately three years.

(emphasis added).

158.    The market immediately reacted, with the price of SVB's shares dropping more than 60% the next day.

159.    On March 9, 2023, Peter Thiel's Founders Fund, which invests in and advises many startups and is closely watched by other market participants, began advising startups to withdraw their money from SVB.

160.    Depositors, including from SVB's startup-heavy depositor base, began to rapidly withdraw their deposits, a sequence of events partially driven by the fact that the bulk of SVB's deposits were not FDIC insured.  By the end of 2022, over 95% of the value of the deposits held at SVB was not backed by FDIC insurance.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

161.    Because the great majority of deposits at SVB were not FDIC insured, when news of trouble at SVB began to spread, depositors feared they might lose their deposited funds. These fears sparked a bank run. On March 9, 2023, depositors attempted to withdraw $42 billion from their accounts at Silicon Valley Bank.

162.    On March 10, the California Department of Financial Protection and Innovation took possession of Silicon Valley Bank, ordered that it be liquidated, and named the FDIC as the receiver. On March 13, the FDIC transferred all deposits to a new FDIC-operated bank, Silicon Valley Bridge Bank, N.A.

163.    On March 17, SVB announced it had filed for bankruptcy. Its stock has since lost substantially all of its value.

164.    Thus, while depositors are being made whole, SVB stockholders have been wiped out. They have received nothing, and their shares are now virtually worthless.

**CLASS ACTION ALLEGATIONS**

165.    Plaintiffs bring this action as a class action on behalf of all persons who acquired SVB common stock in the Merger exchange pursuant to the Offering Materials (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

166.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by SVB or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

167.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of law that is complained of herein.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

168.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

169.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether the Offering Materials were negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

170.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

**For Violation of § 11 of the Securities Act**
**Against All Defendants**

171.     Plaintiffs incorporate all the foregoing by reference.

172.     This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

173.     This Count alleges and sounds in strict liability. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or scienter, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

174.     The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

175.   Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

176.   The Individual Defendants each signed or were named as Directors in the Offering Materials. As such, each is strictly liable for the material misrepresentations in the Offering Materials and the failure of the Offering Materials to be complete and accurate. Each Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials  and ensure that the representations in the Offering Materials were true and accurate, that there were no omissions of material facts that would render the Offering Materials misleading, and that the Offering Materials contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misrepresentations and omissions contained in the Offering Materials and should have known of the omissions of material facts necessary to make the statements made therein not misleading or otherwise required to be stated therein.  Accordingly, the Individual Defendants are liable to Plaintiffs and the Class under Section 11 for the material misrepresentations and omissions in the Offering Materials, and the failure of the Offering Materials to be complete and accurate.

177.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true and without omissions of any material facts and were not misleading.

178.   By reason of the conduct herein alleged, each Defendant violated, or controlled an employee or other person who violated, § 11 of the Securities Act.

179.   Plaintiffs acquired SVB shares pursuant to the Offering Materials.

180.   Plaintiffs and the Class have sustained damage.  The value of SVB common stock has declined substantially subsequent to and due to defendants' violations.

181.   At the time of their acquisition of SVB shares, Plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### Against All Defendants

182.    Plaintiffs incorporate all the foregoing by reference.

183.    This Count is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class against the Individual Defendants.

184.    This Count alleges and sounds in strict liability. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or scienter, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.

185.    The prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiffs and the other members of the Class who purchased SVB shares pursuant to the prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no failure to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the prospectus as set forth above.

186.    Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the prospectus at the time Plaintiffs acquired SVB shares.

187.    By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiffs and the other members of the Class, who purchased SVB shares pursuant to the prospectus, sustained substantial damages in connection with their purchases of the stock.  Accordingly, Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to Defendants

sued herein.  Class members who have sold their common stock seek damages to the extent permitted by law.

### THIRD CAUSE OF ACTION

**For Violation of § 15 of the Securities Act**
**Against the Individual Defendants**

188.    Plaintiffs incorporate all the foregoing by reference.

189.    This Cause of Action is brought pursuant to § 15 of the Securities Act against the Individual Defendants.

190.    The Individual Defendants were controlling persons of SVB by virtue of their positions as directors or senior officers of SVB.  The Individual Defendants each had a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of SVB.

191.    By reason of the wrongful conduct set forth above, each Individual Defendant was a culpable participant in the violations of §§ 11 and 12(a)(2) of the Securities Act alleged above, and thus also liable pursuant to § 15 of the Securities Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Certifying this class action, appointing Plaintiffs as Class representatives, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

DATED:  April 10, 2023

Respectfully submitted

/s/ *Adam E. Polk*

Daniel C. Girard (SBN 114826)
dgirard@girardsharp.com
Adam E. Polk (SBN 273000)
apolk@girardsharp.com
Jordan Elias (SBN 228731)
jelias@girardsharp.com
Namita Dhawan (SBN 326639)
ndhawan@girardsharp.com
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846

*Attorneys for Plaintiffs and the Proposed Class*

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

# Exhibit G

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Adam E. Polk (SBN 37000)<br>Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, CA 94108<br><br>TELEPHONE NO.: 415-981-4800    FAX NO. (Optional):<br>E-MAIL ADDRESS: apolk@girardsharp.com<br>ATTORNEY FOR (Name): Plaintiffs Kim Stevenson and Howard Tarlow | FOR COURT USE ONLY<br><br>**Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 4/10/2023 6:43 PM<br>Reviewed By: Y. Chavez<br>Case #23CV413949<br>Envelope: 11670801** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SANTA CLARA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: 191 North First Street
CITY AND ZIP CODE: San Jose, 95113
BRANCH NAME:

CASE NAME:
Stevenson, et al v. Becker, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 23CV413949 |
|---|---|---|---|---|
| [x] **Unlimited**<br>(Amount demanded exceeds $25,000) | [ ] **Limited**<br>(Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[x] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [x] is  [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [x] Large number of separately represented parties    d. [x] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [x] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action (specify): 3
5. This case [x] is  [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: April 10, 2023
Adam E. Polk
_____
(TYPE OR PRINT NAME)    ▶    _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

Page 1 of 2

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

# Exhibit H

**CM-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Adam E. Polk (SBN 37000)<br>Girard Sharp LLP, 601 California Street, Suite 1400, San Francisco, CA 94108 | *FOR COURT USE ONLY* |

TELEPHONE NO.: 415-981-4800   FAX NO. *(Optional):*

E-MAIL ADDRESS: apolk@girardsharp.com

ATTORNEY FOR *(Name):* Plaintiffs Kim Stevenson and Howard Tarlow

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SANTA CLARA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: 191 North First Street
CITY AND ZIP CODE: San Jose,  95113
BRANCH NAME:

CASE NAME:
Stevenson, et al v. Becker, et al.

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/10/2023 6:43 PM
Reviewed By: Y. Chavez
Case #23CV413949
Envelope: 11670801**

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 23CV413949 |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000)   [ ] **Limited** (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [x] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [x] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):* 3
5. This case [x] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 10, 2023

Adam E. Polk
_____
(TYPE OR PRINT NAME)

► _____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

Page 1 of 2

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. September 1, 2021]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

Exhibit I

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA  95113-1090**

**Electronically Filed**
**by Superior Court of CA,**
**County of Santa Clara,**
**on 4/18/2023 3:01 PM**
**Reviewed By: R. Walker**

TO:     FILE COPY

RE:     **Stevenson, et al. v. Becker, et al. (Class Action/Securities Litigation)** Case #23CV413949
CASE NUMBER:     **23CV413949**

**Envelope: 11741111**


**ORDER DEEMING CASE COMPLEX AND STAYING DISCOVERY**
**AND RESPONSIVE PLEADING DEADLINE**


WHEREAS, the Complaint was filed by Plaintiffs Kim Stevenson ("Plaintiff"), et al. in the Superior Court of California, County of Santa Clara, on **April 10, 2023** and assigned to Department **1** (Complex Civil Litigation), the **Honorable Sunil R. Kulkarni**   presiding, pending a ruling on the complexity issue;

IT IS HEREBY ORDERED that:

The Court determines that the above-referenced case is **COMPLEX** within the meaning of California Rules of Court 3.400.  The matter remains assigned, for all purposes, including discovery and trial, to Department 1 (Complex Civil Litigation), the **Honorable Sunil R. Kulkarni** presiding.

The parties are directed to the Court's local rules and guidelines regarding electronic filing and to the Complex Civil Guidelines, which are available on the Court's website.

Pursuant to California Rules of Court, Rule 3.254, the creation and maintenance of the Master Service List shall be under the auspices of (1) Plaintiff **Kim Stevenson**, as the first-named party in the Complaint, and (2) the first-named party in each Cross-Complaint, if any.

Pursuant to Government Code section 70616(b), each party's complex case fee is due within ten (10) calendar days of this date.

Plaintiff shall serve a copy of this Order on all parties forthwith and file a proof of service within seven (7) days of service.

Any party objecting to the complex designation must file an objection and proof of service within ten (10) days of service of this Order.  Any response to the objection must be filed within seven (7) days of service of the objection.  The Court will make its ruling on the submitted pleadings.

The Case Management Conference is remains set for **August 10, 2023 at 2:30 p.m. in Department 1**  and all counsel are ordered to attend.

Counsel for all parties are ordered to meet and confer in person at least 15 days prior to the First Case Management Conference and discuss the following issues:

1.  Issues related to recusal or disqualification;
2.  Issues of law that, if considered by the Court, may simplify or further resolution of the case, including issues regarding choice of law;
3.  Appropriate alternative dispute resolution (ADR), for example, mediation, mandatory settlement conference, arbitration, mini-trial;
4.  A plan for preservation of evidence and a uniform system for identification of documents throughout the course of this litigation;
5.  A plan for document disclosure/production and additional discovery; which will generally be conducted under court supervision and by court order;

6. Whether it is advisable to address discovery in phases so that information needed to conduct meaningful ADR is obtained early in the case (counsel should consider whether they will stipulated to limited merits discovery in advance of certification proceedings), allowing the option to complete discovery if ADR efforts are unsuccessful;

7. Any issues involving the protection of evidence and confidentiality;

8. The handling of any potential publicity issues;

Counsel for Plaintiff is to take the lead in preparing a Joint Case Management Conference Statement to be filed 5 calendar days prior to the First Case Management Conference, and include the following:

1. a brief objective summary of the case;

2. a summary of any orders from prior case management conferences and the progress of the parties' compliance with said orders;

3. significant procedural and practical problems that may likely be encountered;

4. suggestions for efficient management, including a proposed timeline of key events; and

5. any other special consideration to assist the court in determining an effective case management plan.

To the extent the parties are unable to agree on the matters to be addressed in the Joint Case Management Conference Statement, the positions of each party or of various parties should be set forth separately and attached to this report as addenda. The parties are encouraged to propose, either jointly or separately, any approaches to case management they believe will promote the fair and efficient handling of this case. The Court is particularly interested in identifying potentially dispositive or significant threshold issues the early resolution of which may assist in moving the case toward effective ADR and/or a final disposition.

**STAY ON DISCOVERY AND RESPONSIVE PLEADING DEADLINE** Pending further order of this Court, the service of discovery and the obligation to respond to any outstanding discovery is stayed. However, Defendant(s) shall file a Notice of Appearance for purposes of identification of counsel and preparation of a service list. The filing of such a Notice of Appearance shall be without prejudice to the later filing of a motion to quash to contest jurisdiction. Parties shall not file or serve responsive pleadings, including answers to the complaint, motions to strike, demurrers, motions for change of venue and cross-complaints until a date is set at the First Case Management Conference for such filings and hearings.

This Order is issued to assist the Court and the parties in the management of this "Complex" case through the development of an orderly schedule for briefing and hearings. This Order shall not preclude the parties from continuing to informally exchange documents that may assist in their initial evaluation of the issues presented in this Case.

Plaintiff shall serve a copy of this Order on all the parties in this matter forthwith.

SO ORDERED.

Date: ___April 18, 2023___

_____
**Hon. Sunil R. Kulkarni**
Judge of the Superior Court

---

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

-----
Updated on 3/11/21.

2

# Exhibit J

**ATTACHMENT CV-5012**

## CIVIL LAWSUIT NOTICE

**23CV413949**

*Superior Court of California, County of Santa Clara*
*191 North First St., San José, CA 95113*

CASE NUMBER: _____

<div style="border:1px solid black; text-align:center;">

### PLEASE READ THIS ENTIRE FORM

</div>

_PLAINTIFF_ (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint*, *Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

_DEFENDANT_ (The person sued):  **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint*;
2. You must serve by mail  a copy of your written response on the  Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

   **Warning:  If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

_RULES AND FORMS:_  You must follow the California Rules of Court and the Superior Court of California, County of <_CountyName_> Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms:  www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms:  http://www.sccsuperiorcourt.org/civil/rule1toc.htm

_CASE MANAGEMENT CONFERENCE (CMC):_  You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC.  You may ask to appear by telephone – see Local Civil Rule 8.*

<div style="border:1px solid black;">

Your Case Management Judge is: _Hon. Sunil R. Kulkarni_____   **Department:** _1_____

The 1st CMC is scheduled for:  (Completed by Clerk of Court)

        **Date:** _08/10/23_____   **Time:** _2:30pm_____   in **Department:** _1_____

The next CMC is scheduled for:  (Completed by party if the 1st CMC was continued or has passed)

        **Date:** _____   **Time:** _____   in **Department:** _____

</div>

_ALTERNATIVE DISPUTE RESOLUTION (ADR):_  If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

_WARNING:_ Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

<div style="border:1px solid red; color:red; text-align:center;">

**Reset Form**

</div>

# Exhibit K

LISA BUGNI (SBN# 323962)
lbugni@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:    (415) 318-1200
Facsimile:    (415) 318-1300

Attorneys for Defendant KPMG LLP

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/20/2023 3:45 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11767158**

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| KIM STEVENSON and HOWARD TARLOW, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GREG W. BECKER, DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVIS, JOEL P. FRIEDMAN, JEFFERY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP, <br><br> Defendants. | Case No. 23-cv-413949 <br><br> CLASS ACTION <br><br> **NOTICE OF APPEARANCE OF LISA BUGNI** <br><br><br> Judge: Hon. Sunil R. Kulkarni |

TO THE COURT, AND TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Lisa Bugni hereby appears as counsel of record for Defendant KPMG LLP ("KPMG") and is authorized to receive service of all pleadings, orders, notices, correspondence, and other documents regarding the above- referenced action on behalf of KPMG to:

> Lisa Bugni
> King & Spalding LLP
> 50 California Street, Suite 3300
> San Francisco, CA 94111
> Telephone: (415) 318-1200
> Facsimile: (415) 318-1300
> Email: lbugni@kslaw.com

This appearance is without prejudice to, or waiver of, any defense that KPMG may have.

Dated:  April 20, 2023

KING & SPALDING LLP

By:   LISA BUGNI

Attorneys for Defendant
KPMG LLP

2

**PROOF OF SERVICE**

Case: *Kim Stevenson, et al. v. Greg W. Becker, et al.*
Case No.: 23-cv-413949

I am a citizen of the United States and resident of the State of California. I am employed in the county of San Francisco, State of California, in the office of a member of the bar of this Court, at whose direction this service was made. I am over the age of eighteen years and not a party to the within action.

On **April 20, 2023**, I served the following documents in the manner described below:

**NOTICE OF APPEARANCE OF LISA BUGNI**

☒   **By U.S. Mail**: I am personally and readily familiar with the business practice of King & Spalding LLP for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Francisco, California.

☐   **By Messenger Service**: by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐   **By Overnight Mail:** I am personally and readily familiar with the business practice of King & Spalding LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☐   **By Electronic Service:** By electronically mailing a true and correct copy through King & Spalding LLP's electronic mail system to the email addresses set forth below.

☐   **By Personal Delivery:** I caused such envelope to be delivered by hand to the offices of each addressee below.

On the following part(ies) in this action:

| | |
|---|---|
| Daniel C. Girard<br>Adam E. Polk<br>Jordan Elias<br>Namita Dhawan<br>GIRARD SHARP LLP<br>601 California Street, Suite 1400<br>San Francisco, CA 94108<br>Telephone: (415) 981-4800<br>Facsimile: (4 1 5) 98 1 -4846<br>Email: dgirard@girardsharp.com<br>    apolk@girardsharp.com<br>    jelias@girardsharp.com<br>    ndhawan@girardsharp.com | Attorneys for Plaintiffs and the<br>Proposed Class |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 20, 2023, at San Francisco, California.

_____
Dalia Hill

# Exhibit L

1   LISA BUGNI (SBN# 323962)
    lbugni@kslaw.com
2   **KING & SPALDING LLP**
    50 California Street, Suite 3300
3   San Francisco, CA 94111
    Telephone:   (415) 318-1200
4   Facsimile:    (415) 318-1300

5   Attorneys for Defendant KPMG LLP

6

7

8

9

10

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/24/2023 3:22 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11790451**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

11  KIM STEVENSON and HOWARD TARLOW,        Case No. 23-cv-413949
    individually and on behalf of all others similarly
12  situated,                                         CLASS ACTION

13                           Plaintiffs,              **PROOF OF SERVICE**

14        v.

15  GREG W. BECKER, DANIEL J. BECK, ROGER
    F. DUNBAR, KAREN HON, ERIC A.            Date:
16  BENHAMOU, JOHN S. CLENDENING,           Time:
    RICHARD D. DANIELS, ALISON DAVIS,       Judge:  Hon. Sunil R. Kulkarni
17  JOEL P. FRIEDMAN, JEFFERY N.            Dept:   1
    MAGGIONCALDA, BEVERLY KAY
18  MATTHEWS, MARY J. MILLER, KATE D.
    MITCHELL, JOHN F. ROBINSON, GAREN K.
19  STAGLIN, and KPMG LLP,

20                           Defendants.

21

22

23

24

25

26

27

28

---

MASTER CAPTION
Case No. 23-cv-413949

**PROOF OF SERVICE**

Case:  *Kim Stevenson, et al. v. Greg W. Becker, et al.*
Case No.: 23-cv-413949

I am a citizen of the United States and resident of the State of California.  I am employed in the county of San Francisco, State of California, in the office of a member of the bar of this Court, at whose direction this service was made.  I am over the age of eighteen years and not a party to the within action.

On April 24, 2023, I served the following documents in the manner described below:

- **NOTICE OF VERIFIED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

- **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF VERIFIED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

- **DECLARATION OF LISA BUGNI IN SUPPORT OF UNOPPOSED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

- **VERIFIED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

- **[PROPOSED] ORDER GRANTING VERIFIED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY TO APPEAR PRO HAC VICE FOR KPMG LLP**

☒ **By U.S. Mail:**  I am personally and readily familiar with the business practice of King & Spalding LLP for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Francisco, California.

☐ **By Messenger Service:** by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐ **By Overnight Mail:**  I am personally and readily familiar with the business practice of King & Spalding LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☐ **By Electronic Service:**  By electronically mailing a true and correct copy through King & Spalding LLP's electronic mail system to the email addresses set forth below.

☐ **By Personal Delivery:** I caused such envelope to be delivered by hand to the offices of each addressee below.

2

On the following part(ies) in this action:

> Daniel C. Girard
> Adam E. Polk
> Jordan Elias
> Namita Dhawan
> GIRARD SHARP LLP
> 601 Califronia Street, Suite 1400
> San Francisco, CA 94108
> Facsimile: (4 1 5) 98 1 -4846
> Email: dgirard@girardsharp.com
> apolk@girardsharp.com
> jelias@girardsharp.com
> ndhawan@girardsharp.com

> Attorneys for Plaintiffs and the Proposed Class

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 24, 2023, at San Francisco, California.

_____
Dalia Hill

# Exhibit M

EFS-020

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY:** STATE BAR NO.: 323962<br>NAME: Lisa Bugni<br>FIRM NAME: KING & SPALDING LLP<br>STREET ADDRESS: 50 California Street, Suite 3300<br>CITY: San Francisco   STATE: CA   ZIP CODE: 94111<br>TELEPHONE NO.: (415) 318-1200   FAX NO.: (415) 318-1300<br>E-MAIL ADDRESS: lbugni@kslaw.com<br>ATTORNEY FOR (name): KPMG LLP | FOR COURT USE ONLY<br>E-RECEIVED<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 4/24/2023 3:22 PM<br>Reviewed By: R. Walker<br>Case #23CV413949<br>Envelope: 11790451 |

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SANTA CLARA<br>STREET ADDRESS: 191 North First Street<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: San Jose, CA 95113<br>BRANCH NAME: Downtown Superior Court | |
| PLAINTIFF/PETITIONER: Kim Stevenson, et al.<br>DEFENDANT/RESPONDENT: Greg W. Becker, et al.<br>OTHER: | **CASE NUMBER:**<br>23-cv-413949 |
| | **JUDICIAL OFFICER:**<br>Hon. Sunil R. Kulkarni |
| **PROPOSED ORDER (COVER SHEET)** | **DEPT:**<br>1 |

**NOTE:** This cover sheet is to be used to electronically file and submit to the court a proposed order. The proposed order sent electronically to the court must be in PDF format and must be attached to this cover sheet. In addition, a version of the proposed order in an editable word-processing format must be sent to the court at the same time as this cover sheet and the attached proposed order in PDF format are filed.

1. Name of the party submitting the proposed order:
   KPMG LLP

2. Title of the proposed order:
   Proposed Order Granting Pro Hac Vice Application of Richard T. Marooney

3. The proceeding to which the proposed order relates is:

   a. Description of proceeding: Verified Application for Admission of Richard T. Marooney to Appear Pro Hac Vice

   b. Date and time:

   c. Place: 191 North First Street, Dept. 1
      San Jose, CA 95113

4. The proposed order was served on the other parties in the case.

Lisa Bugni
_____
(TYPE OR PRINT NAME)

► 
_____
(SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
EFS-020 [Rev. February 1, 2017]

**PROPOSED ORDER (COVER SHEET)**
**(Electronic Filing)**

Cal. Rules of Court,
rules 2.252, 3.1312
www.courts.ca.gov

**EFS-020**

| CASE NAME:<br>Kim Stevenson, et al. v. Greg W. Becker, et al. | CASE NUMBER:<br>23-cv-413949 |
|---|---|

## PROOF OF ELECTRONIC SERVICE
### *PROPOSED ORDER*

1. I am at least 18 years old and **not a party to this action.**

   a. My residence or business address is *(specify):*

   b. My electronic service address is *(specify):*

2. I electronically served the *Proposed Order (Cover Sheet)* with a proposed order in PDF format attached, and a proposed order in an editable word-processing format as follows:

   a. On *(name of person served) (If the person served is an attorney, the party or parties represented should also be stated.):*

   b. To *(electronic service address of person served):*

   c. On *(date):*

   ☐ Electronic service of the *Proposed Order (Cover Sheet)* with the attached proposed order in PDF format and service of the proposed order in an editable word-processing format on additional persons are described in an attachment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(TYPE OR PRINT NAME OF DECLARANT)

▶

_____
(SIGNATURE OF DECLARANT)

**PROPOSED ORDER (COVER SHEET)**
**(Electronic Filing)**

LISA BUGNI (SBN# 323962)
lbugni@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:    (415) 318-1200
Facsimile:    (415) 318-1300

Richard T. Marooney (*Pro Hac Vice* Pending)
rmarooney@kslaw.com
**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, NY 10036-2601
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222

Attorneys for Defendant KPMG LLP

FILED

April 24, 2023

Clerk of The Court
Superior Court of CA
County of Santa Clara
23CV413949
By:  rwalker

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

KIM STEVENSON and HOWARD TARLOW,
individually and on behalf of all others similarly
situated,

                         Plaintiffs,

              v.

GREG W. BECKER, DANIEL J. BECK, ROGER
F. DUNBAR, KAREN HON, ERIC A.
BENHAMOU, JOHN S. CLENDENING,
RICHARD D. DANIELS, ALISON DAVI S,
JOEL P. FRIEDMAN, JEFFERY N.
MAGGIONCALDA, BEVERLY KAY
MATTHEWS, MARY J. MILLER, KATE D.
MITCHELL, JOHN F. ROBINSON, GAREN K.
STAGLIN, and KPMG LLP,

                         Defendants.

Case No. 23-cv-413949

CLASS ACTION

**[PROPOSED] ORDER GRANTING
VERIFIED APPLICATION FOR
ADMISSION OF RICHARD T.
MAROONEY TO APPEAR PRO HAC
VICE FOR KPMG LLP**

Date:
Time:
Judge:  Hon. Sunil R. Kulkarni
Dept:   1

---

PROPOSED ORDER RE APPLICATION OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE*
Case No. 23-cv-413949

IT IS ORDERED that Defendant KPMG LLP's Unopposed Application for Admission of Out-Of-State Attorney, Richard T. Marooney, to Appear *Pro Hac Vice* for Defendant KPMG LLP is hereby granted.

Dated: April 24, 2023

_____

_____

JUDGE OF THE SUPERIOR COURT

Sunil R. Kulkarni

PROPOSED ORDER RE APPLICATION OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE*
Case No. 23-cv-413949

# Exhibit N

1  LISA BUGNI (SBN# 323962)
   lbugni@kslaw.com
2  **KING & SPALDING LLP**
   50 California Street, Suite 3300
3  San Francisco, CA 94111
   Telephone:    (415) 318-1200
4  Facsimile:     (415) 318-1300

5  Richard T. Marooney (*Pro Hac Vice* Pending)
   rmarooney@kslaw.com
6  **KING & SPALDING LLP**
   1185 Avenue of the Americas
7  New York, NY 10036-2601
   Telephone:    (212) 556-2100
8  Facsimile:     (212) 556-2222

9  Attorneys for Defendant KPMG LLP

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/24/2023 3:22 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11790451**

10           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                    **COUNTY OF SANTA CLARA**

12

13  KIM STEVENSON and HOWARD TARLOW,         Case No. 23-cv-413949
    individually and on behalf of all others similarly
14  situated,                                 CLASS ACTION

15                          Plaintiffs,        **NOTICE OF VERIFIED
                                               APPLICATION FOR ADMISSION OF
16          v.                                 RICHARD T. MAROONEY TO
                                               APPEAR *PRO HAC VICE* FOR KPMG
17  GREG W. BECKER, DANIEL J. BECK, ROGER     LLP
    F. DUNBAR, KAREN HON, ERIC A.
18  BENHAMOU, JOHN S. CLENDENING,
    RICHARD D. DANIELS, ALISON DAVI S,        Date:
19  JOEL P. FRIEDMAN, JEFFERY N.              Time:
    MAGGIONCALDA, BEVERLY KAY                 Judge:  Hon. Sunil R. Kulkarni
20  MATTHEWS, MARY J. MILLER, KATE D.         Dept:   1
    MITCHELL, JOHN F. ROBINSON, GAREN K.
21  STAGLIN, and KPMG LLP,

22                          Defendants.

23

24

25

26

27

28

PLEASE TAKE NOTICE that Defendant KPMG LLP ("Defendant") hereby moves the Court to grant this unopposed application for an order pursuant to California Rules of Court, Rule 9.40, permitting out-of-state attorney, Richard T. Marooney, to appear as counsel *pro hac vice* for Defendant in the above-captioned case.

This application is made on the grounds that the applicant, Richard T. Marooney, is a member in good standing of the State Bar of New York and has been retained to appear in this action as counsel on behalf of Defendant.  Lisa Bugni of King & Spalding LLP is counsel of record for Defendant.  Richard T. Marooney is neither a resident of the State of California, nor regularly employed in the State of California, nor regularly engaged in substantial business, professional, or other activities in the State of California.

This application is based on this notice, the attached memorandum of points and authorities, the attached verified application of Richard T. Marooney, the attached declaration of Lisa Bugni, all other pleadings and papers on file, or of which this Court may take judicial notice at the time this application is heard, and all evidence adduced, and arguments made at the time of the hearing on this application.  A copy of this application, the supporting memorandum of points and authorities, the verified application of Richard T. Marooney, and the declaration of Lisa Bugni, have been served on the State Bar of California, together with the $50.00 fee, made payable to the State Bar of California, pursuant to the requirements of Rule 9.40(e) of the California Rules of Court.

Dated:  April 24, 2023

KING & SPALDING LLP

By: _____
LISA BUGNI

Attorneys for Defendant KPMG LLP

# Exhibit O

23CV413949
Santa Clara – Civil

1   LISA BUGNI (SBN# 323962)
    lbugni@kslaw.com
2   **KING & SPALDING LLP**
    50 California Street, Suite 3300
3   San Francisco, CA 94111
    Telephone:    (415) 318-1200
4   Facsimile:    (415) 318-1300

5   RICHARD T. MAROONEY (*Pro Hac Vice* Pending)
    rmarooney@kslaw.com
6   **KING & SPALDING LLP**
    1185 Avenue of the Americas
7   New York, NY 10036-2601
    Telephone:    (212) 556-2100
8   Facsimile:    (212) 556-2222

9   Attorneys for Defendant KPMG LLP

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/24/2023 3:22 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11790451**

10

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11

**COUNTY OF SANTA CLARA**

12

13  KIM STEVENSON and HOWARD TARLOW,
    individually and on behalf of all others similarly
14  situated,

15                         Plaintiffs,

16          v.

17  GREG W. BECKER, DANIEL J. BECK, ROGER
    F. DUNBAR, KAREN HON, ERIC A.
18  BENHAMOU, JOHN S. CLENDENING,
    RICHARD D. DANIELS, ALISON DAVI S,
19  JOEL P. FRIEDMAN, JEFFERY N.
    MAGGIONCALDA, BEVERLY KAY
20  MATTHEWS, MARY J. MILLER, KATE D.
    MITCHELL, JOHN F. ROBINSON, GAREN K.
21  STAGLIN, and KPMG LLP,

22                         Defendants.

Case No. 23-cv-413949

CLASS ACTION

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
VERIFIED APPLICATION FOR
ADMISSION OF RICHARD T.
MAROONEY TO APPEAR *PRO HAC
VICE* FOR KPMG LLP**

Judge: Hon. Sunil R. Kulkarni

Date:
Time:
Judge: Hon. Sunil R. Kulkarni
Dept:  1

23

24

25

26

27

28

---

## I.  **INTRODUCTION**

KPMG LLP ("Defendant") is currently represented by California attorney Lisa Bugni from King & Spalding LLP.  Defendant has also retained Richard T. Marooney, an attorney who is licensed in the State of New York and employed by the law firm of King & Spalding LLP, to represent Defendant in the above-referenced action.  Defendant seeks to have Richard T. Marooney admitted to practice before this Court for purposes of the above-referenced action pursuant to California Rules of Court, Rule 9.40.  Plaintiffs in the above-referenced action do not oppose the application.

## II.  **LEGAL STANDARD**

California Rules of Court, Rule 9.40, permits attorneys who are licensed to practice in other states to be admitted *pro hac vice* if they satisfy the following eligibility criteria:

A person who is not a member of the State Bar of California but who is a member in good standing of and eligible to practice before the bar of any United States court or the highest court in any state, territory, or insular possession of the United States, and who has been retained to appear in a particular cause pending in a court of this state, may in the discretion of such court be permitted upon written application to appear as counsel *pro hac vice*, provided that an active member of the State Bar of California is associated as attorney of record. No person is eligible to appear as counsel *pro hac vice* under this rule if the person is: [¶] (1) A resident of the State of California; [¶] (2) Regularly employed in the State of California; or [¶] (3) Regularly engaged in substantial business, professional, or other activities in the State of California.

As set forth in his verified application filed concurrently herewith, Richard T. Marooney is not a resident of the State of California, is not regularly employed in the State of California, and is not regularly engaged in substantial business, professional, or other activities in the State of California.  In addition, Richard T. Marooney is a member in good standing of the State Bar of New York, has been retained as counsel in the above-referenced action, and has associated with an active member of the California State Bar.

California Rules of Court, Rule 9.40(d), requires an applicant seeking admission *pro hac vice* to provide the Court with certain information, including the applicant's address, the courts to

which the applicant has been admitted to practice and the dates of admission, that the applicant is a member in good standing in those courts, that the applicant is not currently suspended or disbarred in any court, the title of court and cause in which the applicant has filed an application to appear *pro hac vice* in the preceding two years, and the name, address, and telephone number of the active member of the California State Bar who is the attorney of record.  The verified application of Richard T. Marooney and the declaration of Lisa Bugni provide all of the information required by Rule 9.40(d).

The application for admission of Richard T. Marooney to appear *pro hac vice* for Defendant has been served on all parties in the above-referenced case, and on the State Bar of California, together with the requisite $50.00 application fee in satisfaction of California Rules of Court, Rule 9.40(c) and (e).

## III.   **CONCLUSION**

Based upon the foregoing, Defendant respectfully requests that the Court grant the application for Richard T. Marooney to appear as counsel *pro hac vice* for the duration of the above-referenced action.

Dated:  April 24, 2023

KING & SPALDING LLP

By:  _____
LISA BUGNI

Attorneys for Defendant KPMG LLP

# Exhibit P

1    LISA BUGNI (SBN# 323962)
     lbugni@kslaw.com
2    **KING & SPALDING LLP**
     50 California Street, Suite 3300
3    San Francisco, CA 94111
     Telephone:    (415) 318-1200
4    Facsimile:     (415) 318-1300

5    Richard T. Marooney (*Pro Hac Vice* Pending)
     rmarooney@kslaw.com
6    **KING & SPALDING LLP**
     1185 Avenue of the Americas
7    New York, NY 10036-2601
     Telephone:    (212) 556-2100
8    Facsimile:     (212) 556-2222

9    Attorneys for Defendant KPMG LLP

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/24/2023 3:22 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11790451**

10

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11

**COUNTY OF SANTA CLARA**

12

13    KIM STEVENSON and HOWARD TARLOW, individually and on behalf of all others similarly situated,

14

                Plaintiffs,

15

16         v.

17    GREG W. BECKER, DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVI S, JOEL P. FRIEDMAN, JEFFERY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP,

18

19

20

21

22                 Defendants.

Case No. 23-cv-413949

CLASS ACTION

**DECLARATION OF LISA BUGNI IN SUPPORT OF UNOPPOSED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

Date:
Time:
Judge: Hon. Sunil R. Kulkarni
Dept:   1

23

24

25

26

27

28

—————————————————————————————————
DECLARATION OF LISA BUGNI IN SUPPORT OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE* FOR KPMG LLP
Case No. 23-cv-413949

I, Lisa Bugni, declare that:

1.       I am an attorney at law duly authorized to practice before all courts of the State of California and I am Partner at the law firm of King & Spalding LLP, attorneys of record for KPMG LLP in the above-referenced cases.  I have personal knowledge of the following facts and, if called as a witness in the above-referenced cases, could competently testify to the matters stated herein.

2.       I make this declaration in support of the unopposed application for an order allowing out-of-state attorney, Richard T. Marooney, to appear *pro hac vice* for KPMG LLP.

3.       On April 21, 2023, I emailed Adam Polk, counsel for Plaintiffs in the above-referenced case.  I informed Mr. Polk that KPMG LLP would seek to have Richard T. Marooney admitted as counsel *pro hac vice*.  Mr. Polk stated that Plaintiffs would not oppose the application.

4.       On April 24, 2023, I caused to be served on the California State Bar in San Francisco a copy of the application for admission of out-of-state attorney, Richard T. Marooney, to appear *pro hac vice* together with the application fee in the amount of $50.00.  A true copy of the confirmation and receipt from the State Bar is attached hereto as **Exhibit A**.

5.       I declare under penalty of perjury under the laws of the State of California that the foregoing information is true.

Executed this 24th day of April, 2023 in San Francisco, California.



_____
                          LISA BUGNI

# EXHIBIT A

**Dalia Hill**

---

**From:**      State Bar of California - Special Admissions <special.admissions@calbar.ca.gov>
**Sent:**      Monday, April 24, 2023 2:19 PM
**To:**        Dalia Hill; Richard Marooney
**Subject:**   Pro Hac Vice Application Acknowledgement Notice

---

CAUTION: **MAIL FROM OUTSIDE THE FIRM**



**Application's Case Number:** 00921906
**Trial Case Name:** Kim Stevenson, et al. v. Greg W. Becker, et al.
**Trial Case Number:** 23-cv-413949

Dear Dalia Hill,

Your Pro Hac Vice application has been received and is pending review. For your application to be approved, you must have submitted an uploaded copy of the original Pro Hac Vice application, in addition to the application fee.

**If you failed to upload the original Pro Hac Vice application/document during the online application process, please follow the steps below to upload the completed document to your existing application:**

1. Login to the Applicant Community site.
2. Click the "Special Admissions" tab at the top of the home page, and then select the "Pro Hac Vice" option.
3. In the "Upload document(s) to a previously submitted application" box, select the "Next" button.
4. Follow the directions on the screen to search for the application using the application's "Case Number" (listed at the top of this message beginning with "00"), and upload the document(s).

Applicants who encounter problems gaining access to the Applicant Community, or those who have not yet created a password to the Applicant Community, should take the following steps:

1. Access the Applicant Community at admissions.calbar.ca.gov.
2. Click "Forgot your password."
3. Click "Send Password Reset Email."
4. Check your email and follow the instructions to reset your password.

If you paid by e-check (ACH), then your application will not be approved until we can confirm that your payment was processed, successfully. It may take up to 7 business days before the transaction is settled. In addition, if you owe any outstanding fees to the State Bar, your application cannot be approved until the fees are paid.

Once the application is deemed complete, you will receive an email notifying you of a successful filing.

If you have any questions, please contact the Special Admissions department at the number below.

Sincerely,


Office of Admissions
State Bar of California
(415) 538-2300


ref:_00Dt0TZax._5008y7eBJx:ref

# Exhibit Q

LISA BUGNI (SBN# 323962)
lbugni@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:    (415) 318-1200
Facsimile:    (415) 318-1300

Richard T. Marooney (*Pro Hac Vice* Pending)
rmarooney@kslaw.com
**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, NY 10036-2601
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222

Attorneys for Defendant KPMG LLP

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/24/2023 3:22 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11790451**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| KIM STEVENSON and HOWARD TARLOW, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GREG W. BECKER, DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVI S, JOEL P. FRIEDMAN, JEFFERY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP,<br><br>Defendants. | Case No. 23-cv-413949<br><br>CLASS ACTION<br><br>**VERIFIED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY TO APPEAR *PRO HAC VICE* FOR KPMG LLP**<br><br>Date:<br>Time:<br>Judge: Hon. Sunil R. Kulkarni<br>Dept:   1 |

I, Richard T. Marooney, declare that:

1.      I am a partner with the law firm of King & Spalding LLP.  I am a member in good standing of the State Bar of New York (Bar Number 2678100).

2.      I have been apprised of the facts, issues and developments in the above-captioned action, and I am familiar with the subject matter of this case.  I intend to act as co-counsel of record for KPMG LLP (Defendant) in this case.

3.      I presently reside at 86 5th Street, Garden City, NY 11530, and am a Partner in the law firm of King & Spalding LLP, resident in the New York office located at 1185 Avenue of the Americas, 34th Floor, New York, NY 10036-2601, and have been since 1995.

4.      I am admitted to practice in the following courts:

- New York (1995)
- U.S. District Court for the Southern District of New York (1996)
- U.S. District Court for the Western District of New York (1998)
- U.S. District Court for the Northern District of New York (1998)
- U.S. District Court for the Eastern District of New York (1996)
- U.S. Court of Appeals for the Second Circuit (2010)

5.      I am currently a member in good standing in all of the courts in which I have been admitted.

6.      I have never been suspended or disbarred in any court.

7.      In the preceding two years, I have not been admitted to appear *pro hac vice* before any court in California.

8.      I am not: (i) a resident of the State of California; (ii) regularly employed in the State of California; or (iii) regularly engaged in substantial business, professional, or other activities in the State of California.

9.      By this application, I request *pro hac vice* permission from the Court to appear as co-counsel on behalf of Defendant.

10.     The name, address, and telephone number of the active member of the State Bar of California who is attorney of record:

2

VERIFIED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY
TO APPEAR *PRO HAC VICE*
Case No. 23-cv-413949

1

LISA BUGNI (SBN# 323962)
lbugni@kslaw.com

2

KING & SPALDING LLP
50 California Street, Suite 3300

3

San Francisco, CA 94111
Telephone:    (415) 318-1200

4

Facsimile:     (415) 318-1300

5

6

Executed this 21st day of April, 2023, in New York, New York.

7

8

9

RICHARD T. MAROONEY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED APPLICATION FOR ADMISSION OF RICHARD T. MAROONEY
TO APPEAR *PRO HAC VICE*
Case No. 23-cv-413949

# Exhibit R

LISA BUGNI (SBN# 323962)
lbugni@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:     (415) 318-1200
Facsimile:     (415) 318-1300

Kevin J. O'Brien (*Pro Hac Vice* Pending)
kobrien@kslaw.com
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5100

Attorneys for Defendant KPMG LLP

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/25/2023 4:01 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11803434**

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SANTA CLARA

| | |
|---|---|
| KIM STEVENSON and HOWARD TARLOW, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>GREG W. BECKER, DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVI S, JOEL P. FRIEDMAN, JEFFERY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP,<br><br>                Defendants. | Case No. 23-cv-413949<br><br>CLASS ACTION<br><br>**PROOF OF SERVICE**<br><br><br>Date:<br>Time:<br>Judge:  Hon. Sunil R. Kulkarni<br>Dept:   1 |

<div align="center">**PROOF OF SERVICE**</div>

Case: *Kim Stevenson, et al. v. Greg W. Becker, et al.*
Case No.: 23-cv-413949

I am a citizen of the United States and resident of the State of California.  I am employed in the county of San Francisco, State of California, in the office of a member of the bar of this Court, at whose direction this service was made.  I am over the age of eighteen years and not a party to the within action.

On April 25, 2023, I served the following documents in the manner described below:

- **NOTICE OF VERIFIED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

- **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF VERIFIED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

- **DECLARATION OF LISA BUGNI IN SUPPORT OF UNOPPOSED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

- **VERIFIED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE* FOR KPMG LLP**

- **[PROPOSED] ORDER GRANTING VERIFIED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN TO APPEAR PRO HAC VICE FOR KPMG LLP**

☒ **By U.S. Mail:**  I am personally and readily familiar with the business practice of King & Spalding LLP for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at San Francisco, California.

☐ **By Messenger Service:** by consigning the document(s) to an authorized courier and/or process server for hand delivery on this date.

☐ **By Overnight Mail:**  I am personally and readily familiar with the business practice of King & Spalding LLP for collection and processing of correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by Federal Express for overnight delivery.

☐ **By Electronic Service:**  By electronically mailing a true and correct copy through King & Spalding LLP's electronic mail system to the email addresses set forth below.

☐ **By Personal Delivery:** I caused such envelope to be delivered by hand to the offices of each addressee below.

1  On the following part(ies) in this action:

2

3  Daniel C. Girard
   Adam E. Polk
   Jordan Elias
4  Namita Dhawan
   GIRARD SHARP LLP
5  601 Califronia Street, Suite 1400
   San Francisco, CA 94108
6  Facsimile: (4 1 5) 98 1 -4846
   Email: dgirard@girardsharp.com
7  apolk@girardsharp.com
   jelias@girardsharp.com
8  ndhawan@girardsharp.com

9

10  Attorneys for Plaintiffs and the Proposed Class

11

12  I declare under penalty of perjury under the laws of the State of California that the foregoing is
    true and correct. Executed on April 25, 2023, at San Francisco, California.
13

14  _____
                    Dalia Hill
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit S

EFS-020

| | | |
|---|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY:**<br>NAME:  Lisa Bugni<br>FIRM NAME:  KING & SPALDING LLP<br>STREET ADDRESS: 50 California Street, Suite 3300<br>CITY:  San Francisco<br>TELEPHONE NO.: (415) 318-1200<br>E-MAIL ADDRESS:  lbugni@kslaw.com<br>ATTORNEY FOR (name):  KPMG LLP | STATE BAR NO.: 323962<br><br><br>STATE:  CA     ZIP CODE:  94111<br>FAX NO.: (415) 318-1300 | **E-RECEIVED**  *FOR COURT USE ONLY*<br>**by Superior Court of CA,<br>County of Santa Clara,<br>on 4/25/2023 4:01 PM<br>Reviewed By: R. Walker<br>Case #23CV413949<br>Envelope: 11803434** |

| | | |
|---|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF**  SANTA CLARA<br>STREET ADDRESS: 191 North First Street<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: San Jose, CA 95113<br>BRANCH NAME: Downtown Superior Court | | |
| PLAINTIFF/PETITIONER: Kim Stevenson, et al.<br>DEFENDANT/RESPONDENT: Greg W. Becker, et al.<br>OTHER: | | **CASE NUMBER:**<br>23-cv-413949 |
| **PROPOSED ORDER (COVER SHEET)** | | **JUDICIAL OFFICER:**<br>Hon. Sunil R. Kulkarni |
| | | **DEPT:**<br>1 |

**NOTE:** This cover sheet is to be used to electronically file and submit to the court a proposed order. The proposed order sent electronically to the court must be in PDF format and must be attached to this cover sheet. In addition, a version of the proposed order in an editable word-processing format must be sent to the court at the same time as this cover sheet and the attached proposed order in PDF format are filed.

1. Name of the party submitting the proposed order:
   KPMG LLP

2. Title of the proposed order:
   Proposed Order Granting Pro Hac Vice Application of Kevin J. O'Brien

3. The proceeding to which the proposed order relates is:

   a. Description of proceeding: Verified Application for Admission of Kevin J. O'Brien to Appear Pro Hac Vice

   b. Date and time:

   c. Place: 191 North First Street, Dept. 1
      San Jose, CA 95113

4. The proposed order was served on the other parties in the case.

Lisa Bugni
_____
(TYPE OR PRINT NAME)                    ▶                    _____
                                                             (SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 2

**PROPOSED ORDER (COVER SHEET)**
**(Electronic Filing)**

**EFS-020**

| CASE NAME: | CASE NUMBER: |
|---|---|
| Kim Stevenson, et al. v. Greg W. Becker, et al. | 23-cv-413949 |

## PROOF OF ELECTRONIC SERVICE
### *PROPOSED ORDER*

1. I am at least 18 years old and **not a party to this action.**

    a. My residence or business address is *(specify):*

    b. My electronic service address is *(specify):*

2. I electronically served the *Proposed Order (Cover Sheet)* with a proposed order in PDF format attached, and a proposed order in an editable word-processing format as follows:

    a. On *(name of person served) (If the person served is an attorney, the party or parties represented should also be stated.):*

    b. To *(electronic service address of person served):*

    c. On *(date):*

    ☐ Electronic service of the *Proposed Order (Cover Sheet)* with the attached proposed order in PDF format and service of the proposed order in an editable word-processing format on additional persons are described in an attachment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(TYPE OR PRINT NAME OF DECLARANT)

▶

_____
(SIGNATURE OF DECLARANT)

EFS-020 [Rev. February 1, 2017]

**PROOF OF ELECTRONIC SERVICE (COVER SHEET)**
**(Electronic Filing)**

Page 2 of 2

1  LISA BUGNI (SBN# 323962)
   lbugni@kslaw.com
2  **KING & SPALDING LLP**
   50 California Street, Suite 3300
3  San Francisco, CA 94111
   Telephone:    (415) 318-1200
4  Facsimile:    (415) 318-1300

5  Kevin J. O'Brien (*Pro Hac Vice* Pending)
   kobrien@kslaw.com
6  **KING & SPALDING LLP**
   1180 Peachtree Street, NE, Suite 1600
7  Atlanta, GA 30309-3521
   Telephone:    (404) 572-4600
8  Facsimile:    (404) 572-5100

9  Attorneys for Defendant KPMG LLP

FILED

April 25, 2023

Clerk of The Court
Superior Court of CA
County of Santa Clara
23CV413949
By:  rwalker

10
          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11
          **COUNTY OF SANTA CLARA**

12

13  KIM STEVENSON and HOWARD TARLOW,
    individually and on behalf of all others similarly
14  situated,

15                              Plaintiffs,

16           v.

17  GREG W. BECKER, DANIEL J. BECK, ROGER
    F. DUNBAR, KAREN HON, ERIC A.
18  BENHAMOU, JOHN S. CLENDENING,
    RICHARD D. DANIELS, ALISON DAVI S,
19  JOEL P. FRIEDMAN, JEFFERY N.
    MAGGIONCALDA, BEVERLY KAY
20  MATTHEWS, MARY J. MILLER, KATE D.
    MITCHELL, JOHN F. ROBINSON, GAREN K.
21  STAGLIN, and KPMG LLP,

22                              Defendants.

Case No. 23-cv-413949

CLASS ACTION

~~**[PROPOSED]**~~ **ORDER GRANTING
VERIFIED APPLICATION FOR
ADMISSION OF KEVIN J. O'BRIEN
TO APPEAR PRO HAC VICE FOR
KPMG LLP**

Date:
Time:
Judge:  Hon. Sunil R. Kulkarni
Dept:  1

23

24

25

26

27

28

PROPOSED ORDER RE APPLICATION OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE*
Case No. 23-cv-413949

1       IT IS ORDERED that Defendant KPMG LLP's Unopposed Application for Admission of

2  Out-Of-State Attorney, Kevin J. O'Brien, to Appear *Pro Hac Vice* for Defendant KPMG LLP is

3  hereby granted.

4

5  Dated: _____    April 25, 2023

                               JUDGE OF THE SUPERIOR COURT

6                                **Hon. Sunil R. Kulkarni**

PROPOSED ORDER RE APPLICATION OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE* Case No.
23-cv-413949

# Exhibit T

1    LISA BUGNI (SBN# 323962)
     lbugni@kslaw.com
2    **KING & SPALDING LLP**
     50 California Street, Suite 3300
3    San Francisco, CA 94111
     Telephone:    (415) 318-1200
4    Facsimile:     (415) 318-1300

5    Kevin J. O'Brien (*Pro Hac Vice* Pending)
     kobrien@kslaw.com
6    **KING & SPALDING LLP**
     1180 Peachtree Street, NE, Suite 1600
7    Atlanta, GA 30309-3521
     Telephone:    (404) 572-4600
8    Facsimile:     (404) 572-5100

9    Attorneys for Defendant KPMG LLP

10

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/25/2023 4:01 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11803434**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11              **COUNTY OF SANTA CLARA**

12

13   KIM STEVENSON and HOWARD TARLOW,
     individually and on behalf of all others similarly
14   situated,

15                          Plaintiffs,

16         v.

17   GREG W. BECKER, DANIEL J. BECK, ROGER
     F. DUNBAR, KAREN HON, ERIC A.
18   BENHAMOU, JOHN S. CLENDENING,
     RICHARD D. DANIELS, ALISON DAVI S,
19   JOEL P. FRIEDMAN, JEFFERY N.
     MAGGIONCALDA, BEVERLY KAY
20   MATTHEWS, MARY J. MILLER, KATE D.
     MITCHELL, JOHN F. ROBINSON, GAREN K.
21   STAGLIN, and KPMG LLP,

22                          Defendants.

23

Case No. 23-cv-413949

CLASS ACTION

**NOTICE OF VERIFIED
APPLICATION FOR ADMISSION OF
KEVIN J. O'BRIEN TO APPEAR *PRO
HAC VICE* FOR KPMG LLP**

Date:
Time:
Judge:  Hon. Sunil R. Kulkarni
Dept:   1

24

25

26

27

28

---

*PRO HAC VICE* APPLICATION OF KEVIN J. O'BRIEN
Case No. 23-cv-413949

PLEASE TAKE NOTICE that Defendant KPMG LLP ("Defendant") hereby moves the Court to grant this unopposed application for an order pursuant to California Rules of Court, Rule 9.40, permitting out-of-state attorney, Kevin J. O'Brien, to appear as counsel *pro hac vice* for Defendant in the above-captioned case.

This application is made on the grounds that the applicant, Kevin J. O'Brien, is a member in good standing of the State Bar of Georgia and has been retained to appear in this action as counsel on behalf of Defendant. Lisa Bugni of King & Spalding LLP is counsel of record for Defendant. Kevin J. O'Brien is neither a resident of the State of California, nor regularly employed in the State of California, nor regularly engaged in substantial business, professional, or other activities in the State of California.

This application is based on this notice, the attached memorandum of points and authorities, the attached verified application of Kevin J. O'Brien, the attached declaration of Lisa Bugni, all other pleadings and papers on file, or of which this Court may take judicial notice at the time this application is heard, and all evidence adduced, and arguments made at the time of the hearing on this application. A copy of this application, the supporting memorandum of points and authorities, the verified application of Kevin J. O'Brien, and the declaration of Lisa Bugni, have been served on the State Bar of California, together with the $50.00 fee, made payable to the State Bar of California, pursuant to the requirements of Rule 9.40(e) of the California Rules of Court.

Dated:  April 25, 2023

KING & SPALDING LLP

By:  _____
LISA BUGNI

Attorneys for Defendant KPMG LLP

# Exhibit U

1  LISA BUGNI (SBN# 323962)
   lbugni@kslaw.com
2  **KING & SPALDING LLP**
   50 California Street, Suite 3300
3  San Francisco, CA 94111
   Telephone:    (415) 318-1200
4  Facsimile:    (415) 318-1300

5  Kevin J. O'Brien (*Pro Hac Vice* Pending)
   kobrien@kslaw.com
6  **KING & SPALDING LLP**
   1180 Peachtree Street, NE, Suite 1600
7  Atlanta, GA 30309-3521
   Telephone:    (404) 572-4600
8  Facsimile:    (404) 572-5100

9  Attorneys for Defendant KPMG LLP

10

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/25/2023 4:01 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11803434**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                   **COUNTY OF SANTA CLARA**

12

13  KIM STEVENSON and HOWARD TARLOW,    Case No. 23-cv-413949
    individually and on behalf of all others similarly
14  situated,                                           CLASS ACTION

15                        Plaintiffs,    **MEMORANDUM OF POINTS AND
                                         AUTHORITIES IN SUPPORT OF
16          v.                           VERIFIED APPLICATION FOR
                                         ADMISSION OF KEVIN J. O'BRIEN
17  GREG W. BECKER, DANIEL J. BECK, ROGER   TO APPEAR *PRO HAC VICE* FOR
    F. DUNBAR, KAREN HON, ERIC A.           KPMG LLP**
18  BENHAMOU, JOHN S. CLENDENING,
    RICHARD D. DANIELS, ALISON DAVI S,   Judge: Hon. Sunil R. Kulkarni
19  JOEL P. FRIEDMAN, JEFFERY N.
    MAGGIONCALDA, BEVERLY KAY            Date:
20  MATTHEWS, MARY J. MILLER, KATE D.    Time:
    MITCHELL, JOHN F. ROBINSON, GAREN K.  Judge: Hon. Sunil R. Kulkarni
21  STAGLIN, and KPMG LLP,               Dept:  1

22                        Defendants.

23

24

25

26

27

28

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *PRO HAC VICE* APPLICATION
OF KEVIN J. O'BRIEN
Case No. 23-cv-413949

I. **INTRODUCTION**

KPMG LLP ("Defendant") is currently represented by California attorney Lisa Bugni from King & Spalding LLP.  Defendant has also retained Kevin J. O'Brien, an attorney who is licensed in the State of Georgia and employed by the law firm of King & Spalding LLP, to represent Defendant in the above-referenced action.  Defendant seeks to have Kevin J. O'Brien admitted to practice before this Court for purposes of the above-referenced action pursuant to California Rules of Court, Rule 9.40.  Plaintiffs in the above-referenced action do not oppose the application.

II. **LEGAL STANDARD**

California Rules of Court, Rule 9.40, permits attorneys who are licensed to practice in other states to be admitted *pro hac vice* if they satisfy the following eligibility criteria:

A person who is not a member of the State Bar of California but who is a member in good standing of and eligible to practice before the bar of any United States court or the highest court in any state, territory, or insular possession of the United States, and who has been retained to appear in a particular cause pending in a court of this state, may in the discretion of such court be permitted upon written application to appear as counsel *pro hac vice*, provided that an active member of the State Bar of California is associated as attorney of record. No person is eligible to appear as counsel *pro hac vice* under this rule if the person is: [¶] (1) A resident of the State of California; [¶] (2) Regularly employed in the State of California; or [¶] (3) Regularly engaged in substantial business, professional, or other activities in the State of California.

As set forth in his verified application filed concurrently herewith, Kevin J. O'Brien is not a resident of the State of California, is not regularly employed in the State of California, and is not regularly engaged in substantial business, professional, or other activities in the State of California.  In addition, Kevin J. O'Brien is a member in good standing of the State Bar of Georgia, has been retained as counsel in the above-referenced action, and has associated with an active member of the California State Bar.

California Rules of Court, Rule 9.40(d), requires an applicant seeking admission *pro hac vice* to provide the Court with certain information, including the applicant's address, the courts to

2

which the applicant has been admitted to practice and the dates of admission, that the applicant is a member in good standing in those courts, that the applicant is not currently suspended or disbarred in any court, the title of court and cause in which the applicant has filed an application to appear *pro hac vice* in the preceding two years, and the name, address, and telephone number of the active member of the California State Bar who is the attorney of record.  The verified application of Kevin J. O'Brien and the declaration of Lisa Bugni provide all of the information required by Rule 9.40(d).

The application for admission of Kevin J. O'Brien to appear *pro hac vice* for Defendant has been served on all parties in the above-referenced case, and on the State Bar of California, together with the requisite $50.00 application fee in satisfaction of California Rules of Court, Rule 9.40(c) and (e).

## III.   **CONCLUSION**

Based upon the foregoing, Defendant respectfully requests that the Court grant the application for Kevin J. O'Brien to appear as counsel *pro hac vice* for the duration of the above-referenced action.

Dated:  April 25, 2023

KING & SPALDING LLP

By:   _____
LISA BUGNI

Attorneys for Defendant KPMG LLP

# Exhibit V

LISA BUGNI (SBN# 323962)
lbugni@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:    (415) 318-1200
Facsimile:    (415) 318-1300

Kevin J. O'Brien (*Pro Hac Vice* Pending)
kobrien@kslaw.com
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Telephone:    (404) 572-4600
Facsimile:    (404) 572-5100

Attorneys for Defendant KPMG LLP

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/25/2023 4:01 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11803434**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SANTA CLARA

| | |
|---|---|
| KIM STEVENSON and HOWARD TARLOW, individually and on behalf of all others similarly situated, | Case No. 23-cv-413949 |
| Plaintiffs, | CLASS ACTION |
| v. | **DECLARATION OF LISA BUGNI IN SUPPORT OF UNOPPOSED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE* FOR KPMG LLP** |
| GREG W. BECKER, DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVI S, JOEL P. FRIEDMAN, JEFFERY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP, | Date:
Time:
Judge:  Hon. Sunil R. Kulkarni
Dept:   1 |
| Defendants. | |

---

DECLARATION OF LISA BUGNI IN SUPPORT OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE*
FOR KPMG LLP
Case No. 23-cv-413949

I, Lisa Bugni, declare that:

1.      I am an attorney at law duly authorized to practice before all courts of the State of California and I am Partner at the law firm of King & Spalding LLP, attorneys of record for KPMG LLP in the above-referenced cases.  I have personal knowledge of the following facts and, if called as a witness in the above-referenced cases, could competently testify to the matters stated herein.

2.      I make this declaration in support of the unopposed application for an order allowing out-of-state attorney, Kevin J. O'Brien, to appear *pro hac vice* for KPMG LLP.

3.      On April 21, 2023, I emailed Adam Polk, counsel for Plaintiffs in the above-referenced case.  I informed Mr. Polk that KPMG LLP would seek to have Kevin J. O'Brien admitted as counsel *pro hac vice*.  Mr. Polk stated that Plaintiffs would not oppose the application.

4.      On April 25, 2023, I caused to be served on the California State Bar in San Francisco a copy of the application for admission of out-of-state attorney, Kevin J. O'Brien, to appear *pro hac vice* together with the application fee in the amount of $50.00.  A true copy of the confirmation and receipt from the State Bar is attached hereto as **Exhibit A**.

5.      I declare under penalty of perjury under the laws of the State of California that the foregoing information is true.

Executed this 25th day of April, 2023 in San Francisco, California.



LISA BUGNI

# EXHIBIT A

**Dalia Hill**

| | |
|---|---|
| **From:** | State Bar of California - Special Admissions <special.admissions@calbar.ca.gov> |
| **Sent:** | Tuesday, April 25, 2023 11:02 AM |
| **To:** | Dalia Hill; Kevin O'Brien |
| **Subject:** | Pro Hac Vice Application Acknowledgement Notice |

CAUTION: **MAIL FROM OUTSIDE THE FIRM**



**Application's Case Number:** 00922194
**Trial Case Name:** Kim Stevenson, et al. v. Greg W. Becker, et al.
**Trial Case Number:** 23-cv-413949

Dear Dalia Hill,

Your Pro Hac Vice application has been received and is pending review. For your application to be approved, you must have submitted an uploaded copy of the original Pro Hac Vice application, in addition to the application fee.

**If you failed to upload the original Pro Hac Vice application/document during the online application process, please follow the steps below to upload the completed document to your existing application:**

1. Login to the Applicant Community site.
2. Click the "Special Admissions" tab at the top of the home page, and then select the "Pro Hac Vice" option.
3. In the "Upload document(s) to a previously submitted application" box, select the "Next" button.
4. Follow the directions on the screen to search for the application using the application's "Case Number" (listed at the top of this message beginning with "00"), and upload the document(s).

Applicants who encounter problems gaining access to the Applicant Community, or those who have not yet created a password to the Applicant Community, should take the following steps:

1. Access the Applicant Community at admissions.calbar.ca.gov.
2. Click "Forgot your password."
3. Click "Send Password Reset Email."
4. Check your email and follow the instructions to reset your password.

If you paid by e-check (ACH), then your application will not be approved until we can confirm that your payment was processed, successfully. It may take up to 7 business days before the transaction is settled. In addition, if you owe any outstanding fees to the State Bar, your application cannot be approved until the fees are paid.

Once the application is deemed complete, you will receive an email notifying you of a successful filing.

If you have any questions, please contact the Special Admissions department at the number below.

Sincerely,


Office of Admissions
State Bar of California
(415) 538-2300


ref:_00Dt0TZax._5008y7ebvu:ref

# Exhibit W

LISA BUGNI (SBN# 323962)
lbugni@kslaw.com
**KING & SPALDING LLP**
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone:     (415) 318-1200
Facsimile:     (415) 318-1300

Kevin J. O'Brien (*Pro Hac Vice* Pending)
kobrien@kslaw.com
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5100

Attorneys for Defendant KPMG LLP

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 4/25/2023 4:01 PM
Reviewed By: R. Walker
Case #23CV413949
Envelope: 11803434**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

| | |
|---|---|
| KIM STEVENSON and HOWARD TARLOW, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>GREG W. BECKER, DANIEL J. BECK, ROGER F. DUNBAR, KAREN HON, ERIC A. BENHAMOU, JOHN S. CLENDENING, RICHARD D. DANIELS, ALISON DAVI S, JOEL P. FRIEDMAN, JEFFERY N. MAGGIONCALDA, BEVERLY KAY MATTHEWS, MARY J. MILLER, KATE D. MITCHELL, JOHN F. ROBINSON, GAREN K. STAGLIN, and KPMG LLP,<br><br>                              Defendants. | Case No. 23-cv-413949<br><br>CLASS ACTION<br><br>**VERIFIED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN TO APPEAR *PRO HAC VICE* FOR KPMG LLP**<br><br><br>Date:<br>Time:<br>Judge:  Hon. Sunil R. Kulkarni<br>Dept:   1 |

1    I, Kevin J. O'Brien, declare that:

2    1.    I am an attorney with the law firm of King & Spalding LLP.  I am a member in

3    good standing of the State Bar of Georgia (Bar Number 714849).

4    2.    I have been apprised of the facts, issues and developments in the above-captioned

5    action, and I am familiar with the subject matter of this case.  I intend to act as co-counsel of

6    record for KPMG LLP (Defendant) in this case.

7    3.    I presently reside at 34 Berkeley Rd, Avondale Estates, GA 30002, and am an

8    attorney in the law firm of King & Spalding LLP, resident in the Atlanta office located at 1180

9    Peachtree Street, NE, Suite 1600, Atlanta, GA 30309-3521, and have been since 2015.

10   4.    I am admitted to practice in the following courts:

11   • Georgia (2015)

12   • New York (2022)

13   • Virginia (2009)

14   • U.S. Court of Appeals for the Second Circuit (2023)

15   • U.S. Court of Appeals for the Eleventh Circuit (2015)

16   • U.S. Court of Appeals for the Fourth Circuit (2010)

17   • U.S. District Court for the Northern District of Georgia (2015)

18   • U.S. District Court for the Southern District of New York (2022)

19   • U.S. District Court for the Eastern District of New York (2022)

20   • U.S. District Court for the Eastern District of Virginia (2009)

21   • U.S. District Court for the Western District of Virginia (2009)

22   5.    I am currently a member in good standing in all of the courts in which I have been

23   admitted.

24   6.    I have never been suspended or disbarred in any court.

25   7.    In the preceding two years, I have not been admitted to appear *pro hac vice* before

26   any court in California.

27   8.    I am not: (i) a resident of the State of California; (ii) regularly employed in the

28   State of California; or (iii) regularly engaged in substantial business, professional, or other

2

VERIFIED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN
TO APPEAR *PRO HAC VICE*
Case No. 23-cv-413949

1    activities in the State of California.

2        9.    By this application, I request *pro hac vice* permission from the Court to appear as

3    co-counsel on behalf of Defendant.

4        10.    The name, address, and telephone number of the active member of the State Bar of

5    California who is attorney of record:

6            LISA BUGNI (SBN# 323962)
             lbugni@kslaw.com
7            KING & SPALDING LLP
             50 California Street, Suite 3300
8            San Francisco, CA 94111
             Telephone:    (415) 318-1200
9            Facsimile:    (415) 318-1300

10

11   Executed this 25th day of April, in Atlanta, Georgia.

12

13

14   _____
                        KEVIN J. O'BRIEN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3
VERIFIED APPLICATION FOR ADMISSION OF KEVIN J. O'BRIEN
TO APPEAR *PRO HAC VICE*
Case No. 23-cv-413949

# Exhibit X

| Attorney or Party without Attorney: | | | For Court Use Only |
|---|---|---|---|
| Adam E. Polk, Esq., Bar #273000<br>Girard Sharp LLP<br>601 California Street, 14th Floor<br>San Francisco, CA 94108<br>*Telephone No:* 415-981-4800    *FAX No:* 415-981-4846 | | | **Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 4/25/2023 5:34 PM<br>Reviewed By: R. Walker<br>Case #23CV413949<br>Envelope: 11804866** |
| | | *Ref. No. or File No.:* | |
| *Attorney for:* Plaintiff(s) | | | |

Insert name of Court, and Judicial District and Branch Court:
Santa Clara County Superior Court
*Plaintiff(s):* Kim Stevenson, et al
*Defendant:* Greg W. Becker, et al

| **AFFIDAVIT OF SERVICE** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>23CV413949 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the Civil Lawsuit Notice; Order Deeming Case Complex and Staying Discovery and Responsive Pleading Deadline

*3. a. Party served:*     KPMG LLP
   *b. Person served:*    Carlos Bobe, Service of Process Intake Clerk

*4. Address where the party was served:*     C T Corporation
                                             28 Liberty Street
                                             New York, NY 10005

*5. I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive
   process for the party (1) on: Wed., Apr. 19, 2023 (2) at: 11:06AM

**7. Person Who Served Papers:**
   a. Bobby Ali
   **b. Class Action Research & Litigation**
   P O Box 740
   Penryn, CA 95663
   c. (916) 663-2562, FAX (916) 663-4955

*Fee for Service:*  $200.90

I Declare under penalty of perjury under the laws of the State of
NEW YORK that the foregoing is true and correct.

4/21/23
*(Date)*

_____
*(Signature)*

8. *STATE OF NEW YORK, COUNTY OF* New York

   *Subscribed and sworn to (or affirmed) before me on this* 21ˢᵗ *day of* April, 2023 *by Bobby Ali*

   *proved to me on the basis of satisfactory evidence to be the person who appeared before me.*

            STEVEN MITCHELL              AFFIDAVIT OF SERVICE        _____       *adpol.247158*
       Notary Public, State of New York                              *(Notary Signature)*
            Reg. No.01-MI-6326046
         Qualified in New York County
      Commission Expires June 8, 20 2-3

# Exhibit Y

1  KRISTOPHER KASTENS (State Bar No. 254797)
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
2  333 Twin Dolphin Drive, Suite 700
    Redwood Shores, CA 94065
3  Telephone: (650) 752-1700
    Facsimile: (650) 752-1800
4  Email: kkastens@kramerlevin.com

5
    *Attorneys for Defendant*
6  Daniel J. Beck

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 5/3/2023 4:31 PM
Reviewed By: A. Floresca
Case #23CV413949
Envelope: 11879185**

7

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9               **COUNTY OF SANTA CLARA**

10

11  KIM STEVENSON and HOWARD
     TARLOW, individually and on behalf of all
12  others similarly situated,

13             Plaintiffs,
14      v.

15  GREG W. BECKER, DANIEL J. BECK,
     ROGER F. DUNBAR, KAREN HON, ERIC
16  A. BENHAMOU, JOHN S. CLENDENING,
     RICHARD D. DANIELS, ALISON DAVIS,
17  JOEL P. FRIEDMAN, JEFFREY N.
     MAGGIONCALDA, BEVERLY KAY
18  MATTHEWS, MARY J. MILLER, KATE D.
     MITCHELL, JOHN F. ROBINSON, GAREN
19  K. STAGLIN, and KPMG LLP,

20           Defendants.

21

Case No. 23-cv-413949

**PROOF OF SERVICE**

22

23

24

25

26

27

28

PROOF OF SERVICE                                    Case No. 23-cv-413949

**PROOF OF SERVICE**

I declare that I am a citizen of the United States.  My office address is 333 Twin Dolphin Drive, Suite 700, Redwood Shores, California 94065.  I reside in the state of California where this mailing occurs.   I am over the age of 18 years, and not a party to the within action. On the date set forth below, I served the foregoing document(s) described as:

**NOTICE OF APPEARANCE OF KRISTOPHER KASTENS**

**NOTICE OF VERIFIED APPLICATIONS FOR ADMISSION *PRO HAC VICE* OF JENNIFER S. WINDOM, BARRY H. BERKE, DARREN A. LAVERNE, AND DANIEL M. KETANI**

**VERIFIED APPLICATION OF JENNIFER S. WINDOM TO APPEAR AS COUNSEL *PRO HAC VICE***

**VERIFIED APPLICATION OF BARRY H. BERKE TO APPEAR AS COUNSEL *PRO HAC VICE***

**VERIFIED APPLICATION OF DARREN A. LAVERNE TO APPEAR AS COUNSEL *PRO HAC VICE***

**VERIFIED APPLICATION OF DANIEL M. KETANI TO APPEAR AS COUNSEL *PRO HAC VICE***

**DECLARATION OF KRISTOPHER KASTENS IN SUPPORT OF THE VERFIED APPLICATIONS FOR ADMISSION *PRO HAC VICE* OF JENNIFER S. WINDOM, BARRY H. BERKE, DARREN A. LAVERNE, AND DANIEL M. KETANI**

**[PROPOSED] ORDER GRANTING THE VERFIED APPLICATIONS FOR ADMISSION *PRO HAC VICE* OF JENNIFER S. WINDOM, BARRY H. BERKE, DARREN A. LAVERNE, AND DANIEL M. KETANI**

On the following person(s) in this action by mail as follows:

| | |
|---|---|
| Daniel C. Girard | Lisa Bugni |
| Adam E. Polk | King & Spalding LLP |
| Jordan Elias | 50 California Street, Suite 3300 |
| Namita Dhawan | San Francisco, CA 94111 |
| GIRARD SHARP LLP | Telephone: (415) 318-1200 |
| 601 California Street, Suite 1400 | Facsimile: (415) 318-1300 |
| San Francisco, CA 94108 | lbugni@kslaw.com |
| Telephone: (415) 981-4800 | |
| Facsimile: (415) 981-4846 | *Attorneys for Defendant KPMG LLP* |
| dgirard@girardsharp.com | |
| apolk@girardsharp.com | |

---

1

jelias@girardsharp.com
ndhawan@girardsharp.com

*Attorneys for Plaintiffs*

(X)     BY UNITED STATES MAIL On May 3, 2023, I enclosed the documents in a sealed envelope or package addressed to the persons as set forth above.  I placed the envelope for collection and mailing, following ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage thereon fully prepaid.

( )     BY OVERNIGHT DELIVERY On **, 2023, I enclosed the documents in an envelope and package provided by an overnight delivery carrier and addressed to the persons above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

( )     BY-MAIL OR ELECTRONIC TRANSMISSION On April 28, 2023, I caused the documents to be sent to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

( )     BY PERSONAL SERVICE On **, 2023 at _____, CA, I caused such envelope(s) to be delivered to _____. I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.


Executed on May 3, 2023, in Redwood Shores, California.


_____
Kristopher Kastens

PROOF OF SERVICE                                                    Case No. 23-cv-413949

# Exhibit Z

1  KRISTOPHER KASTENS (State Bar No. 254797)
2  KRAMER LEVIN NAFTALIS & FRANKEL LLP
   333 Twin Dolphin Drive, Suite 700
3  Redwood Shores, CA 94065
   Telephone: (650) 752-1700
4  Facsimile: (650) 752-1800
   Email: kkastens@kramerlevin.com
5
   *Attorneys for Defendant*
6  Daniel J. Beck

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 5/3/2023 4:31 PM
Reviewed By: A. Floresca
Case #23CV413949
Envelope: 11879185

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                     **COUNTY OF SANTA CLARA**

10

11  KIM STEVENSON and HOWARD
    TARLOW, individually and on behalf of all
12  others similarly situated,

13                 Plaintiffs,
             v.
14
    GREG W. BECKER, DANIEL J. BECK,
15  ROGER F. DUNBAR, KAREN HON, ERIC
    A. BENHAMOU, JOHN S. CLENDENING,
16  RICHARD D. DANIELS, ALISON DAVIS,
    JOEL P. FRIEDMAN, JEFFREY N.
17  MAGGIONCALDA, BEVERLY KAY
    MATTHEWS, MARY J. MILLER, KATE D.
18  MITCHELL, JOHN F. ROBINSON, GAREN
    K. STAGLIN, and KPMG LLP,
19
20                 Defendants.
21

Case No. 23-cv-413949

**NOTICE OF VERIFIED APPLICATIONS
OF JENNIFER S. WINDOM, BARRY H.
BERKE, DARREN A. LAVERNE, AND
DANIEL M. KETANI TO APPEAR AS
COUNSEL *PRO HAC VICE***

Hon. Sunil R. Kulkarni

22  <u>**TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF**</u>
23  <u>**SANTA CLARA; TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS**</u>
    <u>**OF RECORD; AND TO THE STATE BAR OF CALIFORNIA**</u>
24
25
26
27
28

PLEASE TAKE NOTICE that Defendant Daniel J. Beck ("Defendant") hereby moves the Court to grant this unopposed application for an order pursuant to California Rules of Court, Rule 9.40, permitting out-of-state attorneys Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani ("the Applicants"), to appear as counsel *pro hac vice* for Defendant in the above-captioned case.

These applications are made on the grounds that the Applicants have been retained to appear in this action as counsel on behalf of Defendant. Jennifer S. Windom is a member in good standing of the Bar of the District of Columbia. Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani are members in good standing of the State Bar of New York. Kristopher Kastens is counsel of record for Defendant. Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani are not residents of the State of California. Nor are Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani regularly engaged in substantial business, professional, or other activities in the State of California.

This application is based on this notice, the attached verified applications of Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani, the attached declaration of Kristopher Kastens, all other pleadings and papers on file, or of which this Court may take judicial notice at the time the application is heard, and all evidence adduced, and arguments made at the time of the hearing on this application. A copy of this notice, the verified applications of Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani, and the declaration of Kristopher Kastens have been served on the State Bar of California, together with the $50.00 fee per application, made payable to the State Bar of California, pursuant to the requirements of Rule 9.40(e) of the California Rules of Court.

NOTICE OF VERIFIED APPLICATIONS
TO APPEAR AS COUNSEL *PRO HAC VICE*                    Case No. 23-cv-413949

1

2
Dated: May 3, 2023                        By: _____

3                                          Kristopher Kastens (State Bar No. 254797)
                                           KRAMER LEVIN NAFTALIS
4                                          & FRANKEL LLP
                                           333 Twin Dolphin Drive, Suite 700
5                                          Redwood Shores, California 94065
                                           Telephone:  (650) 752-1700
6                                          Facsimile:  (650) 752-1800
                                           E-mail:  kkastens@kramerlevin.com
7
                                           *Attorneys for Defendant*
8                                          Daniel J. Beck

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF VERIFIED APPLICATIONS                        Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

# Exhibit AA

1  KRISTOPHER KASTENS (State Bar No. 254797)
   KRAMER LEVIN NAFTALIS & FRANKEL LLP
2  333 Twin Dolphin Drive, Suite 700
   Redwood Shores, CA 94065
3  Telephone: (650) 752-1700
   Facsimile: (650) 752-1800
4  Email: kkastens@kramerlevin.com

5  *Attorneys for Defendant*
   Daniel J. Beck
6

7

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 5/3/2023 4:15 PM
Reviewed By: A. Floresca
Case #23CV413949
Envelope: 11878893**

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                        **COUNTY OF SANTA CLARA**

10

11  KIM STEVENSON and HOWARD          Case No. 23-cv-413949
    TARLOW, individually and on behalf of all
12  others similarly situated,             **NOTICE OF APPEARANCE OF
                                          KRISTOPHER KASTENS**
13                    Plaintiffs,
14           v.

15  GREG W. BECKER, DANIEL J. BECK,
    ROGER F. DUNBAR, KAREN HON, ERIC
16  A. BENHAMOU, JOHN S. CLENDENING,
    RICHARD D. DANIELS, ALISON DAVIS,
17  JOEL P. FRIEDMAN, JEFFREY N.
    MAGGIONCALDA, BEVERLY KAY
18  MATTHEWS, MARY J. MILLER, KATE D.
    MITCHELL, JOHN F. ROBINSON, GAREN
19  K. STAGLIN, and KPMG LLP,

20                    Defendants.

21

22

23

24

25

26

27

28

NOTICE OF APPEARANCE OF KRISTOPHER KASTENS        Case No. 23-cv-413949

**PLEASE TAKE NOTICE** that the appearance of Kristopher Kastens (State Bar No. 254797) of Kramer Levin Naftalis & Frankel LLP, 333 Twin Dolphin Drive, Suite 700, Redwood Shores, California 94065, as counsel of record for and on behalf of Defendant Daniel J. Beck, in the above-captioned matter for the purpose of receiving notices and orders from the Court.  Copies of all pleadings and notices pertaining to the above-captioned matter not otherwise filed through the Court's electronic filing system should be forwarded to counsel at the following address:

Kristopher Kastens
KRAMER LEVIN NAFTALIS & FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, California 94065
Telephone: (650) 752-1700
Facsimile: (650) 752-1800
E-mail: kkastens@kramerlevin.com

Respectfully submitted,

Dated:  May 3, 2023           By: _____
                                  Kristopher Kastens (State Bar No. 254797)
                                  KRAMER LEVIN NAFTALIS
                                  & FRANKEL LLP
                                  333 Twin Dolphin Drive, Suite 700
                                  Redwood Shores, California 94065
                                  Telephone:  (650) 752-1700
                                  Facsimile:  (650) 752-1800
                                  E-mail:  kkastens@kramerlevin.com

                                  *Attorneys for Defendant*
                                  Daniel J. Beck

NOTICE OF APPEARANCE OF KRISTOPHER KASTENS           Case No. 23-cv-413949

# Exhibit BB

1   KRISTOPHER KASTENS (State Bar No. 254797)
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
2   333 Twin Dolphin Drive, Suite 700
    Redwood Shores, CA 94065
3   Telephone: (650) 752-1700
    Facsimile: (650) 752-1800
4   Email: kkastens@kramerlevin.com

5   *Attorneys for Defendant*
6   Daniel J. Beck

7

8            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **COUNTY OF SANTA CLARA**

10

11  KIM STEVENSON and HOWARD          Case No. 23-cv-413949
    TARLOW, individually and on behalf of all
12  others similarly situated,        **DECLARATION OF KRISTOPHER
                                      KASTENS IN SUPPORT OF THE
13                 Plaintiffs,         VERIFIED APPLICATIONS FOR
                                      ADMISSION *PRO HAC VICE* OF
14          v.                        JENNIFER S. WINDOM, BARRY H.
                                      BERKE, DARREN A. LAVERNE, AND
15  GREG W. BECKER, DANIEL J. BECK,   DANIEL M. KETANI**
    ROGER F. DUNBAR, KAREN HON, ERIC
16  A. BENHAMOU, JOHN S. CLENDENING,
    RICHARD D. DANIELS, ALISON DAVIS,
17  JOEL P. FRIEDMAN, JEFFREY N.
    MAGGIONCALDA, BEVERLY KAY
18  MATTHEWS, MARY J. MILLER, KATE D.
    MITCHELL, JOHN F. ROBINSON, GAREN
19  K. STAGLIN, and KPMG LLP,

20                 Defendants.

21

22

23

24

25

26

27

28

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 5/3/2023 4:31 PM
Reviewed By: A. Floresca
Case #23CV413949
Envelope: 11879185

I, Kristopher Kastens, declare:

1.    I am partner at the law firm Kramer Levin Naftalis & Frankel LLP.  I have knowledge of the facts contained herein and, if called as a witness, I could and would competently testify thereto. I make this declaration in support of the Verified Applications for Admission *Pro Hac Vice* of Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani.

2.    I am an attorney at law duly authorized to practice in the State of California.  My business address is 333 Twin Dolphin Drive, Suite 700, Redwood Shores, California 94065.  I am counsel of record for Defendant Daniel J. Beck.

3.    On May 3, 2023, I caused to be served on the State Bar of California, through the Applicant Portal and at its San Francisco offices, the Verified Applications for Admission *Pro Hac Vice* of Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani, a copy of the Notice of Verified Application for Admission *Pro Hac Vice* of Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani; the contemporaneously-filed Declaration of Kristopher Kastens, and a copy of the Proposed Order granting the Application for Admission *Pro Hac Vice* of Jennifer S. Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani, pursuant to the requirements set forth in Rule 9.40 of the California Rules of Court.  On May 3, 2023, I caused electronic payment in the amount of $50.00 to be delivered to the State Bar of California through the Applicant Portal with proof of payment sent to its San Francisco offices.

I declare under penalty of perjury under the law of the State of California and the United States that each of the above statements is true and correct.  Executed on May 3, 2023 in Redwood Shores, California.

_____
Kristopher Kastens

1

DECLARATION OF KRISTOPHER KASTENS IN SUPPORT OF                    Case No. 23-cv-413949
THE VERIFIED APPLICATIONS FOR ADMISSION *PRO HAC VICE*

# Exhibit CC

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 5/3/2023 4:31 PM
Reviewed By: A. Floresca
Case #23CV413949
Envelope: 11879185

1   KRISTOPHER KASTENS (State Bar No. 254797)
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
2   333 Twin Dolphin Drive, Suite 700
    Redwood Shores, CA 94065
3   Telephone: (650) 752-1700
    Facsimile: (650) 752-1800
4   Email: kkastens@kramerlevin.com

5
    *Attorneys for Defendant*
6   Daniel J. Beck

7

8                 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                         **COUNTY OF SANTA CLARA**

10

11  KIM STEVENSON and HOWARD              Case No. 23-cv-413949
    TARLOW, individually and on behalf of all
12  others similarly situated,            **VERIFIED APPLICATION OF JENNIFER
                                          S. WINDOM TO APPEAR AS COUNSEL**
13                  Plaintiffs,           ***PRO HAC VICE***
            v.
14
    GREG W. BECKER, DANIEL J. BECK,
15  ROGER F. DUNBAR, KAREN HON, ERIC
    A. BENHAMOU, JOHN S. CLENDENING,
16  RICHARD D. DANIELS, ALISON DAVIS,
    JOEL P. FRIEDMAN, JEFFREY N.
17  MAGGIONCALDA, BEVERLY KAY
    MATTHEWS, MARY J. MILLER, KATE D.
18  MITCHELL, JOHN F. ROBINSON, GAREN
    K. STAGLIN, and KPMG LLP,
19
20                  Defendants.
21

22  **TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF
    SANTA CLARA; TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS
23  OF RECORD; AND TO THE STATE BAR OF CALIFORNIA**

24

25

26

27

28

---

I, Jennifer S. Windom, hereby submit this Verified Application to appear as counsel *pro hac vice* in the above-referenced action pursuant to California Rules of Court, Rule 9.40; and in support of this Verified Application, hereby declare as follows:

1.      I am partner in the law firm Kramer Levin Naftalis & Frankel LLP, counsel of record for Defendant Daniel J. Beck in this action.  I have knowledge of the facts contained herein and, if called as a witness, I could and would competently testify thereto.

2.      My office address is:  2000 K Street NW 4th Floor, Washington, DC 20006.  My email address is jwindom@kramerlevin.com.  My residence address is: 4437 Yuma Street, NW, Washington, DC 20016.  I am not (i) a resident of the State of California, (ii) regularly employed in the State of California, or (iii) regularly engaged in substantial business, professional, or other activities in the State of California.

3.      I am an attorney at law duly authorized to practice law in the District of Columbia.  I have been admitted to practice in the following courts (with year of admission in parentheses):

        (a)      Illinois (Illinois Supreme Court) (2005);

        (b)      District of Columbia (D.C. Court of Appeals) (2007);

        (c)      U.S. Court of Appeals, District of Columbia Circuit (2019);

        (d)      U.S. District Court., District of Columbia (2007);

        (e)      U.S. Court of Federal Claims (2007); and

        (f)      U.S. Supreme Court (2019).

4.      I am a member in good standing in the courts listed above.

5.      I am not currently, nor have I ever been, suspended or disbarred in any court.

6.      I applied to appear as counsel *pro hac vice* in one California state court action in the two (2) years preceding this application.  On May 1, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the Superior Court of California, County of Santa Clara in a case captioned Rossi v. Greg W. Becker et al, 23-cv-414120.  That application is currently pending.

7.      I have applied to appear as counsel *pro hac vice* in four recent California federal court actions on behalf of Defendant Beck. On March 27, 2023, I applied to appear *pro hac vice* on behalf of

VERIFIED APPLICATION OF JENNIFER S. WINDOM                    Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

Defendant Beck in the District Court of the Northern District of California for three cases captioned as Siddiqui v. Greg W. Becker and Daniel J. Beck 4:23-cv-01228-HSG, Snook v. Greg W. Becker and Daniel J. Beck 3:23-cv-01173-VC, and Vanipenta v. SVB Financial Group et. al. 3:23-cv-01097-JD. On April 13, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the District Court of the Northern District of California for one case captioned as City of Hialeah Employees' Retirement System v. Greg W. Becker, et al. 3:23-cv-01697-AMO.  My *pro hac vice* applications in each of these four cases were granted.

8.   The California attorney of record for Defendant Beck in this case, with whom I will be associated, is:

> Kristopher Kastens (California State Bar No. 254797)
> KRAMER LEVIN NAFTALIS & FRANKEL LLP
> 333 Twin Dolphin Drive, Suite 700
> Redwood Shores, California 94065
> Telephone: (650) 752-1700
> Facsimile: (650) 752-1800
> E-mail: kkastens@kramerlevin.com

9.   Pursuant to California Rules of Court, Rule 9.40(c) and California Code of Civil Procedure, section 1013a, on May 3, 2023, I caused a true and correct copy of this Application to be served upon all parties who have appeared in this action and upon the State Bar of California at its San Francisco Office, as shown by the attached Proof of Service.

10.   Pursuant to California Rules of Court, Rule 9.40(e), I have paid a fee in the amount of $50.00 to the State Bar of California, and submitted along with a copy of this Application upon the State Bar of California at its San Francisco Office.

11.   Plaintiffs do not oppose my application for admission *pro hac vice*.

//

//

//

VERIFIED APPLICATION OF JENNIFER S. WINDOM       Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

1

## <u>VERIFICATION</u>

2      I, Jennifer S. Windom, certify and declare that I have read the foregoing Verified Application to

3 Appear As Counsel *Pro Hac Vice* and know its contents. I declare under penalty of perjury under the

4 laws of the State of California that the foregoing is true and correct.

5      Executed on May 3, 2023 in Washington, District of Columbia.

6

7      _____

8      Jennifer S. Windom

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED APPLICATION OF JENNIFER S. WINDOM                 Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

# Exhibit DD

1   KRISTOPHER KASTENS (State Bar No. 254797)
2   KRAMER LEVIN NAFTALIS & FRANKEL LLP
    333 Twin Dolphin Drive, Suite 700
3   Redwood Shores, CA 94065
    Telephone: (650) 752-1700
4   Facsimile: (650) 752-1800
    Email: kkastens@kramerlevin.com
5
    *Attorneys for Defendant*
6   Daniel J. Beck

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 5/3/2023 4:31 PM
Reviewed By: A. Floresca
Case #23CV413949
Envelope: 11879185**

7

8               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **COUNTY OF SANTA CLARA**

10

11   KIM STEVENSON and HOWARD          Case No. 23-cv-413949
     TARLOW, individually and on behalf of all
12   others similarly situated,        **VERIFIED APPLICATION OF DARREN A.
                                         LAVERNE TO APPEAR AS COUNSEL**
13                  Plaintiffs,         *PRO HAC VICE*
14         v.

15   GREG W. BECKER, DANIEL J. BECK,
     ROGER F. DUNBAR, KAREN HON, ERIC
16   A. BENHAMOU, JOHN S. CLENDENING,
     RICHARD D. DANIELS, ALISON DAVIS,
17   JOEL P. FRIEDMAN, JEFFREY N.
     MAGGIONCALDA, BEVERLY KAY
18   MATTHEWS, MARY J. MILLER, KATE D.
     MITCHELL, JOHN F. ROBINSON, GAREN
19   K. STAGLIN, and KPMG LLP,

20                  Defendants.

21

22   <u>**TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF**</u>
     <u>**SANTA CLARA; TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS**</u>
23   <u>**OF RECORD; AND TO THE STATE BAR OF CALIFORNIA**</u>

24

25

26

27

28

I, Darren A. LaVerne, hereby submit this Verified Application to appear as counsel *pro hac vice* in the above-referenced action pursuant to California Rules of Court, Rule 9.40; and in support of this Verified Application, hereby declare as follows:

1.    I am partner in the law firm Kramer Levin Naftalis & Frankel LLP, counsel of record for Defendant Daniel J. Beck in this action.  I have knowledge of the facts contained herein and, if called as a witness, I could and would competently testify thereto.

2.    My office address is:  1177 Avenue of the Americas, New York, NY 10036.  My email is dlaverne@kramerlevin.com.  My residence address is: 77 Woodridge Circle, New Canaan, CT 06840.  I am not (i) a resident of the State of California, (ii) regularly employed in the State of California, or (iii) regularly engaged in substantial business, professional, or other activities in the State of California.

3.    I am an attorney at law duly authorized to practice law in State of New York.  I have been admitted to practice in the following courts (with year of admission in parentheses):

      (a)    New York, Court of Appeals (2005);

      (b)    U.S. Court of Appeals, 2nd Circuit (2007);

      (c)    U.S. Court of Appeals, 4th Circuit (2020);

      (d)    U.S. Court of Appeals, 9th Circuit (2021);

      (e)    U.S. Court of Appeals, 11th Circuit (2021);

      (f)    U.S. District Court, Eastern District of New York (2022);

      (g)    U.S. District Court, Southern District of New York (2006);

      (h)    U.S. Court of Appeals, District of Columbia (2007); and

      (i)    U.S. District Court, Eastern District of Michigan (2007).

4.    I am a member in good standing in the courts listed above.

5.    I am not currently, nor have I ever been, suspended or disbarred in any court.

6.    I have applied to appear as counsel *pro hac vice* in two California state court actions in the two (2) years preceding this application.  On September 2, 2021, I applied to appear *pro hac vice* in the Courts of Appeal of the State of California, Third Appellate District in a case titled Clark, et al. v

VERIFIED APPLICATION OF DARREN A. LAVERNE                 Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

Superior Court of Sacramento County, No. C094735.  My *pro hac vice* application in this case was granted.  On May 1, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the Superior Court of California, County of Santa Clara in a case captioned Rossi v. Greg W. Becker et al, 23-cv-414120. That application is currently pending.

7.      I have applied to appear as counsel *pro hac vice* in four recent California federal court actions on behalf of Defendant Beck.  On March 27, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the District Court of the Northern District of California for three cases captioned as Siddiqui v. Greg W. Becker and Daniel J. Beck 4:23-cv-01228-HSG, Snook v. Greg W. Becker and Daniel J. Beck 3:23-cv-01173-VC, and Vanipenta v. SVB Financial Group et. al. 3:23-cv-01097-JD. On April 13, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the District Court of the Northern District of California for one case captioned as City of Hialeah Employees' Retirement System v. Greg W. Becker, et al. 3:23-cv-01697-AMO.  My *pro hac vice* applications in each of these four cases were granted.

8.      The California attorney of record for Defendant Beck in this case, with whom I will be associated, is:

> Kristopher Kastens (California State Bar No. 254797)
> KRAMER LEVIN NAFTALIS & FRANKEL LLP
> 333 Twin Dolphin Drive, Suite 700
> Redwood Shores, California 94065
> Telephone: (650) 752-1700
> Facsimile: (650) 752-1800
> E-mail: kkastens@kramerlevin.com

9.      Pursuant to California Rules of Court, Rule 9.40(c) and California Code of Civil Procedure, section 1013a, on May 3, 2023, I caused a true and correct copy of this Application to be served upon all parties who have appeared in this action and upon the State Bar of California at its San Francisco Office, as shown by the attached Proof of Service.

10.      Pursuant to California Rules of Court, Rule 9.40(e), I have paid a fee in the amount of $50.00 to the State Bar of California, and submitted along with a copy of this Application upon the State Bar of California at its San Francisco Office.

VERIFIED APPLICATION OF DARREN A. LAVERNE
TO APPEAR AS COUNSEL *PRO HAC VICE*

Case No. 23-cv-413949

11.     Plaintiffs do not oppose my application for admission *pro hac vice*.

## <u>VERIFICATION</u>

I, Darren A. LaVerne, certify and declare that I have read the foregoing Verified Application to Appear As Counsel *Pro Hac Vice* and know its contents.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 3, 2023 in New York, New York.

_____
Darren A. LaVerne

VERIFIED APPLICATION OF DARREN A. LAVERNE          Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

# Exhibit EE

1  KRISTOPHER KASTENS (State Bar No. 254797)
   KRAMER LEVIN NAFTALIS & FRANKEL LLP
2  333 Twin Dolphin Drive, Suite 700
   Redwood Shores, CA 94065
3  Telephone: (650) 752-1700
   Facsimile: (650) 752-1800
4  Email: kkastens@kramerlevin.com

5
   *Attorneys for Defendant*
6  Daniel J. Beck

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 5/3/2023 4:31 PM
Reviewed By: A. Floresca
Case #23CV413949
Envelope: 11879185**

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **COUNTY OF SANTA CLARA**

10

11 KIM STEVENSON and HOWARD
   TARLOW, individually and on behalf of all
12 others similarly situated,

13              Plaintiffs,

14        v.

15 GREG W. BECKER, DANIEL J. BECK,
   ROGER F. DUNBAR, KAREN HON, ERIC
16 A. BENHAMOU, JOHN S. CLENDENING,
   RICHARD D. DANIELS, ALISON DAVIS,
17 JOEL P. FRIEDMAN, JEFFREY N.
   MAGGIONCALDA, BEVERLY KAY
18 MATTHEWS, MARY J. MILLER, KATE D.
   MITCHELL, JOHN F. ROBINSON, GAREN
19 K. STAGLIN, and KPMG LLP,

20              Defendants.

21

Case No. 23-cv-413949

**VERIFIED APPLICATION OF DANIEL M.
KETANI TO APPEAR AS COUNSEL *PRO
HAC VICE***

22 <u>**TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF**</u>
23 <u>**SANTA CLARA; TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS**</u>
   <u>**OF RECORD; AND TO THE STATE BAR OF CALIFORNIA**</u>

24

25

26

27

28

VERIFIED APPLICATION OF DANIEL M. KETANI                    Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

I, Daniel M. Ketani, hereby submit this Verified Application to appear as counsel *pro hac vice* in the above-referenced action pursuant to California Rules of Court, Rule 9.40; and in support of this Verified Application, hereby declare as follows:

1.     I am an associate in the law firm Kramer Levin Naftalis & Frankel LLP, counsel of record for Defendant Daniel J. Beck in this action.  I have knowledge of the facts contained herein and, if called as a witness, I could and would competently testify thereto.

2.     My office address is:  1177 Avenue of the Americas, New York, NY 10036.  My email address is dketani@kramerlevin.com.  My residence address is: 510 East 86th Street, APT 12B, New York, NY 10028.  I am not (i) a resident of the State of California, (ii) regularly employed in the State of California, or (iii) regularly engaged in substantial business, professional, or other activities in the State of California.

3.     I am an attorney at law duly authorized to practice law in State of New York.  I have been admitted to practice in the following courts (with year of admission in parentheses):

(a)     New York, Court of Appeals (2015);

(b)     U.S. Court of Appeals, 9th Circuit (2021);

(c)     U.S. Court of Appeals, 11th Circuit (2021);

(d)     U.S. District Court, Eastern District of New York (2016); and

(e)     U.S. District Court, Southern District of New York (2016).

4.     I am a member in good standing in the courts listed above.

5.     I am not currently, nor have I ever been, suspended or disbarred in any court.

6.     I applied to appear as counsel *pro hac vice* in one California state court action in the two (2) years preceding this application.  On May 1, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the Superior Court of California, County of Santa Clara in a case captioned Rossi v. Greg W. Becker et al, 23-cv-414120.  That application is currently pending.

7.     I have applied to appear as counsel *pro hac vice* in four recent California federal court actions on behalf of Defendant Beck.  On March 27, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the District Court of the Northern District of California for three cases captioned

VERIFIED APPLICATION OF DANIEL M. KETANI                    Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

as Siddiqui v. Greg W. Becker and Daniel J. Beck 4:23-cv-01228-HSG, Snook v. Greg W. Becker and Daniel J. Beck 3:23-cv-01173-VC, and Vanipenta v. SVB Financial Group et. al. 3:23-cv-01097-JD. On April 13, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the District Court of the Northern District of California for one case captioned as City of Hialeah Employees' Retirement System v. Greg W. Becker, et al. 3:23-cv-01697-AMO.  My *pro hac vice* applications in each of these four cases were granted.

8.      The California attorney of record for Defendant Beck in this case, with whom I will be associated, is:

> Kristopher Kastens (California State Bar No. 254797)
> KRAMER LEVIN NAFTALIS & FRANKEL LLP
> 333 Twin Dolphin Drive, Suite 700
> Redwood Shores, California 94065
> Telephone: (650) 752-1700
> Facsimile: (650) 752-1800
> E-mail: kkastens@kramerlevin.com

9.      Pursuant to California Rules of Court, rule 9.40(c) and California Code of Civil Procedure, section 1013a, on May 3, 2023, I caused a true and correct copy of this Application to be served upon all parties who have appeared in this action and upon the State Bar of California at its San Francisco Office, as shown by the attached Proof of Service.

10.      Pursuant to California Rules of Court, rule 9.40(e), I have paid a fee in the amount of $50.00 to the State Bar of California and submitted along with a copy of this Application upon the State Bar of California at its San Francisco Office.

11.      Plaintiffs do not oppose my application for admission *pro hac vice.*

//

//

//

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Daniel M. Ketani, certify and declare that I have read the foregoing Verified Application to Appear As Counsel *Pro Hac Vice* and know its contents.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 3, 2023 in New York, New York.

_____

Daniel M. Ketani

VERIFIED APPLICATION OF DANIEL M. KETANI                    Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

# Exhibit FF

1   KRISTOPHER KASTENS (State Bar No. 254797)
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
2   333 Twin Dolphin Drive, Suite 700
    Redwood Shores, CA 94065
3   Telephone: (650) 752-1700
    Facsimile: (650) 752-1800
4   Email: kkastens@kramerlevin.com
5
    *Attorneys for Defendant*
6   Daniel J. Beck

7

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 5/3/2023 4:31 PM
Reviewed By: A. Floresca
Case #23CV413949
Envelope: 11879185

8           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9              **COUNTY OF SANTA CLARA**

10

11  KIM STEVENSON and HOWARD
    TARLOW, individually and on behalf of all
12  others similarly situated,

13              Plaintiffs,
14        v.

15  GREG W. BECKER, DANIEL J. BECK,
    ROGER F. DUNBAR, KAREN HON, ERIC
16  A. BENHAMOU, JOHN S. CLENDENING,
    RICHARD D. DANIELS, ALISON DAVIS,
17  JOEL P. FRIEDMAN, JEFFREY N.
    MAGGIONCALDA, BEVERLY KAY
18  MATTHEWS, MARY J. MILLER, KATE D.
    MITCHELL, JOHN F. ROBINSON, GAREN
19  K. STAGLIN, and KPMG LLP,

20              Defendants.

21

Case No. 23-cv-413949

**VERIFIED APPLICATION OF BARRY H.
BERKE TO APPEAR AS COUNSEL *PRO
HAC VICE***

22  **TO THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF
23  SANTA CLARA; TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS
    OF RECORD; AND TO THE STATE BAR OF CALIFORNIA**

24

25

26

27

28

VERIFIED APPLICATION OF BARRY H. BERKE                    Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

I, Barry H. Berke, hereby submit this Verified Application to appear as counsel *pro hac vice* in the above-referenced action pursuant to California Rules of Court, Rule 9.40; and in support of this Verified Application, hereby declare as follows:

1. I am partner in the law firm Kramer Levin Naftalis & Frankel LLP, counsel of record for Defendant Daniel J. Beck in this action.  I have knowledge of the facts contained herein and, if called as a witness, I could and would competently testify thereto.

2. My office address is:  1177 Avenue of the Americas, New York, NY 10036.  My email address is bberke@kramerlevin.com.  My residence address is: 154 West 18th St, APT 4AD, New York, NY 10011.  I am not (i) a resident of the State of California, (ii) regularly employed in the State of California, or (iii) regularly engaged in substantial business, professional, or other activities in the State of California.

3. I am an attorney at law duly authorized to practice law in State of New York.  I have been admitted to practice in the following courts (with year of admission in parentheses):

  (a) New York, Court of Appeals (1990);

  (b) U.S. Court of Appeals, 2nd Circuit (1992);

  (c) U.S. Court of Appeals, 3rd Circuit (2012);

  (d) U.S. District Court, Eastern District of New York (1995); and

  (e) U.S. District Court, Southern District of New York (1990).

4. I am a member in good standing in the courts listed above.

5. I am not currently, nor have I ever been, suspended or disbarred in any court.

6. I applied to appear as counsel *pro hac vice* in one California state court action in the two (2) years preceding this application. On May 1, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the Superior Court of California, County of Santa Clara in a case captioned Rossi v. Greg W. Becker et al, 23-cv-414120.  That application is currently pending.

7. I have applied to appear as counsel *pro hac vice* in four recent California federal court actions on behalf of Defendant Beck. On March 27, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the District Court of the Northern District of California for three cases captioned as

VERIFIED APPLICATION OF BARRY H. BERKE    Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

Siddiqui v. Greg W. Becker and Daniel J. Beck 4:23-cv-01228-HSG, Snook v. Greg W. Becker and Daniel J. Beck 3:23-cv-01173-VC, and Vanipenta v. SVB Financial Group et. al. 3:23-cv-01097-JD. On April 13, 2023, I applied to appear *pro hac vice* on behalf of Defendant Beck in the District Court of the Northern District of California for one case captioned as City of Hialeah Employees' Retirement System v. Greg W. Becker, et al. 3:23-cv-01697-AMO. My *pro hac vice* applications in each of these four cases were granted.

      8.      The California attorney of record for Defendant Beck in this case, with whom I will be associated, is:

> Kristopher Kastens (California State Bar No. 254797)
> KRAMER LEVIN NAFTALIS & FRANKEL LLP
> 333 Twin Dolphin Drive, Suite 700
> Redwood Shores, California 94065
> Telephone: (650) 752-1700
> Facsimile: (650) 752-1800
> E-mail: kkastens@kramerlevin.com

      9.      Pursuant to California Rules of Court, Rule 9.40(c) and California Code of Civil Procedure, section 1013a, on May 3, 2023, I caused a true and correct copy of this Application to be served upon all parties who have appeared in this action and upon the State Bar of California at its San Francisco Office, as shown by the attached Proof of Service.

      10.      Pursuant to California Rules of Court, Rule 9.40(e), I have paid a fee in the amount of $50.00 to the State Bar of California, and submitted along with a copy of this Application upon the State Bar of California at its San Francisco Office.

      11.      Plaintiffs do not oppose my application for admission *pro hac vice*.

## **VERIFICATION**

      I, Barry H. Berke, certify and declare that I have read the foregoing Verified Application to Appear As Counsel *Pro Hac Vice* and know its contents.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

VERIFIED APPLICATION OF BARRY H. BERKE          Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

Executed on May 3, 2023 in New York, New York.

_____
Barry H. Berke

VERIFIED APPLICATION OF BARRY H. BERKE                    Case No. 23-cv-413949
TO APPEAR AS COUNSEL *PRO HAC VICE*

# Exhibit GG

Filed
May 4, 2023
Clerk of the Court
Superior Court of CA
County of Santa Clara
23CV413949
By: afloresca

1   KRISTOPHER KASTENS (State Bar No. 254797)
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
2   333 Twin Dolphin Drive, Suite 700
    Redwood Shores, CA 94065
3   Telephone: (650) 752-1700
    Facsimile: (650) 752-1800
4   Email: kkastens@kramerlevin.com

5   *Attorneys for Defendant*                          Signed: 5/4/2023 01:32 PM
6   Daniel J. Beck

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                     **COUNTY OF SANTA CLARA**

10

11  KIM STEVENSON and HOWARD            Case No. 23-cv-413949
    TARLOW, individually and on behalf of all
12  others similarly situated,          [PROPOSED] ORDER GRANTING THE
                                         VERIFIED APPLICATIONS FOR
13              Plaintiffs,              ADMISSION *PRO HAC VICE* OF
         v.                              JENNIFER S. WINDOM, BARRY H.
14                                       BERKE, DARREN A. LAVERNE, AND
    GREG W. BECKER, DANIEL J. BECK,      DANIEL M. KETANI
15  ROGER F. DUNBAR, KAREN HON, ERIC
    A. BENHAMOU, JOHN S. CLENDENING,
16  RICHARD D. DANIELS, ALISON DAVIS,
    JOEL P. FRIEDMAN, JEFFREY N.
17  MAGGIONCALDA, BEVERLY KAY
    MATTHEWS, MARY J. MILLER, KATE D.
18  MITCHELL, JOHN F. ROBINSON, GAREN
    K. STAGLIN, and KPMG LLP,
19
20              Defendants.

21

22

23

24

25

26

27

28

1    Having considered the Verified Applications for Admission *Pro hac Vice* of Jennifer S.

2    Windom, Barry H. Berke, Darren A. LaVerne, and Daniel M. Ketani, all other papers submitted, and

3    the records and files herein, and having determined that all conditions to admission as counsel *pro hac*

4    *vice* as set forth in Rule 9.40 of the California Rules of Court have been satisfied,

5    IT IS HEREBY ORDERED that the applications are granted and Jennifer S. Windom, Barry H.

6    Berke, Darren A. LaVerne, and Daniel M. Ketani may appear as counsel *pro hac vice* on behalf of

7    Defendant Daniel J. Beck.

8

9

10   Dated: _____May 4, 2023_____    
                                        _____

11                                      Hon. Sunil R. Kulkarni

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        1